**EXHIBIT A**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| THE ESTATE OF JACK C. LUNNEEN, deceased, | ) |
| by Thomas E. Lunneen, personal representative, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| BERRIEN SPRINGS, a village, ORONOKO | ) |
| TOWNSHIP, a municipal corporation, BERRIEN | ) |
| COUNTY, a municipal corporation, JAMES WYSS, | ) |
| in his individual capacity and in his official capacity | ) |
| as officer for Berrien Springs-Oronoko Township | ) |
| Police Department, ROGER JOHNSON, in his | ) |
| individual capacity and in his official capacity as a | ) |
| deputy for the Berrien County Sheriff's | ) |
| Department, L. PAUL BAILEY, in his individual | ) |
| capacity and in his official capacity as Sheriff of | ) |
| the Berrien County Sheriff's Department, | ) |
| PAUL E. TOLIVER, in his individual capacity and in | ) |
| his official capacity as Chief of Police for the | ) |
| Berrien Springs Oronoko Township Police | ) |
| Department, and JOHN DOES 1– | ) |
| 10, in their individual and official capacities, | ) |
| | ) |
| Defendants. | ) |

**EXPERT REPORT OF JEFFREY J. NOBLE**

1.    My name is Jeffrey J. Noble, and I make this report at the request of plaintiff's counsel.

2.    I was a police officer in the City of Irvine for 28 years rising to the position of Deputy Chief of Police prior to my retirement.  I served as an interim Deputy Chief of Police at the Westminster Police Department for nine months.

    a.    I was a police officer for 28 years and retired in July 2012 as the Deputy Chief of Police with the Irvine Police Department, located in southern California.  As a Deputy Chief, I was directly responsible for all police operations including Patrol, Traffic, Criminal Investigations, Emergency Management, Crime Prevention, DARE, K9s, Training, and SWAT.  The City of Irvine encompasses over 70 square

miles with a population of over 218,000.  I served in a wide range of assignments as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs, Emergency Management and Crime Prevention.  The Irvine Police Department had over 200 police officers and over 100 civilian employees during my employment with the department.

b.      In April 2014, I was hired by the Westminster, California Police Department as an interim Deputy Chief of Police.  My employment with the Westminster Police Department was by means of a temporary contract, and I was asked to review the department's Internal Affairs unit; department policies relating to Internal Affairs investigations, discipline and police officer conduct; conduct department audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period.  My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation.  I concluded this interim position in January 2015.  The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

c.      As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

4.      I have a Juris Doctor degree, with honors, from Western State University College of Law and I am admitted to practice law in the State of California.  I have a bachelor's degree in Criminal Justice with an emphasis on Administration from California State University at Long Beach.

5.      As a police consultant and expert witness, I have extensive experience on matters involving police investigative procedures, misconduct and corruption.  For example:

a.      In 2014, I was part of a Carnegie Institute of Peace Think Tank for addressing police use of force in developing countries.

b.      I have consulted with other police organizations on a wide range of police practices, procedures, including criminal and administrative investigations.  For instance, I was retained in 2004 as an expert to review and evaluate the internal investigation conducted by the San Francisco, California, Office of Community

Complaints of the case widely known as "Fajitagate" involving the indictment of seven command staff members and three officers of the San Francisco Police Department.  In 2007 and again in 2009, I was retained by the City of Austin, Texas to review the police department's internal homicide and Internal Affairs investigation of two officer involved fatal shootings.

c.    I have been retained as both a defense and a plaintiff's expert in over 300 cases and have testified as an expert in state court in California, Washington, Tennessee, Connecticut, Minnesota, Illinois and New Mexico and in federal court in Illinois, Tennessee, Georgia, South Carolina, North Carolina, Virginia, Texas and California.

d.    I have prepared expert reports for cases in the states of California, Washington, Pennsylvania, Georgia, Illinois, Tennessee, Idaho, Arkansas, Texas, Colorado, New York, Oklahoma, Connecticut, Florida, New Mexico, Minnesota, Ohio, Kentucky, Louisiana, Indiana, Wisconsin, Virginia, Delaware, Oregon, Arizona, New Mexico, New Jersey, Mississippi, North Carolina, South Carolina, Wyoming, Kansas and Missouri.

e.    I have been retained in criminal cases involving allegations of criminal uses of force by police officers in the states of New Mexico, Delaware, Minnesota, Pennsylvania, California, Georgia, Washington, and Florida.

f.    I served as an independent policy advisor to the Large City Internal Affairs Project, which was funded by the United States Department of Justice.  This group consists of the 12 largest police agencies in the United States as well as a select group of independent policy advisors and academics.  The project was an effort to develop national best practices in internal investigations for police agencies.  I was the chair of a sub-committee whose efforts were focused on the investigation of allegations of officer misconduct.  Because of this project the COPS Office published a document entitled, "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice."

g.    I have given presentations at the International Association of Chiefs of Police conference in 2004, 2009, 2012, and 2014; the national COPS conference on Internal Affairs issues and the Academy of Criminal Justices Sciences annual meeting on tactical reckless decision making in 2009; the American Psychological Association annual conference in 2013; and National Tactical Officers' Association annual conference in 2004.

h.    In 2013, I gave a presentation in Mexico at the request of the Mexican government on preventing corruption in police institutions.

3

i.        I have published 21 articles on policing which discussed the subject matters of: Internal Affairs, personnel issues, pursuits, use of force issues and investigative procedures.  Those articles are listed in my attached resume.

j.        I have published two chapters for policing textbooks on tactical recklessness and the code of silence.

k.        I have co-authored, along with Geoffrey Alpert, Ph.D., a textbook on police Internal Affairs investigations titled, "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight."

l.        As evidence that the opinions in our book are accepted by other experts of police administrative investigations, my book was cited extensively in the COPS 2009 publication, "Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practice Guide for Local Law Enforcement."

m.       In 2020, I co-authored a textbook, "Evaluating Police Uses of Force," with Seth Stoughton and Geoffrey Alpert.

6.      My experience, training and background are more fully described in my attached resume.

7.      My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

8.      I reviewed the following material in making my opinions:

- Complaint
- Berrien County Sheriff's Department Report (Lunneen 0001-4)
- Berrien County Sheriff's Department Incident Report (Lunneen 0005-9)
- Statement of Officer Wyss (Lunneen 00010-12)
- Sergeant Wyss Report (Lunneen 00013-14)
- Michigan State Police Report (Lunneen 00015-17)
- Michigan State Police Incident Report (Lunneen 00018-42)
- Taser Pulse Log (Lunneen 00043-45)
- Medical Examiner's Report (Lunneen 00046-47)
- October 22, 2018, memorandum to Officer Wyss – Administrative Leave and October 26, 2018, memorandum determining no misconduct (Lunneen 00048-49)

4

- Berrien County Prosecutor's Office Memo to Investigating Officer (Lunneen 00050)
- Denial of Criminal Charters from Prosecutor (Lunneen 00051-53)
- Automated Incident Capture System Incident Property Report (Lunneen 00054-83)
- Autopsy Report (Lunneen 00084-98)
- Toxicology Report (Lunneen 00099-106)
- Laboratory Services Report (Lunneen 00107-133)
- Detail Call for Service Report (Lunneen 00134-137)
- Videos
  - Officer Wyss (Lunneen 000138)
  - Sergeant Johnson (Lunneen 000139)
  - Unidentified Officer (Lunneen 000140)
- Audio Recording of 911 Call (Lunneen 000141)
- Depositions
  - Roger Johnson
    - Exhibit 1 – PoliceOne.com Members Report
    - Exhibit 2 – Johnson Incident Report
    - Exhibit 3 – Johnson Supplemental Incident Report
    - Exhibit 4 – Johnson Trainings
  - James Wyss
    - Exhibit 5 – Incident Report
  - Elizabeth A. Douglas, MD
    - Exhibit 1 – CV
    - Exhibit 2 – Expert Report
    - Exhibit 3 – Photograph
- BCSD File (BC0001-313)
- Enhanced Videos - Wyss and Johnson BWCs Combined
- Defendant Berrien County's Second Supplemental Answers to Plaintiff's First Set of Requests for Production
- Berrien Springs Oronoko Township Police Department Manual of Policies and Procedures (BSOT 300-726)
- January 12, 2022, Expert Report of Michael Freeman

9. At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such aid, I will ensure that they are made available for review, if requested, prior to their use.

10. My professional charges for this litigation work is an hourly fee of $345 plus expenses including all travel time.  My fees for deposition and trial testimony are $3,450 per calendar day or any portion thereof, plus travel time and expenses.

11. The opinions that follow are made within a reasonable degree of certainty within the

field of police practices based on over 35 years of professional law enforcement experience and scholarship.

**Summary of Incident**

12.     On October 22, 2018, at about 1:23 a.m., Ms. Dry called 911 to report that a man had been circling her home and yelling for help.  According to Ms. Dry, the man had pushed her window mounted air conditioning unit through her window causing the window to break.

13.     Berrien Springs-Oronoko Township Police Department Officer James Wyss was dispatched to the call and spoke with Ms. Dry who told him that the suspect, later identified as Jack Lunneen, had been yelling, "help," and beat on her window causing her window mounted air conditioner to fall into her home and breaking the glass window.

14.     Berrien County Sheriff's Department Sergeant Roger Johnson responded to the area and conducted a canvass trying to locate Mr. Lunneen.  Both officers were wearing police uniforms and were driving marked police vehicles.

15.     Officer Wyss saw Mr. Lunneen as he was speaking with Ms. Dry.  Officer Wyss followed Mr. Lunneen on foot and Mr. Lunneen was eventually detained by Sergeant Johnson a short distance away.  Mr. Lunneen was bare foot and was wearing only sweatpants in 30-degree weather.  Mr. Lunneen was 5'7" tall and weighed 228 pounds.

16.     Mr. Lunneen walked to the passenger side of the patrol car, Sergeant Johnson ordered him to return to the front of the patrol and Mr. Lunneen complied.  Mr. Lunneen began to walk toward Sergeant Johnson and Sergeant Johnson pointed his taser at Mr. Lunneen's chest and ordered him to "Stay right there, I'm not playing with you."  Mr. Lunneen asked for help, then kneeled on the ground in front of the patrol car and asked, "Are you guys going to kill me?"  Officer Wyss replied, "No."

17.     At some point, Sergeant Johnson radioed the dispatcher and asked for paramedics to respond and stated that Mr. Lunneen had "excited delirium of some sort."

18.     Mr. Lunneen stood up and told the officers he was an addict and that he needed help and he then began to walk away from the officers.

19.     Sergeant Johnson asked Officer Wyss if he had probable cause to arrest Mr. Lunneen and Officer Wyss said he did.  The officers did not tell Mr. Lunneen he was under arrest and instead tried to grab him and pointed a taser at him.  Mr. Lunneen tried to flee from the officers by walking away and as he did so, he continued to cry for help.

20.     Sergeant Johnson repeated commands that included "Get on your knees or I'll tase you," and he eventually tased Mr. Lunneen in the chest when Mr. Lunneen moved

6

forward toward him and when he did not comply with the commands.  Mr. Lunneen pulled the taser wires off his chest, ran away, and continued to call for help.  Officer Wyss then pepper sprayed Mr. Lunneen and a physical struggle ensued.  Sergeant Johnson and Officer Wyss took Mr. Lunneen to the ground and struggled to control him. The physical struggle lasted for approximately two minutes.

21.  After Mr. Lunneen was handcuffed, the officers made no efforts to roll him onto his side or sit him up although they both had training and department policies that required them to take this action to prevent positional asphyxia.  The officers still did not place Mr. Lunneen in a recovery position even after they realized he was unresponsive and turning grey.

22.  Sergeant Johnson said he had prior contact with Mr. Lunneen and knew that he suffered from mental illness and methamphetamine use and Officer Wyss acknowledged that he believed Mr. Lunneen was under the influence of drugs or in the midst of a mental health crisis.

23.  The officers struggled with Mr. Lunneen on the ground for approximately two minutes before he was handcuffed.  The officers left Mr. Lunneen in a prone position on the ground with his hands handcuffed behind his back for approximately 3 minutes and 47 seconds before the paramedic instructed the officers to place Mr. Lunneen on his back and remove the handcuffs.  During that time, neither officer made any effort to render medical aid to Mr. Lunneen even they both had AEDs in their vehicles, and they had both been trained in first aid.  The last audio sound made by Mr. Lunneen occurred about 9 seconds before he was handcuffed, and he does not make any obvious movement after that last moan.

24.  Mr. Lunneen was transported to Lakeland Medical Center Emergency Room, St. Joseph, Michigan, where he was pronounced dead.

25.  The medical Examiner found the cause of death was excited delirium associated with methamphetamine use.

**Background**

26.  Sergeant Roger Johnson

a.  Incident Report

1.)  Sergeant Johnson said on October 22, 2018, at about 1:24 AM, he responded to assist a Berrien Springs Oronoko Township police officer on a possible breaking and entering report.  The dispatcher advised a male had broken out a window of a residence, pulled out an air conditioner and fled from the area.  Sergeant Johnson said that Officer Wyss went to the residence, and he began to canvass the area in an attempt to locate

the suspect.

2.) Officer Wyss radioed he saw a possible suspect in the area of 101 Union. Sergeant Johnson said he drove down Madison Street south of Union and saw Mr. Lunneen who matched the suspect description.

3.) Mr. Lunneen laid on the ground near a driveway, then stood back up and walked to his police vehicle near the passenger side door.  Mr. Lunneen said something about getting in the police vehicle, but Sergeant Johnson said he could not hear him clearly.  Sergeant Johnson said he ordered Mr. Lunneen to the front of the patrol car and Mr. Lunneen began speaking but was not making any sense.

4.) Sergeant Johnson said Mr. Lunneen was not wearing a shirt, there was blood on his body, and he appeared to be sweating profusely.  Sergeant Johnson said because the temperature was in the mid-30s, he was concerned for Mr. Lunneen medical well-being.  Sergeant Johnson said he immediately radioed the dispatcher to start an ambulance for possible excited delirium.

5.) Sergeant Johnson said Officer Wyss arrived at the scene and he asked Officer Wyss if there was probable cause to arrest Mr. Lunneen.  Officer Wyss said he did have probable cause to arrest Mr. Lunneen.

6.) Sergeant Johnson said Mr. Lunneen continued to yell about different things including yelling for help and asking if they were going to kill him.

7.) Sergeant Johnson said Mr. Lunneen began walking toward Cass Street and at times Mr. Lunneen would charge toward him and then turn around.  Sergeant Johnson said at one point he saw a vehicle traveling south on Cass Street and he was concerned that Mr. Lunneen was going to walk in front of the car.

8.) Sergeant Johnson said during this time, Officer Wyss ordered Mr. Lunneen several times to put his hands behind his back and to get on his knees, but Mr. Lunneen refused to do so.

9.) Sergeant Johnson said when Mr. Lunneen refused to comply, he deployed his Taser at Mr. Lunneen.  Sergeant Johnson said the Taser probes appeared to strike Mr. Lunneen in the front torso area, but the Taser did not have any effect.  Mr. Lunneen swiped his arms in front of

8

his body, and it appeared he disconnected the Taser probes from his body.

10.)   Sergeant Johnson said Mr. Lunneen then lunged toward Officer Wyss and Officer Wyss sprayed Mr. Lunneen with his pepper spray but it did not appear to have an effect.  Mr. Lunneen then lunged again toward Officer Wyss and he and Officer Wyss took Mr. Lunneen to the ground.  Mr. Lunneen continued to resist and refuse to comply with the officers' commands to put his hands behind his back.  Sergeant Johnson said they struggled with Mr. Lunneen for approximately two minutes before they are able to handcuff him.

11.)   Sergeant Johnson said once Mr. Lunneen was handcuffed, the officers got off of him.  Mr. Lunneen stopped resisting and was quiet.  Sergeant Johnson said he heard a slight snore which he believed to be Mr. Lunneen nodding into a "unconscious stupor."  Sergeant Johnson said he believed Mr. Lunneen's behavior to be consistent with someone who is passing out due to unknown substances in his system.[1]

b.   Deposition

1.)   Sergeant Johnson said he has worked for the Berrien County Sheriff's Department for the last 18 years.[2]

2.)   Sergeant Johnson said he has received training the people who are either withdrawing from the use of drugs or under the influence of drugs may sometimes be a medical condition.  Sergeant Johnson said sometimes people who use drugs are battling a psychiatric condition or mental illness.[3]

3.)   Sergeant Johnson said he was trained on de-escalation techniques for people who may be under the influence of drugs or who may be mentally ill.[4]

4.)   Sergeant Johnson said he's certified in CPR and first aid.  Sergeant Johnson said he knows how to check a person's pulse and to determine if someone is breathing. Sergeant Johnson said he had a defibrillator in his

---

[1] Lunneen 000013-14.
[2] Johnson deposition at 8.
[3] Johnson deposition at 18-19.
[4] Johnson deposition at 19.

police car.[5]  Sergeant Johnson said he has used the defibrillator
approximately 100 times.[6]  Sergeant Johnson said his defibrillator was in
his police car the night that Mr. Lunneen died.[7]

5.)      Sergeant Johnson said he was acquainted with Mr. Lunneen from being
around Berrien Springs.[8]  Sergeant Johnson said he believed that Mr.
Lunneen had a criminal record, but he had never arrested him.[9]  Sergeant
Johnson said he heard rumors that Mr. Lunneen was involved in narcotic
activity.[10]  Sergeant Johnson said he immediately recognized Mr. Lunneen
when he saw him.[11]

6.)      Sergeant Johnson said he discharged his Taser one time at Mr. Lunneen.[12]

7.)      Sergeant Johnson said he does not recall ever reading Officer Wyss'
report regarding this incident.[13]

8.)      Sergeant Johnson said he saw Mr. Lunneen three or four times prior to
the incident, and he has seen him when he did not appear to be under
the influence of drugs or suffering from a mental illness.  Sergeant
Johnson said on the night he saw Mr. Lunneen, he knew right away
something was off probably due to a drug situation.[14]

9.)      Sergeant Johnson said it was 34° and Mr. Lunneen was not wearing a
shirt or shoes.  Sergeant Johnson said that is not normal behavior.[15]
Sergeant Johnson said he knew something wasn't right, and that is why
he called for an ambulance.[16]

10.)     Sergeant Johnson said he used de-escalation tactics by just talking with
Mr. Lunneen.[17]  Sergeant Johnson said he cannot think of any specific de-
escalation tactics that he used.  Sergeant Johnson said he was trained to

---

[5] Johnson deposition at 26-27.
[6] Johnson deposition at 28.
[7] Johnson deposition at 31.
[8] Johnson deposition at 33.
[9] Johnson deposition at 36.
[10] Johnson deposition at 37.
[11] Johnson deposition at 97.
[12] Johnson deposition at 39.
[13] Johnson deposition at 45.
[14] Johnson deposition at 47.
[15] Johnson deposition at 48-49.
[16] Johnson deposition at 55.
[17] Johnson deposition at 57.

control the scene and to contact paramedics.[18]

11.)   Sergeant Johnson said Mr. Lunneen did not have a weapon, he was not a
danger to anyone but himself, and he was not a danger to the officers.[19]
Sergeant Johnson said he believed a "possibility of the threat existed."[20]

12.)   Sergeant Johnson said he tased Mr. Lunneen to save Mr. Lunneen's life
from being hit by a car.  Sergeant Johnson said the vehicle can be seen on
the video coming toward Mr. Lunneen.  Sergeant Johnson said he did not
see any other vehicles on the roadway.[21]

13.)   Sergeant Johnson said he has been trained that there is a potential for
suspects to suffocate by their own weight or the officers' weight if the
officer pushes down on the suspect with their hands when the suspect's
hands are behind their back, while the suspect is laying in a prone
position.  Sergeant Johnson said he has been trained to limit the amount
of time the suspect is in a prone position when possible.[22] Sergeant
Johnson said when a person no longer presents a threat and needs
medical attention, then the officers should provide medical care.[23]

14.)   Sergeant Johnson said he has been trained to provide medical care when
a suspect is subdued and no longer fighting, moving or resisting.[24]

15.)   Sergeant Johnson said he took a course in responding to excited delirium
calls in 2015 and a course on responding to people with mental illness in
2016.[25]

16.)   Sergeant Johnson said Mr. Lunneen presented a threat that night when
he lunged at the Officer Wyss and pushed back toward him.  Mr. Lunneen
never posed a deadly threat and he never suspected that Mr. Lunneen
may have a weapon.[26]

17.)   Sergeant Johnson said Mr. Lunneen was given orders several times, but

---

[18] Johnson deposition at 60.
[19] Johnson deposition at 58.
[20] Johnson deposition at 64.
[21] Johnson deposition at 62-63.
[22] Johnson deposition at 66-67.
[23] Johnson deposition 95.
[24] Johnson deposition at 69.
[25] Johnson deposition at 86.
[26] Johnson deposition at 92.

he failed to comply.  Sergeant Johnson said in order to bring the situation to an end, he deployed his Taser at Mr. Lunneen.[27]  Sergeant Johnson said Mr. Lunneen brushed the Taser probes away and the Taser did not appear to have any effect.[28]

18.)   Sergeant Johnson said he did not see any bystanders in the area who needed protection.[29]  Sergeant Johnson said he only saw one vehicle traveling on the roadway during the incident.[30]

19.)   Sergeant Johnson said it was his intent to detain Mr. Lunneen to provide medical care until an ambulance arrived.[31]

20.)   Sergeant Johnson said he believed that Mr. Lunneen had committed the crime of attempted breaking and entering which is a felony.[32]

21.)   Sergeant Johnson said he has been trained on the dangers of asphyxia that occurs when people are put on their stomach with their hands behind their back.[33]

22.)   Sergeant Johnson said he does not recall checking to see if Mr. Lunneen was breathing and believes he checked his pulse but does not recall.[34]

23.)   Sergeant Johnson said if he did not check Mr. Lunneen's pulse or breathing at any time that would not be a violation of his policy.[35]

27.   Officer James Wyss

a.   Statement

1.)   Officer Wyss said on October 22, 2018, at approximately 1:15 AM he was parked at the intersection of S. Mechanic and E. Ferry Street, when a subject who was later identified as Mr. Lunneen, rode a bicycle up to his vehicle and asked to speak with him.  Officer Wyss said he had difficulty understanding Mr. Lunneen but Mr. Lunneen did mention he was at the Little's house sometime that evening and he also mentioned Sergeant

---

[27] Johnson deposition at 103.
[28] Johnson deposition at 105.
[29] Johnson deposition at 104.
[30] Johnson deposition at 105.
[31] Johnson deposition at 110.
[32] Johnson deposition at 111.
[33] Johnson deposition at 118.
[34] Johnson deposition at 119.
[35] Johnson deposition at 122.

Johnson.  Officer Wyss said Mr. Lunneen appeared agitated and had difficulty standing still or looking at him for more than a second or two. Mr. Lunneen rode away on his bicycle saying he was going to Speedway.

2.)  Officer Wyss said he followed Mr. Lunneen, but lost sight of him when he rode his bicycle through an alleyway.

3.)  Officer Wyss said he spoke with Sergeant Johnson and told him what happened and that the subject mentioned Sergeant Johnson's name, but Sergeant Johnson said he did not know who the subject was.  Officer Wyss said while he was speaking to Sergeant Johnson, he was dispatched to 101 West Union St. for a malicious destruction of property complaint. Officer Wyss said he was advised by the dispatcher the subject had broken a window, damage an air conditioner unit, and was possibly still in the area of the residence.

4.)  Officer Wyss said he spoke with the caller, Eileen Dry.  Ms. Dry said someone came to her house, banged on her window and then pushed the window mounted air conditioning unit through the window, breaking the glass in the process.  Officer Wyss said as he spoke with Ms. Dry, he saw a subject wearing only dark pants run across the yard and then headed south toward the downtown area.  The subject was yelling, but Officer Wyss said he could not understand what the subject was saying.

5.)  Officer Wyss followed the subject on foot and radioed Sergeant Johnson of the subject's direction of travel.  Sergeant Johnson radioed he located the subject on W. Madison St., so Officer Wyss returned to his patrol car and drove to Sergeant Johnson's location.

6.)  Officer Wyss said when he arrived, the subject whom Sergeant Johnson identified as Mr. Lunneen, was kneeling in front of Sergeant Johnson's patrol car and Sergeant Johnson was standing near him.  Mr. Lunneen then stood up, said he was an addict, that he had reached the end and he did not want anyone to kill him.  Officer Wyss said he told Mr. Lunneen no one was going to kill him, and Mr. Lunneen began moving toward his patrol vehicle.

7.)  Officer Wyss said Mr. Lunneen appeared to be unaware of his surroundings, was walking back and forth, appeared to be agitated, and was shouting as if talking to people who were not present.  Officer Wyss said Mr. Lunneen's behavior was consistent with what he recognized as associated with excited delirium based on his training and experience. Officer Wyss said Sergeant Johnson radioed dispatch and asked for paramedics to respond and then asked if he had probable cause to arrest

13

Mr. Lunneen.

8.)     Officer Wyss said he told Sergeant Johnson that he had probable cause to arrest Mr. Lunneen, so Sergeant Johnson took out his handcuffs and attempted to gain physical control of Mr. Lunneen, but Mr. Lunneen broke away from their hold and walked toward the street.  Sergeant Johnson unholstered his Taser and aimed it at Mr. Lunneen, telling Mr. Lunneen to get down onto his knees.  Officer Wyss said both he and Sergeant Wyss gave Mr. Lunneen verbal commands to get down on his knees, but Mr. Lunneen did not respond.

9.)     Officer Wyss said Mr. Lunneen was going to walk into oncoming traffic and he saw a car coming from the north.  Officer Wyss said he took out his flashlight to wave the car away and Mr. Lunneen approached him with his arms raised.  Sergeant Johnson said he was going to deploy his Taser and then fired a single Taser round at Mr. Lunneen.  Officer Wyss said he saw one probe hit Mr. Lunneen in the torso, but Mr. Lunneen pulled the probe out and appeared to be unaffected by the Taser.

10.)    Officer Wyss said Mr. Lunneen began moving southbound on North Cass Street and Sergeant Johnson asked if he had pepper spray.  Officer Wyss said he deployed his pepper spray two times at Mr. Lunneen, but Mr. Lunneen appeared to be unaffected.

11.)    Officer Wyss said they were moving as these events occurred and when they reached the parking lot of 5/3 Bank, he decided to attempt to physically restrain Mr. Lunneen to prevent him from causing further injury to himself.  Officer Wyss said he and Sergeant Johnson attempted to take Mr. Lunneen to the ground, but Mr. Lunneen pushed back.  Officer Wyss said he was able to sweep Mr. Lunneen's legs out from under him and took Mr. Lunneen to the ground where Mr. Lunneen landed on his hands and knees.  Sergeant Johnson attempted to pull Mr. Lunneen's arms behind his back while he attempted to handcuff Mr. Lunneen.  Officer Wyss said during the struggle, Mr. Lunneen grabbed his left leg with his right arm and would not let go when he was given several verbal commands.

12.)    Officer Wyss said he applied pressure to Mr. Lunneen's mandibular nerve, command him to let go, and broke his hold on his leg.  Officer Wyss said he and Sergeant Johnson were then able to handcuff Mr. Lunneen.

13.)    Officer Wyss said Mr. Lunneen stopped moving after he was handcuffed.  Officer Wyss said it appeared that Mr. Lunneen was still breathing, and

14

Sergeant Johnson said, "Hey, wake up" to Mr. Lunneen and he shook Mr. Lunneen and attempted to apply a sternum rub.  Officer Wyss said Mr. Lunneen appeared to be bleeding from his nose and Mr. Lunneen moaned but did not otherwise respond.

14.)     Officer Wyss said the paramedics responded and began CPR on Mr. Lunneen.[36]

b.     Deposition

1.)     Officer Wyss is an officer with the Village of Berrien Springs Police Department.[37]

2.)     Officer Wyss said on the day of the incident he was the only officer on-duty for his department.[38]  Officer Wyss said the Berrien County Sheriff's department acts as dispatchers for his department.[39]

3.)     Officer Wyss said he first made contact with Mr. Lunneen at about midnight on the night of the incident when he was sitting parked on South Mechanic Street by East Ferry and Mr. Lunneen approached his car riding a bicycle.[40] Officer Wyss said Mr. Lunneen was fully dressed at that time and although he does not recall the specifics of what he was wearing, it seemed appropriate for the season.  Officer Wyss said he had never met Mr. Lunneen before.[41]

4.)     Officer Wyss said Mr. Lunneen was speaking incoherently and he mentioned Sergeant Johnson and the "Littles."  Officer Wyss said the Littles were brothers who used to live in the village.[42]  Officer Wyss said he spoke with Mr. Lunneen for about a minute before Mr. Lunneen rode away on his bicycle.[43]

5.)     Officer Wyss said he began to follow Mr. Lunneen and lost sight of him at the Speedway.[44]  Officer Wyss said he wanted to speak with Mr. Lunneen because he wanted to know if Mr. Lunneen was severely intoxicated because his statements did not align with what he believed to be

---

[36] Lunneen 00010-11.
[37] Wyss deposition at 5.
[38] Wyss deposition at 13.
[39] Wyss deposition at 13.
[40] Wyss deposition at 14-16.
[41] Wyss deposition at 18.
[42] Wyss deposition at 19.
[43] Wyss deposition at 21.
[44] Wyss deposition at 24.

normal.[45]

6.)   Officer Wyss said he noticed a county police vehicle and pulled up alongside the vehicle and spoke with Sergeant Johnson.  Officer Wyss said he told Sergeant Johnson about Mr. Lunneen and that Mr. Lunneen had mentioned his name and was not making a lot of sense.[46]

7.)   Officer Wyss said as he is speaking with Sergeant Johnson, he received a call from the dispatcher who was reporting a malicious destruction of property report at 101 W. Union which was about four or five blocks away.[47]  Officer Wyss said the dispatcher told him that a subject was attempting to push a window air conditioner unit into the home.[48]

8.)   Officer Wyss said he first drove along a couple of adjoining streets to see if he could locate the subject, then went to the residence to speak with the complainant, Ms. Dry.[49]  Ms. Dry said the subject had circled her house, pushed in her air-conditioning unit, and was yelling and screaming for help.[50]

9.)   Officer Wyss said he radioed Sergeant Johnson to provide the suspect's description because he knew that Sergeant Johnson was still in the area.[51]

10.)  Officer Wyss said he saw Mr. Lunneen run by and Ms. Dry identified him as the suspect.[52]  Officer Wyss said he followed Mr. Lunneen on foot until Sergeant Johnson radioed that he had contact with Mr. Lunneen.  Officer Wyss said he then returned to his vehicle and drove to Sergeant Johnson's location.[53]

11.)  Officer Wyss said when he arrived, he immediately recognized Mr. Lunneen as the man he had spoken with earlier.[54]  Mr. Lunneen was kneeling on the ground in front of Sergeant Johnson's vehicle, and he began to speak with Mr. Lunneen.  Officer Wyss said Mr. Lunneen was compliant and asked for permission to stand up.[55]

---

[45] Wyss deposition at 25.
[46] Wyss deposition at 27.
[47] Wyss deposition at 29.
[48] Wyss deposition at 30.
[49] Wyss deposition at 32.
[50] Wyss deposition at 33.
[51] Wyss deposition at 34.
[52] Wyss deposition at 36.
[53] Wyss deposition at 38-39.
[54] Wyss deposition at 40.
[55] Wyss deposition at 42.

12.)   Officer Wyss said while Mr. Lunneen was speaking with him, Sergeant Johnson contacted the dispatcher and requested paramedics because he believed they had a case of excited delirium.[56]

13.)   Officer Wyss said Mr. Lunneen stood up and appeared to be speaking with people who were not present.[57]  Mr. Lunneen was speaking gibberish and mentioned that he was an addict.[58]

14.)   Officer Wyss said Mr. Lunneen's pants fit pretty loosely, he did not observe anything in his waistband, and he did not believe he had anything in his pockets.[59]

15.)   Officer Wyss said Sergeant Johnson asked him if he had "PC," which means probable cause for arrest.[60]

16.)   Officer Wyss said he did not use de-escalation tactics because they were trying to gain physical control of Mr. Lunneen to handcuff him.[61]  Officer Wyss said he did not tell Mr. Lunneen they were going to handcuff him and simply told him to turn around.[62]  Officer Wyss said Mr. Lunneen moved away from the officers heading west on Madison toward N. Cass Street.[63]

17.)   Officer Wyss said Mr. Lunneen screamed for help quite a few times during the course of the interaction.[64]

18.)   Officer Wyss said he understands excited delirium to be a subject who can become very agitated.[65]  Officer Wyss said a subject suffering from excited delirium cannot be easily reasoned with and it is very difficult to calm them down.[66]  Officer Wyss said excited delirium can be dangerous and can be treated if medical care is rendered.[67]

19.)   Officer Wyss said his concern was to get Mr. Lunneen out of the street

---

[56] Wyss deposition at 43.
[57] Wyss deposition at 43.
[58] Wyss deposition at 44.
[59] Wyss deposition at 45.
[60] Wyss deposition at 46.
[61] Wyss deposition at 46.
[62] Wyss deposition at 47.
[63] Wyss deposition at 51.
[64] Wyss deposition at 52.
[65] Wyss deposition at 48.
[66] Wyss deposition at 49.
[67] Wyss deposition at 50.

and then continue assessing the situation.  Officer Wyss said he saw one vehicle coming from the north to the intersection.  Officer Wyss said he removed his flashlight and flashed it at the driver to wave the driver away and that is when Mr. Lunneen raised his hand as if to strike him.  Officer Wyss said no cars passed him while he was dealing with Mr. Lunneen.[68]

20.)   Officer Wyss said Sergeant Johnson drew his Taser after he saw Mr. Lunneen make a fist.[69] Officer Wyss said Mr. Lunneen was close enough to hit him with his fists, so he backed up and that is when Sergeant Johnson deployed his taser.[70]  Officer Wyss said Sergeant Johnson did not warn Mr. Lunneen he was about to be tased.[71]  Officer Wyss said he saw one probe of the taser strike Mr. Lunneen, but did not see the second probe strike him.[72]  Mr. Lunneen swatted the probes off his body.[73]

21.)   Officer Wyss said he believed the Taser did not work and Sergeant Johnson asked him if he had OC spray.  Officer Wyss said he deployed OC spray at Mr. Lunneen.[74]  Officer Wyss said he did not believe the OC spray had any effects on Mr. Lunneen.[75]

22.)   Officer Wyss said at one point, Mr. Lunneen expressed concern that someone was going to kill him, and he told Mr. Lunneen, "No one's going to kill you."[76]

23.)   Officer Wyss said he used a leg sweep on Mr. Lunneen to take him to the ground.  Mr. Lunneen was initially on his hands and knees, but eventually they turned him, so he was lying on his stomach.[77]  Officer Wyss said Mr. Lunneen grabbed one of his legs, but Mr. Lunneen was not biting or hitting him.[78]  Officer Wyss said he used a mandibular technique to his jaw to distract him to get him to let go of his leg.[79]

24.)   Officer Wyss said Mr. Lunneen did not have any weapons and he was flailing about, but he did not make any type of coordinated punch or

---

[68] Wyss deposition at 54-55.
[69] Wyss deposition at 57.
[70] Wyss deposition at 58-59.
[71] Wyss deposition at 60.
[72] Wyss deposition at 62-63.
[73] Wyss deposition at 64.
[74] Wyss deposition at 65.
[75] Wyss deposition at 70.
[76] Wyss deposition at 66.
[77] Wyss deposition at 71.
[78] Wyss deposition at 73.
[79] Wyss deposition at 74.

martial arts move.[80]

25.)   Officer Wyss said he was able to handcuff Mr. Lunneen when he was in a prone position on the ground.[81]

26.)   Officer Wyss said he had an AED device in his police vehicle.[82] Officer Wyss said nothing that prevented him from going to get his AED device or his breathing bag from his vehicle.[83]

27.)   Officer Wyss said there was a point where Mr. Lunneen did not seem to be breathing.  Officer Wyss said he checked the paramedic status with the dispatcher and was told the paramedic was at the fairgrounds which was about a half mile from their position.[84]

28.)   Officer Wyss said he rolled Mr. Lunneen over onto his side and did a sternum rub, but the camera did not capture that event.  Officer Wyss said he moved Mr. Lunneen into a "three quarters position" and kept him there until the paramedics arrived.[85]

29.)   Officer Wyss said he has been trained that once he has someone controlled, he should move them on their side or place them in a seated position and to not leave them prone because there is a risk of suffocation.  Officer Wyss said his department policy states in all capital letters, "Avoid placing the person in a prone position."  Officer Wyss said this is basic police training.[86]

28.   Medical Examiner's Report

a.   The Medical Examiner determined that Mr. Lunneen's cause of death was excited delirium associated with methamphetamine use and cardiomegaly and likely hypertensive.[87]

b.   The Medical Examiner noted in the autopsy report, "Given the totality of the circumstances, autopsy findings, consultant reports, histology, and toxicology, in my opinion, the cause of death is excited delirium associated with methamphetamine use, and with the decedent's cardiac pathology a

---

[80] Wyss deposition at 76.
[81] Wyss deposition at 78.
[82] Wyss deposition at 78.
[83] Wyss deposition at 80.
[84] Wyss deposition at 85-86.
[85] Wyss deposition at 88.
[86] Wyss deposition at 114-115.
[87] Lunneen 00047.

contributing factor. Excited delirium is described as, "a distinct disorder that is characterized by the acute onset of violent and bizarre behavior such as incoherent shouting, paranoia, combativeness, hyperactivity, aggression, and the demonstration of extreme strength that is quickly followed by sudden death" The diagnosis of excited delirium requires, "detailed information regarding the person's medical history, medications, drug abuse history, toxicology results, and behavior preceding death." There is significant debate in the medical community regarding manner of death certification in excited delirium deaths associated with law enforcement intervention. There are reasonable arguments for invoking a manner of death of accident or homicide.  In my opinion, for public health and vital statistics purposes, the manner of death is best certified as indeterminate."[88]

c.     The Medical Examiner found multiple blunt force injuries to Mr. Lunneen's head, trunk, and extremities.[89]

d.     Mr. Lunneen's blood was positive for amphetamines and methamphetamine.[90]

29.   Body Worn Cameras (Not intended to be a verbatim transcript)

a.     Officer Wyss

1.)   06:00 – Officer Wyss radios that he will contact the caller.

2.)   06:57 – Officer Wyss exits his vehicle.

3.)   07:40 – Officer Wyss speaks with Ms. Dry on the front porch of the residence.  Ms. Dry said a "crazy man" whom she described as a white, male 45-55 years old and not wearing a shirt walked around his house and was hollering for help. The man dug through her recycling bin and then pushed her air conditioner into her living room causing the glass in a window to break.

4.)   10:30 – Officer Wyss told Ms. Dry that a person had come up to his car "spouting out a bunch of nonsense and then rode away on a bicycle."

5.)   12:54 – Officer Wyss radioed that he sees the subject and said he is heading southbound toward downtown down Main Street.  Officer Wyss said "Union and Main.  He's not wearing a shirt, black pants."  Officer

---

[88] Lunneen 00087.
[89] Lunneen 00085.
[90] Lunneen 00099.

Wyss appears to be following the subject on foot.

6.)     13:15 – Officer Wyss radioed that the subject just ran into someone's backyard and that he lost visual, but he could hear him.  Officer Wyss then radioed that he thinks the subject is in the alley.

7.)     14:09 – Officer Wyss begins to run back to his police vehicle.

8.)     14:29 – Officer Wyss enters his vehicle.

9.)     14:57 – Officer Wyss arrives at Sergeant Johnson's location and exits his vehicle.

10.)    15:00 – Mr. Lunneen can be seen on his knees in front of Sergeant Johnson's vehicle.

11.)    15:12 – Mr. Lunneen begins to stand up and rests his arm on the front push bars of the police vehicle and Officer Wyss tells him to stay on the ground.

12.)    15:21 – Mr. Lunneen stands up briefly before going back down to his knee and Officer Wyss again tells Mr. Lunneen to sit down.

13.)    15:26 – Mr. Lunneen said, "Help."

14.)    15:27 – Officer Wyss asks Mr. Lunneen what was going on tonight and Mr. Lunneen asked Sergeant Johnson if he could stand up.  Mr. Lunneen then stood up and faced Officer Wyss.  Mr. Lunneen begins speaking with the officers, but his statement is mostly inaudible.  Mr. Lunneen said, "You guys are going to kill me," and Officer Wyss responded that no one was going to kill him.

15.)    16:25 – Sergeant Johnson asked Officer Wyss if he had "PC" and Officer Wyss said that he did.  Both officers told Mr. Lunneen, who was facing the officers, to turn around.  Mr. Lunneen said, 'Help" and slowly walked away toward the front of Officer Wyss' vehicle.

16.)    16:33 – A laser pointer from Sergeant Johnson's taser can be seen directed at Mr. Lunneen.  Mr. Lunneen continues to back away from the officers and Officer Wyss tells Mr. Lunneen that he needs to "stay right here."  Sergeant Johnson tells Mr. Lunneen to put his hands behind his

back and Mr. Lunneen said, "Help."

17.)   16:40 – Mr. Lunneen continues to walk backwards away from the officers and asks the officer why they are "being this way?" and he again says, "Help."

18.)   16:45 – Sergeant Johnson is seen holding his taser in front of his body and the taser is pointed at Mr. Lunneen.  Sergeant Johnson tells Mr. Lunneen to get down on his knees.  Mr. Lunneen continues to walk backwards and continues to call for help.  Both officers begin to give Mr. Lunneen commands to get down on his knees and Mr. Lunneen repeatedly states, 'help."

19.)   16:59 – Both officers begin to give more stern orders for Mr. Lunneen to get down on his knees.  Mr. Lunneen states, 'Don't please," and continues to say, "Help."  Officer Wyss continues to give Mr. Lunneen commands to get down on his knees and to "Stay back."

20.)   17:48 – Sergeant Johnson said, "A car's coming," but no vehicles are visible traveling in the roadway.

21.)   17:57 – Mr. Lunneen moves forward toward Sergeant Johnson and Sergeant Johnson deployed his taser.  The taser did not appear to be effective and Mr. Lunneen immediately begins to run away.

22.)   18:17 – Mr. Lunneen said, 'Why," and "I'm sorry."  Officer Wyss tells Mr. Lunneen to stay there and to stay back.  Mr. Lunneen appears to move forward toward Officer Wyss and said, "Please don't do it," and "Help." As Mr. Lunneen moves forward, Officer Wyss walks backwards.

23.)   18:35 – Mr. Lunneen appears to be in the middle of the roadway and a taser laser pointing device can be seen on Mr. Lunneen.

24.)   18:54 – Officer Wyss tries to grab Mr. Lunneen's right arm while giving him commands to get on his knees.  Mr. Lunneen appears to throw a punch at Officer Wyss with his right hand.

25.)   19:04 – It appears the officers take Mr. Lunneen to the ground.  Officer Wyss said, 'Give me your hand," and "roll over."  Both officers begin to yell at Mr. Lunneen to "roll over."  Mr. Lunneen can be seen laying on the ground on his back and he continues to say, "Help."

26.)     19:33 – Officer Wyss said, "Don't grab me. Don't' grab me."

27.)     20:07 – The officers continued to struggle with Mr. Lunneen and Officer Wyss said, "Let go of me, let go of me."

28.)     20:24 – Sergeant Johnson asks, "You got a cuff?"

29.)     20:45 – Sergeant Johnson asked, 'You got it?" and Officer Wyss responded, "No, hang on."

30.)     20:46 – Mr. Lunneen stops making audible noises.

31.)     20:54 – Officer Wyss said, "Got one."

32.)     21:03 – Mr. Lunneen can be seen laying prone on the ground. Sergeant Johnson stands up and moves away from Mr. Lunneen.  Mr. Lunneen is handcuffed at this point.

33.)     21:35 – Sergeant Johnson said, "Hey.  Wake up."

34.)     21:45 – Sergeant Johnson radios, "Advise priority one."

35.)     21:51 – Officer Wyss said, 'What did he take?" and Sergeant Johnson responds, "I don't know."

36.)     22:09 – Mr. Lunneen can be seen laying prone on the ground with his right shoulder slightly elevated off the ground.  Officer Wyss is holding the handcuffs.

37.)     22:24 – Sergeant Johnson walks away from Mr. Lunneen and yells out, "Over here."

38.)     22:45 – Sergeant Johnson walks back toward where Mr. Lunneen is laying on the ground.  Officer Wyss asks, "You hurt?" and Sergeant Johnson said, "No, I'm good."

39.)     22:51 – Officer Wyss appears to stand up while Mr. Lunneen is still laying prone on the ground.  Officer Wyss said, "Yeah, this uniform is getting washed."

40.)     22:59 – Sergeant Johnson is flashing his flashlight on and officer and one

of the officers yells out, "Bank parking lot."

41.)    22:37 – Officer Wyss leans down and shakes Mr. Lunneen but there is no response.  Mr. Lunneen has not moved or made a sound since he was handcuffed.

42.)    23:42 – An officer states, "He is kinda grey."

43.)    23:54 – Sergeant Johnson leans down and shakes Mr. Lunneen but there is no response.

44.)    23:59 – A paramedic vehicle arrives.

45.)    24:01 – Sergeant Johnson said, "Wake up."

46.)    24:09 – Sergeant Johnson tells the paramedic, "He just lost his mind.  We were fighting with him, fighting with him, and now he is unconscious." The paramedic asks, "Is he breathing?" and Sergeant Johnson said, "He was a minute ago."  The paramedic checked Mr. Lunneen's pulse and then returned to his vehicle.

47.)    24:32 – Sergeant Johnson asks Officer Wyss where did his taser go and Officer Wyss said he kicked it "away from him."

48.)    24:49 – The paramedic returns and said, "Can we get him on his back guys?  And, we should probably uncuff him to."

49.)    25:00 – Officer Wyss begins to unhandcuff Mr. Lunneen.

50.)    25:37 – Mr. Lunneen is unhandcuffed and rolled onto his back.

51.)    27:00 – The paramedic applies a CPR compression device to Mr. Lunneen.

52.)    28:05 – CPR is initiated.

53.)    28:40 – Officer Wyss is asked if Mr. Lunneen is the same guy that ran up to him before and Officer Wyss said he was.

54.)    32:39 – Sergeant Johnson tells another officer, "We were trying to play nice, thinking that he was mental."

24

b.    Sergeant Johnson

1.)    1:00 – Sergeant Johnson parks and exits his vehicle.

2.)    1:12 – Sergeant Johnson said, "Hey, step to the front of the vehicle." Mr.
Lunneen appears at the front of the vehicle and Sergeant Johnson said,
"Stay right there and don't move." Mr. Lunneen continues to walk past
the vehicle and Sergeant Johnson said, 'Stay right there! I'm not playing
with you." The laser pointer of Sergeant Johnson's taser is visible on Mr.
Lunneen's chest.

3.)    1:41 – Mr. Lunneen is kneeling on the ground with his hands resting on
the front of the patrol car. Sergeant Johnson is putting on gloves as
Officer Wyss arrives. Officer Wyss parks his vehicle in front of and facing
Sergeant Johnson's vehicle.

4.)    2:06 – Sergeant Johnson radioed the dispatcher and asked for
paramedics to respond and tells the dispatcher that Mr. Lunneen may be
suffering from excited delirium.

5.)    2:10 – Mr. Lunneen said, 'Help," and Officer Wyss asked, "What's going
on tonight man?" Mr. Lunneen faces Sergeant Johnson and tells
Sergeant Johnson, "Stay right there please and I'll stay right here."
Sergeant Johnson responds, "Okay, that's fine."

6.)    2:21 – Mr. Lunneen stands up and faces Officer Wyss. Mr. Lunneen then
leans against the front of the patrol car and appears to be out of breath.
Mr. Lunneen is speaking with the officers but much of what he says is
inaudible.

7.)    3:03 – Officer Wyss said, "Nobody is going to kill you tonight." Mr. Wyss
walks forward and is standing between the patrol cars. Sergeant Johnson
asks, "Do you have PC?" Sergeant Johnson approaches Mr. Lunneen and
tells him to turn around. Mr. Lunneen begins to walk away as the officers
try to grab his arms.

8.)    3:19 – Officer Wyss tells Mr. Lunneen to put his hands behind his back
and to get down on his knees or "We'll tase you." Sergeant Johnson tells
Mr. Lunneen to stop walking and Mr. Lunneen repeatedly yelled, "Help."

25

9.)     3:38 – Officer Wyss said, "You're going to walk into traffic."

10.)    3:43 – Mr. Lunneen continues to walk away the officers and Officer Wyss raises his voice and tells Mr. Lunneen to get down on his knees now.  Mr. Lunneen is repeating "Don't please," and Officer Wyss is repeating commands to get down on your knees.

11.)    4:14 – The officers continue to walk toward Mr. Lunneen as he continues to walk backwards away from the officers.  The officers are repeating commands to "Stay back," and "Get down on your knees."

12.)    4:40 – Sergeant Johnson deploys his taser at Mr. Lunneen.  Sergeant Johnson radios, "get another car started."

13.)    4:53 – Mr. Lunneen and Officer Wyss are in the middle of the roadway and Officer Wyss said, "Stop right there."

14.)    5:06 – Mr. Lunneen begins to walk at Officer Wyss.  Sergeant Johnson asks, "Do you got spray?  Spray him!"

15.)    5:13 – Mr. Lunneen moves forward to Officer Wyss.  It appears that Mr. Lunneen is making a punching motion toward Officer Wyss.

16.)    5:39 – Sergeant Johnson radios, 'Get another car over here," and Mr. Lunneen said, "Get another car."  Mr. Lunneen is walking in the roadway and the officers are following him.

17.)    5:40 – The officers contact Mr. Lunneen and take him to the ground.  Officer Wyss tells Mr. Lunneen to get on his stomach and to roll over.

18.)    5:54 – Sergeant Johnson places his hand on the left side of Mr. Lunneen's face.  The officer repeat commands to roll over and Mr. Lunneen repeatedly said, "Help."

19.)    6:16 – Sergeant Johnson's hand is still on Mr. Lunneen's face and Officer Wyss said, "Don't grab me."  Officer Wyss said, "Come on give us your hands.  Chill out.  Come on give us your hands."

20.)    7:29 – Sergeant Johnson asks, "Got it?"  and Officer Wyss said, "No, hang on."  During this time the video is black, and the subjects cannot be seen.

21.)     7:48 – Sergeant Johnson stands up and moves away from Mr. Lunneen.  It appears that Sergeant Johnson's video camera and come off of his uniform and he replaces the camera.

22.)     8:03 – Sergeant Johnson radios, 'He's detained.  Go ahead and speed up medics."

23.)     8:13 – Mr. Lunneen is laying prone on the ground with his hand handcuffed behind his back.  Officer Wyss is standing over Mr. Lunneen holding the handcuffs.

24.)     8:16 – Sergeant Johnson shakes Mr. Lunneen and said, "Hey."  There is no movement or sound from Mr. Lunneen.  Sergeant Johnson shakes Mr. Lunneen again and said, 'Wake up.'

25.)     8:45 – Sergeant Johnson again said, "Wake up."

26.)     8:55 – The officers begin to flash their flashlights at another officer who is at the scene but driving away from the officers.  Sergeant Johnson said, "Come on.  Look around."  Sergeant Johnson walks into the roadway and yells, "Over here."

27.)     9:30 – Officer Wyss asks Sergeant if he is hurt and Sergeant Johnson said, No, I'm good."  Mr. Lunneen is still laying prone on the ground – more on his left shoulder and it appears he is in that position due to his large stomach.  Officer Wyss is kneeling over him holding the handcuffs. Sergeant Johnson said, "I got blood all over me," and Officer Wyss replied, "Yeah, this uniform is getting washed."  Officer Wyss stands and moves back from Mr. Lunneen.

28.)     9:45 – Sergeant Johnson yells, "Bank parking lot" and walks into the roadway.  Sergeant Johnson yells, "Over here.  Over here."

29.)     10:16 – Sergeant Johnson asks Officer Wyss, "Is he breathing?"  Officer Wyss leans down over Mr. Lunneen and shakes him, but Mr. Lunneen makes no movement or sound.  Sergeant Johnson said, "We need to get some Narcan.  I don't know what the heck he took."

30.)     10:38 – Sergeant Johnson shakes Mr. Lunneen and there is no response.

31.)     10:40 – The paramedic vehicle arrives.

32.)    10:41 – Sergeant Johnson shakes Mr. Lunneen and said, "Wake up." Sergeant Johnson then speaks with the paramedic who said, "What's up," and Sergeant Johnson said, "He lost his mind.  We were fighting with him, fighting with him.  Now he's unresponsive."  The paramedics asks if he is breathing, and Sergeant Johnson said he was a minute ago.  The paramedic checks Mr. Lunneen and returns to his vehicle.

33.)    11:25 – Sergeant Johnson picked up his taser and said, "This thing didn't even work."

34.)    15:38 – Sergeant Johnson said, "He said he was an addict over there.  He said he hit the low point or something, um, then he thought we were trying to kill him.  The he just freaked out and was running toward traffic. Tried tasing him, it didn't work.  We ended up over here, he was trying to swing and took him down to the ground.  He was a s strong as hell whatever he's on."

35.)    16:05 – Sergeant Johnson said, "He's involved with meth, I know that, just don't know to what extent."

**A Reasonable Police Officer Would Believe They had Reasonable Suspicion to Detain Mr. Lunneen**

30.    Police officers are trained that they have reasonable suspicion to detain a person briefly for purposes of investigation when the officer, in light of experience and training, is aware of articulable facts or circumstances which could lead a reasonably prudent person to believe that a crime has occurred, or that criminal activity is going to occur.[91]

31.    Here, Officer Wyss responded to a report of a vandalism where a subject had had pushed a window mounted air conditioner unit into a home causing the window to break in the process.  Officer Wyss spoke with the victim, Ms. Dry, who identified Mr. Lunneen.  Officer Wyss radioed Mr. Lunneen's physical description of Mr. Lunneen to Sergeant Johnson and Sergeant Johnson detained Mr. Lunneen a short distance away.

32.    A reasonable police officer in these circumstances would have believed they had reasonable suspicion to detain Mr. Lunneen to conduct an investigation into the reported vandalism.

---

[91]See, *Terry v. Ohio,* 392 US 1 (1968) and Berrien Springs Okonoke Township Police Department Pre-Arrest and Contact Management policy (BSOT 347).

**A Reasonable Police Officer Would Have Believed They Had Probable Cause to Arrest Mr. Lunneen**

33.     Police officers are trained that they make may an arrest based on probable cause. Probable cause to arrest exists when a police officer, in light of experience and training, is aware of articulable facts or circumstances which could lead a reasonably prudent person to conclude that a suspect has committed, or is in the process of committing, a criminal act.

34.     Here, as discussed above, the officers were investigating a vandalism, Mr. Lunneen had been identified as the suspect by the victim, Ms. Dry, it was late at night and there were no other people in the general area, Mr. Lunneen matched the suspect description, was in the immediate area of the crime, and fled the crime scene when observed by Officer Wyss.

35.     A reasonable police officer in these circumstances would have believe that Mr. Lunneen had pushed the window mounted air conditioner in the home and caused the damage as reported by Ms. Dry and would have arrested Mr. Lunneen.

**The Uses of Force by Sergeant Johnson and Officer Wyss to Detain and Handcuff Mr. Lunneen**

36.     Police officers are trained that the U.S. Supreme Court in its landmark decision *Graham v. Connor* held that to determine whether the force used to affect a particular seizure is reasonable, one must balance the nature and quality of the intrusion on the individual's rights against the countervailing government interests at stake.  This balancing test is achieved by the application of what the Court labeled the objective reasonableness test. The factors to be considered include: 1.) The severity of the crime, 2.) Whether the suspect poses an immediate threat to the safety of the officers or others, and 3.) Whether the suspect is actively resisting or attempting to evade arrest by flight.

37.     Whether one's actions were objectively reasonable cannot be considered in a vacuum, but must be considered in relation to the totality of the circumstances.  The standard for evaluating the unreasonable use of force reflects deference to the fact that peace officers are often forced to make split-second judgments in tense circumstances concerning the amount of force required.  The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

38.     Police officers are trained and prepared to assess dangerous situations and respond accordingly.  Police officers are trained that for their force to be reasonable the level and manner of force must be proportional to the level of resistance and threat with which they are confronted.  Proportionality is best understood as a range of permissible

conduct based on the totality of the circumstances, rather than a set of specific, sequential, predefined force tactics arbitrarily paired to specified types or levels of resistance or threat.

39.    Whether or not the suspect poses an immediate threat to the safety of the officer or others is the most important of the *Graham* factors.  There must be objective factors to justify an immediate threat, as a simple statement by an officer that he fears for his safety or the safety of others is insufficient.  There is no requirement that a police officer wait until a suspect harms another to confirm that a serious threat of harm exists, but merely a subjective fear or a hunch will not justify the use of force by police.[92]

40.    When determining whether or not there is an immediate threat to the officer or others, police officers are trained to assess a number of factors. These factors include, but are not limited to:

a.    Severity of the threat to officers or others.

b.    The conduct of the individual being confronted as reasonably perceived by the officer at the time.

c.    Officer/subject factors (age, size, relative strength, skill level, injury/exhaustion and number of officers vs. subjects).

d.    The effects of drugs or alcohol.

e.    Subject's mental state or capacity.

f.    Proximity of weapons or dangerous improvised devices.

g.    The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

h.    The availability of other options and their possible effectiveness.

i.    Seriousness of the suspected offense or reason for contact with the individual.

j.    Training and experience of the officer.

k.    Potential for injury to citizens, officers and suspects.

l.    Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the officer.

---

[92] *See*, Berrien Springs Okonoke Township Police Department Use of Force policy (BSOT321-325) and

m.   The risk and reasonable foreseeable consequences of escape.

n.   The apparent need for immediate control of the subject or a prompt resolution of the situation.

o.   Whether the conduct of the individual being confronted no longer reasonably appears to pose an immediate threat to the officer or others.

p.   Prior contacts with the subject or awareness of any propensity for violence.

q.   Other exigent circumstances

41.   Sergeant Johnson's use of the taser.

a.   Sergeant Johnson said Mr. Lunneen began walking toward Cass Street and at times Mr. Lunneen would charge toward him and then turn around.  Sergeant Johnson said at one point he saw a vehicle traveling south on Cass Street and he was concerned that Mr. Lunneen was going to walk in front of the car.

b.   Sergeant Johnson said during this time, Officer Wyss ordered Mr. Lunneen several times to put his hands behind his back and to get on his knees, but Mr. Lunneen refused to do so.

c.   Sergeant Johnson said when Mr. Lunneen refused to comply, he deployed his Taser at Mr. Lunneen.  Sergeant Johnson said the Taser probes appeared to strike Mr. Lunneen in the front torso area, but the Taser did not have any effect. Mr. Lunneen swiped his arms in front of his body and it appeared he disconnected the Taser probes from his body.

d.   Sergeant Johnson said Mr. Lunneen did not have a weapon, he was not a danger to anyone but himself, and he was not a danger to the officers.   Sergeant Johnson said he believed a "possibility of the threat existed."

e.   Sergeant Johnson said he tased Mr. Lunneen to save Mr. Lunneen's life from being hit by a car.  Sergeant Johnson said the vehicle can be seen on the video coming toward Mr. Lunneen.  Sergeant Johnson said he did not see any other vehicles on the roadway.

f.   Here, Sergeant Johnson said that Mr. Lunneen did not have a weapon, he was not a danger to the officers or anyone else, and he only used the taser to save Mr. Lunneen's life for fear that he may be struck by a passing motorist.  While Sergeant Johnson can be heard on the video stating, "A car's coming" prior to the activation of the taser, the video does not show that Mr. Lunneen was at

31

immediate threat of being hit by a vehicle and indeed there were no other vehicles traveling on the roadway.

g.   If the finder of fact determines that Mr. Lunneen was not at immediate threat of being struck by a vehicle and because Sergeant Johnson acknowledges the only reason he used his taser was to save Mr. Lunneen from being struck by a vehicle rather than any threat posed by Mr. Lunneen, the use of force by Sergeant Johnson was excessive, objectively unreasonable and inconsistent with generally accepted police practices.

42.   Officer Wyss use of OC spray

a.   Sergeant Johnson said after the taser had been deployed, Mr. Lunneen lunged toward Officer Wyss and Officer Wyss sprayed Mr. Lunneen with his pepper spray but it did not appear to have an effect.

b.   In these circumstances, where Mr. Lunneen was refusing to comply with the officers' commands, where the officers had reasonable suspicion to detain Mr. Lunneen, and where Mr. Lunneen can be seen on the video moving forward toward Officer Wyss, the use of OC spray to control Mr. Mr. Lunneen was objectively reasonable and consistent with generally accepted police practices.

43.   The officers use of force by taking Mr. Lunneen to the ground and use of control holds.

a.   Sergeant Johnson said after Mr. Lunneen was sprayed with the OC spray, Mr. Lunneen then lunged again toward Officer Wyss and he and Officer Wyss took Mr. Lunneen to the ground.  Mr. Lunneen continued to resist and refuse to comply with the officers' commands to put his hands behind his back.  Sergeant Johnson said they struggled with Mr. Lunneen for approximately two minutes before they were able to handcuff him.

b.   Officer Wyss said they were moving as these events occurred and when they reached the parking lot of 5/3 Bank, he decided to attempt to physically restrain Mr. Lunneen to prevent him from causing further injury to himself.  Officer Wyss said he and Sergeant Johnson attempted to take Mr. Lunneen to the ground, but Mr. Lunneen pushed back.  Officer Wyss said he was able to sweep Mr. Lunneen's legs out from under him and took Mr. Lunneen to the ground where Mr. Lunneen landed on his hands and knees.  Sergeant Johnson attempted to pull Mr. Lunneen's arms behind his back while he attempted to handcuff Mr. Lunneen.  Officer Wyss said during the struggle, Mr. Lunneen grabbed his left leg with his right arm and would not let go when he was given several verbal commands.  Officer Wyss said he applied pressure to Mr. Lunneen's mandibular

nerve, command him to let go, and broke his hold on his leg.  Officer Wyss said he and Sergeant Johnson were then able to handcuff Mr. Lunneen.

c.     The use of a take down and the control holds used to placed handcuffs on Mr. Lunneen were objectively reasonable and consistent with generally accepted police practices.

**Sergeant Johnson and Officer Wyss Failed to Follow Generally Accepted Police Practices by Failing to Roll Mr. Lunneen Onto His Side or Placing Him in a Seated Position Once He was Secured and by Failing to Immediately Render Medical Aid**

44.     It is generally accepted in policing that, under certain circumstances, restraint techniques, including physically holding a subject down, can constitute a use of force.[93] Moreover, Officers are responsible for the health, safety and welfare of people in their custody and must protect them from known risks of harm. Officers learn that they can, when appropriate, put a subject into a prone (face down) position on the ground to facilitate handcuffing or to secure the individual.  However, it is well known and generally accepted that keeping handcuffed individuals in the prone position after handcuffing can negatively affect the subject's breathing and cause or contribute to positional asphyxia.[94]  It is generally accepted in policing that the risks of asphyxiation are magnified when officers apply weight or pressure to a handcuffed, prone subject.

45.     It is also generally accepted that subjects who appear to be in an agitated or excited state, usually due to mental illness, intoxication, or a combination, and are acting delirious or irrational, have a significantly elevated need for oxygen and are therefore more susceptible to positional asphyxiation.  Compounding the risk is that people who are in such a state of "excited" or "agitated" "delirium," while frequently not involved in any significant criminal activity, nevertheless are not responsive to "officer presence" and verbal commands that are effective to gain compliance without the use of force in most other situations.  Officers not infrequently have to use devices such as Tasers and wrestle the subject into restraints.  The altercation itself further increases the demand for oxygen and increases the risk of positional asphyxiation from a prone restraint.

---

[93] Seth W. Stoughton, Jeffrey J. Noble, Geoffrey P. Alpert, Evaluating Police Uses of Force 195-96, 202-03 (2020).

[94] Some commentators have distinguished between "positional asphyxia" and "compression asphyxia" on technical grounds. In technical usage, positional asphyxia is typically used to refer to situations in which the subject's respiration (breathing) is compromised by the positioning of the subject's body, while compression asphyxia is typically used to refer to situations where weight or pressure on the subject can mechanically limit the subject's respiration. Both positional asphyxia and compression asphyxia are types of mechanical asphyxia, a phrase that refers to some mechanical interference with normal breathing. Commentators also sometimes use the phrase "restraint asphyxia" to refer to a combination of separate factors that, *in toto*, can contribute to mechanical asphyxia. As an industry, however, policing has generally adopted less technical terminology, often using "positional asphyxia" in a somewhat generalized way to refer to a combination of mechanical factors that can inhibit a restrained subject's breathing.

46.     Importantly, it is also generally accepted that the oxygen deficit that can result in positional asphyxia does not preclude speech.  As an article first published in 2015 by Calibre Press—one of the largest publishers of police media, if not *the* largest publisher of police media, in the United States—explained, the idea that someone can breathe because they are speaking is a "major misconception" and "perhaps one of the **most lethal** misconceptions in . . . law enforcement."[95]

47.     As an industry, policing has known about the risks of positional asphyxia for over thirty years.  In 1988, four doctors published an article describing that keeping individuals "prone, handcuffed, 'and hog-tied'" had negatively affected their ability to recover "peripheral oxygen saturation and heart rate" when compared to individuals "at rest" and "during exercise."[96]  The authors, writing in the American Journal of Medical Pathology, contended that "the physiological effects produced by positional restraint should be recognized in deaths where such measures are used."[97]  This was followed, several years later, by an article in the same journal reporting a case study of three in-custody deaths "attributed to positional asphyxia."[98]  Early research focused particularly on the risks of keeping a "hog-tied" individual—that is, someone who is handcuffed behind their back with their legs bound at the ankles and connected to their wrists such that their legs are bent with their feet brought to a position near their buttocks—but it was quickly recognized that handcuffed individuals were at heightened risk of positional asphyxia even when they were not hog-tied.[99]

48.     This issue was brought into the forefront of police policymaking in the early 1990s, after a 16-year-old died after being restrained by San Diego Police Department officers.  A police task force surveyed the medical literature and hundreds of police agencies around the country before issued a series of recommendations, including "[o]nce an

---

[95] Steve Cole, *Screaming Their Last Breath: Why First Responders Must Never Ignore the Words "I Can't Breathe"*, Dec. 11, 2015, reprinted Jun. 2, 2020, https://bit.ly/37kTnRJ (emphasis in original).

[96] Donald T. Reay *et al.*, *Effects of Positional Restraint on Oxygen Saturation and Heart Rate Following Exercise*, 9 AM. J. FORENSIC MED. & PATHOLOGY 16 (1988).

[97] *Id.*

[98] Donald T. Reay, *et al.*, *Positional Asphyxia During Law Enforcement Transport*, 13 AM. J. FORENSIC MED. & PATHOLOGY 90 (1992). Later articles disputed the degree of risk posed by positional asphyxia and criticized the methodology of earlier research, but such research suffered from its own methodological flaws. Specifically, later research was based on experiments involved healthy, non-obese, and usually younger, individuals without preexisting health conditions who were not under the influence of drugs or alcohol and who did not violently struggle with officers. Such study participants are not, of course, representative of the at-risk population with whom the police interact. Indeed, there is good reason to think that a researcher proposing an experimental study involving individuals from the relevant population would be denied approval on ethical grounds because such research would be too dangerous. Additionally, experimental studies generally did not try to replicate field conditions. As one such study acknowledged, "It is possible that a combination of factors, including underlying medical condition, intoxication, agitation, delirium, and struggle as well as body position, may result in respiratory compromise that would not be detected by our study." Theodore C. Chan, *et al.*, *Restraint Position and Positional Asphyxia*, 30 ANNALS OF EMERGENCY MEDICINE 578, 585 (1997).

[99] See, e.g., Ronald L. O'Halloran & Janice G. Frank, *Asphyxial Death During Prone Restraint Revisited; A Report of 21 Cases*, 21 AM. J. FORENSIC MED. & PATHOLOGY 39, 48 (2000).

individual has been controlled and handcuffed, the officer should roll the subject onto his/her side, or into a sitting position as soon as possible to reduce the risk of positional asphyxia."[100]

49.     The International Association of Chiefs of Police—the world's oldest and largest professional policing organization—endorsed this directive in 1993, writing, "when it is necessary to use the weight of several officers in order to subdue an individual for handcuffing, the arrestee should be freed from that weight as soon as possible in order to allow him to breathe freely. In order to facilitate the individual's breathing, he should also be rolled onto his side or into a sitting position as soon as possible."[101]  In 1995, the United States Department of Justice provided a bulletin that stated, "[A]s soon as the suspect is handcuffed, get him off his stomach."[102]  Any failure to do so, the bulletin made clear, could create a "vicious cycle of suspect resistance and officer restraint" in which the handcuffed, prone subject's breathing becomes labored as they begin to experience an oxygen deficit, the subject responses to the oxygen deficiency by struggling, and the officers respond to the subject's struggling by putting more weight on their back, which further compromises the subject's breathing.[103]  In 1998, the International Association of Chiefs of Police wrote, "during the past decade police departments have been repeatedly warned not to permit the restraint of prisoners in the prone position."[104]  In 2001, the Department of Justice advised police agencies to "develop use of force policies that address . . . particular use of force issues such as . . . positional asphyxia."[105]  In the 2015 consent decree with the City of Ferguson, the Department of Justice required the adoption of procedures and training that "[m]inimiz[e] the risk of positional asphyxia" and instruct officers to "use restraint techniques that do not compromise a subject's breathing."[106]  A 2017 textbook on policing, *Police in America*, states that "positional asphyxia occurs when a person's body position prevents normal and adequate breathing," and that this "[u]sually" occurs "when the subject is face down with hands secured behind the back."[107]  In short, concerns about positional asphyxia and the corresponding directive to avoid keeping handcuffed individuals in the prone position had become generally accepted in policing by at least the turn of the century.

---

[100] SAN DIEGO POLICE DEP'T, FINAL REPORT OF THE CUSTODY DEATH TASK FORCE (1992).

[101] INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, TRAINING KEY NO. 429, CUSTODY DEATH SYNDROME (1993).

[102] United States Department of Justice, National Institute of Justice, *Positional Asphyxia—Sudden Death*, June 1995, https://bit.ly/36o4lXc.

[103] *Id.*

[104] International Association of Chiefs of Police, *The Prone Restraint–Still A Bad Idea*, 10 POL'Y REV. 1,2 (1998).

[105] UNITED STATES DEP'T OF JUSTICE, PRINCIPLES FOR PROMOTING POLICE INTEGRITY 4 (2001).

[106] Consent Decree at 41, United States v. City of Ferguson, No. 4:16-cv-00180 (E.D. Mo. Apr. 19, 2016), https://bit.ly/3mp0VZZ. In the 2016 consent decree with the City of Cleveland, the Department of Justice required officers to be trained in and to follow protocols related to "the risks of positional asphyxia," specifically in "using restraint techniques that do not impair the subject's respiration" following the use of pepper spray or electronic control weapons. Settlement Agreement at 17, 19, United States v. City of Cleveland, No. 1:15-cv-01046-SO (N.D. Ohio June 12, 2015), https://bit.ly/3fUBo8n.

[107] STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).

50.   Today, many police agencies around the United States have policies explicitly restricting the use of prone restraint; those policies overwhelmingly direct officers to avoid keeping handcuffed individuals in the prone position for any extended period of time.[108]  Many other agencies do not have specific policies, but officers are still expected to mitigate the risks of positional asphyxia by not keeping subjects in the prone position after handcuffing.

51.   The IACP developed a Model Policy in 2017 that was accompanied by a Concepts and Issues Paper on Excited Delirium.  That policy directed that, "When restrained, officers should position the subject in a manner that will assist breathing, such as placement on his or her side, and avoid pressure to the chest, neck or head.  Officers should not attempt to control continued resistance or exertion by pinning the subject to the ground

---

[108] *See, e.g.*, Berkeley Police Department, Handcuffing and Restraints, Policy 302 ("If the person being handcuffed is on the ground or in a prone position, officers should, as soon as possible, place the person in an upright sitting position or on their side for respiratory recovery and to mitigate the potential for positional asphyxia."), Albuquerque Police Department, Use of Force, SOP 2-52 at 5, https://bit.ly/33wYrRJ ("In situations when the individual is forced into a face down position, officers shall release pressure/weight from the individual and position the individual on their side or sit them up as soon as they are restrained and it is safe to do so."), Charlotte-Mecklenburg Police Department, Directive 500-003, https://bit.ly/3mp7uM7 ("Avoid placing a subject in a position that is likely to contribute to positional asphyxia . . . control restraints while lying on back/stomach should be avoided."); Denver Police Department, Operations Manual, Force Related Policies, 105.01(5)(e), https://bit.ly/3lmIq77 ("[O]fficers will immediately cease applying body weight to an individual's back, head, neck, or abdomen once the individual is restrained and other control tactics may reasonably be utilized other than body weight. As soon as possible after an individual has been handcuffed, the individual should be turned onto his/her side or allowed to sit up, so long as the individual's actions no longer place officers at risk of imminent injury. Officers will make all reasonable efforts to ensure that the individual is not left in a prone position for longer than absolutely necessary to gain control over the resisting individual."); Detroit Police Department, Use of Force, 304.2-7, Duty to Report/Render Aid, https://bit.ly/2HR7h59 ("Restrained subjects should be placed in an upright or seated position to avoid Positional Asphyxia which can lead to death, when a subject's body position interferes with breathing."); Indianapolis Police Department, General Order 8.1, Prisoner Handling, Transportation and Escape, https://bit.ly/2HQFFx0 ("A subject placed on their chest or stomach, with the legs and arms restrained behind the back, may have difficulty breathing, leading to serious injury or death. 1. Officers should avoid leaving any prisoner on their chest or stomach for any period of time longer than is absolutely necessary, regardless of the type of restraint used. 2. The subject should be moved onto their side, allowing less interference with normal breathing, as soon as possible."); New Orleans Police Department, Operations Manual, Chapter 1.3.1.1, Handcuffing and Restraint Devices, https://bit.ly/3lokG2u ("If a subject has been placed on his or her stomach, turn him or her on the side or in a seated position as soon as handcuffs are properly applied. If the subject continues to struggle, *do not* sit, lie or kneel on the subject's back." (emphasis in original)); New York Police Department, Patrol Guide, Use of Force, 221-02, https://on.nyc.gov/37ixnXG ("Avoid actions which may result in chest compression, such as sitting, kneeling, or standing on a subject's chest or back, thereby reducing the subject's ability to breathe. . . . Position the subject to promote fee breathing, as soon as safety permits, by sitting the person up or turning the person onto his/her side."); Metropolitan Police Department (Washington, D.C.), General Order 901.07, Use of Force, https://bit.ly/3moUnum ("In order to avoid asphyxiation, members shall …[p]osition the individual in a manner to allow free breathing once the subject has been controlled and placed under custodial restraint using handcuffs or other authorized methods.…Members are prohibited from: Placing a person in a prone position (i.e., lying face down) for a prolonged period of time … except during exigent circumstances. Prisoners shall be carefully monitored while in a prone position as a prone position may be a contributing factor to cause a prisoner to suffocate, also referred to as positional asphyxiation.").

or against a solid object, using their body weight.  Officers should check the subject's pulse and respiration on a continuous basis until transferred to EMS personnel. Officers shall ensure the airway is unrestricted and be prepared to administer CPR or an automated external defibrillator (AED) if the subject becomes unconscious.  Following a struggle, the subject should be showing normal signs of physical exertion such as heavy breathing. However, if the subject becomes calm and breathing is not labored during or after the application of restraints, it might be an indication that he or she is in jeopardy and requires immediate medical attention to avoid cardiac arrest."

52.   As mentioned above, it is also well known and generally accepted in policing that there are certain factors that exacerbate the risk of positional asphyxia.  The 1995 DOJ bulletin, for example, identified certain factors that "appear to be associated most often with" in-custody deaths, including "cocaine-induced excited delirium," "[d]rug and acute alcohol intoxication," "[v]iolent struggle," and "unresponsiveness of subject during or immediately after a struggle."[109]  A 2017 policing textbook described positional asphyxia risk factors that include drug-induced "psychosis," "preexisting physical conditions," and "pressure on the abdomen" that can result from officers "holding a person down in the prone position."[110]  In 2019, *Police Magazine*, a police-oriented publication, published an article titled *How to Prevent Positional Asphyxia*, which identified positional asphyxia as "a potential danger of some common physical restraint techniques," and explained that "positional asphyxia is not just about the position of the subject's body.  There are precipitating factors that make positional asphyxia deadly. These factors include intoxication due to alcohol, drug use, obesity, psychiatric illnesses, and physical injury," as well as "predisposing medical conditions" and "violent struggle."[111]  The article instructs officers that they should "avoid the use of prone restraint techniques" when feasible and "[o]nce the suspect is handcuffed, get them off the face-down position."[112]

53.   There are four specific factors that, officers learn, can indicate that a subject is particularly susceptible to the risks of positional asphyxia.

a.    First, officers learn that positional asphyxia results when a subject cannot take in sufficient oxygen over time to sustain themselves.  For that reason, indications that a subject is becoming oxygen deprived indicate a particular susceptibility to positional asphyxia.  It is generally accepted in policing that officers must take seriously and should never ignore a subject's statements that they cannot breathe.[113]

---

[109] *Id.*

[110] *Id.*

[111] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU.

[112] *Id.*

[113] See, e.g., Steve Cole, Screaming Their Last Breath: Why First Responders Must Never Ignore the Words "I Can't Breathe", Dec. 11, 2015, reprinted Jun. 2, 2020, https://bit.ly/37kTnRJ

    b.    Second, officers are taught that pre-existing health conditions can exacerbate the risk of positional asphyxia.[114]

    c.    Third, officers are taught that intoxication and substance abuse can exacerbate the risk of positional asphyxia.[115]

    d.    Fourth, officers are taught that excited delirium can exacerbate the risk of positional asphyxia.[116]

54.    The Berrien County Sheriff's Department policy states, "Additionally, no person taken into custody by members of this department will be handcuffed behind their back and placed in a prone position for an extended period of time without an officer monitoring the prisoner (Positional Asphyxia)."[117] The Berrien Springs Oronoko Township Police Department's policy states, "Officer should avoid restraint and transport techniques that place individuals into positions that restrict breathing"[118] and, "Once controlled, the person should be placed on their side or in a seated position. An officer will be assigned to monitor the physical condition of the person. AVOID PLACING THE PERSON IN A PRONE POSITION."[119]

55.    The officers reasonably believed that Mr. Lunneen may be suffering from excited delirium.

    a.    Sergeant Johnson said Mr. Lunneen was not wearing a shirt, there was blood on his body and he appeared to be sweating profusely. Sergeant Johnson said because the temperature was in the mid-30s, he was concerned for Mr. Lunneen medical well-being. Sergeant Johnson said he immediately radioed the dispatcher to start an ambulance for possible excited delirium.

    b.    Sergeant Johnson said once Mr. Lunneen was handcuffed, the officers got off of him. Mr. Lunneen stopped resisting and was quiet. Sergeant Johnson said he heard a slight snore which he believed to be Mr. Lunneen nodding into a "unconscious stupor." Sergeant Johnson said he believed Mr. Lunneen's behavior to be consistent with someone who is passing out due to unknown substances in his system.

---

[114] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU; STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).

[115] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU; STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).

[116] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU; STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).

[117] BC0286.

[118] BSOT 333. *See also*, BSOT 362, "Situations requiring special attention during transports include: b. A position that restricts breathing and normal diaphragm function, such as laying on their stomach in a prone position. If at all possible, place and keep prisoners seated in an upright position during transport."

[119] BSOT 367.

c.   Officer Wyss said Mr. Lunneen appeared to be unaware of his surroundings, was walking back and forth, appeared to be agitated, and was shouting as if talking to people who were not present.  Officer Wyss said Mr. Lunneen's behavior was consistent with what he recognized as associated with excited delirium based on his training and experience.

56.   The officers were trained that after a person is handcuffed that they should remove the person from a prone position and place the subject into a recovery position.

a.   Sergeant Johnson said he has been trained that there is a potential for suspects to suffocate by their own weight or the officers' weight if the officer pushes down on the suspect with their hands when the suspect's hands are behind their back, while the suspect is laying in a prone position.  Sergeant Johnson said he has been trained to limit the amount of time the suspect is in a prone position when possible.

b.   Sergeant Johnson said he has been trained on the dangers of asphyxia that occurs when people are put on their stomach with their hands behind their back.

c.   Officer Wyss said he has been trained that once he has someone controlled, he should move them on their side or place them in a seated position and to not leave them prone because there is a risk of suffocation.  Officer Wyss said his department policy states in all capital letters, "Avoid placing the person in a prone position."  Officer Wyss said this is basic police training.

57.   Officer Wyss claims he rolled Mr. Lunneen over onto his side and did a sternum rub, but the camera did not capture that event.  Officer Wyss also said he moved Mr. Lunneen into a "three quarters position" and kept him there until the paramedics arrived.

a.   Officer Wyss' claim that placed Mr. Lunneen in a "three quarters position" is disputed by the body worn camera videos that do not show him placing Mr. Lunneen into a recovery position.

b.   The videos do show that Mr. Lunneen is laying slightly on his side, but that position is due to Mr. Lunneen's large stomach and not any action by the officers.

58.   Here, the officers failed to follow their training and place Mr. Lunneen in a recovery position for more than 4 minutes and 30 seconds after he had been secured and that failure was inconsistent with generally accepted police practices.

59.   Once Mr. Lunneen was handcuffed and in custody, the officers failed to provide medical

aid.

a.   Sergeant Johnson said once Mr. Lunneen was handcuffed, the officers got off of
him.  Mr. Lunneen stopped resisting and was quiet.  Sergeant Johnson said he
heard a slight snore which he believed to be Mr. Lunneen nodding into a
"unconscious stupor."  Sergeant Johnson said he believed Mr. Lunneen's
behavior to be consistent with someone who is passing out due to unknown
substances in his system.

b.   Sergeant Johnson said when a person no longer presents a threat and needs
medical attention, then the officers should provide medical care.

c.   Officer Wyss said he had an AED device in his police vehicle.  Officer Wyss said
nothing that prevented him from going to get his AED device or his breathing bag
from his vehicle.

d.   Officer Wyss said there was a point where Mr. Lunneen did not seem to be
breathing.  Officer Wyss said he checked the paramedic status with the
dispatcher and was told the paramedic was at the fairgrounds which was about a
half mile from their position.

60.   Here, the officers failed to provide Mr. Lunneen any emergency medical care after he
had been secured and was in obvious need of medical care.  While the officers did
request paramedics, they failed to apply their basic first aid training even after Officer
Wyss recognized that Mr. Lunneen did not appear to be breathing.  This failure was
inconsistent with generally accepted police practices.

_____                    1/17/22
Jeffrey J. Noble                                              Date