# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

THOMAS E. LUNNEEN,

      Plaintiff,

vs.

BERRIEN SPRINGS, VILLAGE OF, et al.,

      Defendants.

Case No. 1:20-cv-1007-HYJ-PJG

Hon. Hala Y. Jarbou

Hon. Mag. Judge Phillip J. Green

---

| | |
|---|---|
| Mel C. Orchard III | G. Gus Morris (P32960) |
| Noah W. Drew (P74335) | McGraw Morris P.C. |
| Emily S. Madden | 2075 W. Big Beaver Road, Suite 750 |
| The Spence Law Firm LLC | Troy, Michigan 48084 |
| 15 S. Jackson Street / P.O. Box 548 | (248) 502-4000 |
| Jackson, Wyoming 83001 | gmorris@mcgrawmorris.com |
| (307) 733-7290 / (307) 733-5248 | rvanwert@mcgrawmorris.com |
| orchard@spencelawyers.com | *Attorneys for Township Defendants, Wyss &* |
| drew@spencelawyers.com | *Toliver* |
| madden@spencelawyers.com | |
| *Attorneys for Plaintiff* | James T. McGovern (P79410) |
| | James M. Straub (P21083) |
| Sean W. Drew (P33851) | Straub, Seaman & Allen P.C. |
| Drew Law Office | 1014 Main Street / P.O. Box 318 |
| 302 Sycamore Street / P.O. Box 880 | St. Joseph, Michigan 49085 |
| Niles, Michigan 49120 | (269) 982-1600 |
| (269) 683-6121 | jmcgovern@lawssa.com |
| drewlawoffice@gmail.com | jstraub@lawssa.com |
| *Co-Counsel for Plaintiff* | *Attorneys for Berrien County, Bailey &* |
| | *Johnson* |

---

## PLAINTIFF'S JOINT RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT – ORAL ARGUMENT REQUESTED

Plaintiff Thomas Lunneen, by and through counsel Mel C. Orchard III, Noah W. Drew, and Emily S. Madden of The Spence Law Firm LLC, and Sean W. Drew of Drew Law Office, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, files his Joint Response in Opposition to Defendants' Motions for Summary Judgement. [ECF Nos. 78, 81].

# I.     SUMMARY

In the early morning of October 22, 2018, Jack Lunneen was suffering from and exhibiting signs of severe medical and psychological distress: he was partial clothed, incoherent, agitated and paranoid. When Jack encountered Defendants Wyss and Johnson, he is compliant and asking for help. Despite recognizing they are dealing physically and mentally impaired person, Defendants Johnson and Wyss try to arrest Jack, pepper spray him twice and discharge a Taser hitting Jack in the chest. The officers eventually wrestle Jack down and put their full weight upon his back forcing his face, chest and stomach against the asphalt while they handcuff him and leave him on his stomach. Jack's last audible words are "I'm sorry, sir, I'm sorry," "Sir," and "I apologize."

As a result, Jack is rendered unconscious. When the paramedic arrives, he immediately recognizes Jack is not breathing. This was no surprise to the Wyss or Johnson as they recognized Jack was "going grey" just moments after Jack was knocked out. Despite the efforts of the paramedic, Jack could not be resuscitated as he was without medical care for too long – approximately 7 minutes. Johnson and Wyss were trained to roll people like Jack over, or sit him up. They were also trained to provide first aid and administer defibrillators or CPR to remedy the medical crisis they created. They did none of those things. Jack was later pronounced dead. The cause was positional asphyxia, a condition known to both Johnson and Wyss and their superiors.

Plaintiff Thomas Lunneen, Jack's oldest brother and the wrongful death representative, initiated this action, and seeks to hold Defendants responsible under the following theories: excessive force, deliberate indifference to serious medical needs, and unconstitutional conditions of detainment against Johnson and Wyss under § 1983; *Monell* liability against BCSO and Sheriff Bailey, and BSOTPD and Chief Toliver; and violations of Michigan law, including gross negligence, against Johnson and Wyss.

## II.    UNDISPUTED AND MATERIAL FACTS

Unless otherwise indicated, the following facts are undisputed:

**1:15a.m.    Jack Lunneen approaches Officer Wyss and asks for Sergeant Johnson**

1.    Around 1:15 a.m. on October 22, 2018, Officer James Wyss with the Berrien Springs Oronoko Township Police Department parks his patrol vehicle at the intersection of South Mechanic and East Ferry in the small Village of Berrien Springs, Michigan.[1] [*Thorton*, ECF No. 57-15 53; *Wyss Dep.*, ECF No. 81-2, 14:7–12, 14:14–17, 15:7–8, 16:7–9; *Wyss MSP*, Ex. 1 at 1].

2.    While Wyss is waiting for "shit heads to come across the bridge either leaving or going to" a bar nearby, Jack Lunneen rides his bicycle up to Wyss's patrol car and starts a conversation. [ECF No. 57-15, 53; ECF No. 81-2, 14:17–18, 15:24–16:1–6, 17:16–23, 19:6–13, 21:3–6, 25:15–18; Ex. 1 at 1].

3.    Although the Village is incredibly small (a population of 1,800 people and a geographical area of one square mile), Wyss does not recognize Jack. [ECF No. 81-2, 18:20–21; *VillageMap*, Ex. 2].

4.    Wyss does, however, recognize that Jack is overweight, incoherent, agitated, and fully dressed. [ECF No. 81-2, 17:24–18:10, 19:6–13, 25:15–18].[2]

5.    Jack is "spouting of all kinds of nonsense," but one thing is very clear: he wants to speak with Johnson. [ECF No. 57-15, 53; ECF No. 81-2, 19:6–15, 20:12, 25:15–18; *Video1*, Ex. 3 at 10:36–10:48].

---

[1] Berrien Springs is a village located within the Oronoko Charter Township, Michigan. [*Cnty. Answer*, ECF No. 14, ¶ 9]. During the events in question, the Berrien County Sheriff's Department had concurrent jurisdiction to assist BSOTPD with the call.

[2] Jack was 51 years old, 5'9", and weighed 228 pounds. [ECF No. 81-6, at 3 (noting obesity and 34 BMI)].

6.     About a minute into the conversation, Jack rides off on his bicycle towards the Speedway, and Wyss begins to follow but quickly loses sight of Jack. [ECF No. 81-2, 21:7–15, 23:12–17; Ex. 1, at 1].

7.     While continuing to look for Jack, Wyss encounters Johnson's patrol vehicle and flags him down. [ECF No. 81-2, 24:25–25:2, 29:13–14; Ex. 1 at 1; ECF No. 57-15, 53].

8.     Wyss tells Johnson about the interaction with Jack by describing Jack's physical appearance and agitated demeanor; he also tells Johnson that Jack mentioned Johnson by name. [ECF No. 81-2, 26:9–25, 27:9–11; ECF No. 57-15, 53; Ex. 1 at 1; *Map*, Ex. 4].

9.     Johnson and Jack had a good, cordial relationship with one another, both personally and professionally. [*Johnson Dep.*, ECF No. 81-3, 33:14–21, 36:4–5]. Personally, Johnson and Jack knew each other just "from being around Berrien Springs." [*Id.*]. Johnson knew Jack had done work in and around the area, they had run into each other on various occasions, and they had somewhat regular conversations with one another. [*See id.*].

10.    Johnson believed that Jack was looking to give Johnson information relating to people possessing or delivering narcotics, which was common for their relationship. [*Id.* at 34:2–22; *See Prior Encounters*, Ex. 5 at 1–4].[3] Johnson believed Jack may "have been in trouble with some people and wanted" Johnson's help. [ECF No. 81-3, 35:16–18].

**1:24 a.m.     Eileen Dry calls 911 to report a man circling her home and yelling for help**

---

[3] For example, in May 2018, Johnson was an officer investigating a Violation of Controlled Substance Act. [Ex. 5, ] 1–4]. Jack is listed as an informant who led Johnson to marijuana in a home where Johnson was conducting a search warrant. [*Id.* at 3]. In July 2011, Jack requested a meeting with Johnson at the jail because he "had information about drug activity in the Benton Harbor area." [*Id.* at 5]. Other local law enforcement personnel personally knew of Jack, too. *See also Township Incident Rep.*, at 2 (stating a bike was identified as Jack's because Sgt. Teed had previously seen Jack on it)].

11.     By 1:24 a.m., Eileen Dry calls 911 to report that a man was running around her "house and some other houses" yelling for help. [ECF No. 78, 8; *Call for Service Reps.*, Ex. 6 at 1; *911 Call*, Ex. 7 at 0:08–0:14, 0:23–0:24, 1:38–1:40, 2:51–3:2; ECF No. 57-15, at 10].

12.     Dry claims the man dug through her recycling bin before running towards Main Street. She claims he then returned to the side of her house where he pushed in the window air conditioning unit, causing some glass on her window to break. [Ex. 7 at 0:15–0:21, 2:51–3:21; ECF No. 78, 8].

13.     Dry reports the man was wearing black pants but no shirt. [Ex. 7 at 1:31–1:35].

14.     At the time of her call, Dry could no longer see or hear Jack. [Ex. 6 at 2]. She simply requests police "cruise the neighborhood" to try to find him. [Ex. 7 at 1:21– 1:31].

**1:27 a.m.     Wyss and Johnson respond to the call**

15.     While Dry is still on the phone with 911—and while Johnson and Wyss are still chatting—Dispatch notifies Wyss of the call from Dry and reports a man was running around the caller's home and had pushed in a window AC unit, causing the window to break. [*Johnson MSP*, Ex. 8 at 1]. Wyss believes the call was for malicious destruction of property (MDOP). [Ex. 1 at 1; *But see* Ex. 8 at X].

16.     Wyss *immediately* believes Jack is the suspect. [ECF No. 81-2, 29:19–30:6; Ex. 3 at 10:39–10:48 ("If this is the same guy I'm thinking of . . ."); ECF No. 57-15, 36; *See also id.* at 75 (Johnson asking Wyss whether Jack was the guy who approached him earlier)].

17.     Initially, both Wyss and Johnson canvas the area in their patrol vehicles. [Ex. 1 at 1]. After six or so minutes, Wyss decides to make contact with Dry; Johnson continues to canvas the area. [ECF No. 81-2, 30:21–31:3; ECF No. 78, 8; ECF No. 81, at 10, 11; Ex. 8 at 1; ECF No. 57-15, at 35; Ex. 3, at 0:01–7:13].

**1:34 a.m.      Wyss arrives at Dry's house; Johnson canvases the area**

18.      When Wyss arrives at Dry's house, Dry relays the same information to Wyss: a man with black pants but no shirt was circling the outside of her house, yelling for help, and digging through her recycling bin before running away and then returning, which is when he pushed in her window AC unit causing her window to break. [*See* ECF No. 78, 8; *See* ECF No. 81, 10; Ex. 3 at 8:08–8:34; ECF No. 81-2, 33:2–6, 34:21–24; ECF No. 81, 11; ECF No. 57-15, 35; Ex. 1 at 1].

**1:40a.m.      Wyss sees Jack and follows him on foot; Johnson activates his body camera**

19.      After about seven minutes of speaking to Dry, Wyss sees Jack yelling incoherently and running towards Main Street.  [Ex. 3 at 13:07–13:27; *See* ECF No. 78, 8; ECF No. 81, 12; Ex. 1 at 1 (stating Jack was yelling incoherently); ECF No. 57-15, 37; ECF No. 81-2, 36:18–24].

20.      Wyss begins to follow in Jack's direction by walking. [*Twp. Answer*, ECF No. 15, ¶ 35].

21.      Wyss radios Johnson: "he's not wearing a shirt; black pants." [Ex. 3 at 13:24–13:27; Ex. 8 at 1; ECF No. 57-15, 8: 13:49, ECF No. 57-15, 37].[4]

**1:42 a.m.      Johnson makes contact with compliant and familiar Jack Lunneen**

22.      By this time, Jack is near the corner of Cass and Madison, which is approximately a block away from Dry's home. [ECF No. 78, 8]. Jack approaches the passenger side of Johnson's vehicle and asks to get in. [Ex. 8 at 1; ECF No. 78, 8].

23.      Johnson tells Wyss he has a visual and provides their location. [Ex. 3 at 14:23–14:32]. At this point, Wyss begins to jog back to his vehicle and drive to their location.  [*Id.* at 14:23–14:24; ECF No. 81-2, 39:8–16; Ex. 1 at 1].

---

[4] Dash-camera video footage from the incident is unavailable because neither officer had his overhead lights activated. [*MSP Rep.*, Ex. X, at 3].

24.     Johnson parks and exits his vehicle. [Ex. 3 at 14:23–14:32; *Video2*, Ex. 10 at 14:33–14:41].

25.     Johnson recognizes Jack *immediately*. Jack had worked for Johnson's father in years past [*T. Lunneen Dep.*, Ex. 11, 30:7–12]. In fact, Johnson was quite familiar with Jack. [ECF 81-3, 33:13-34:14 "He's done work around the area. I've ran into him. I've just had conversations with him."]. Johnson also knew Jack from his involvement with the BCSO Narcotics team. *Id.*

26.     Johnson also recognizes that this behavior is abnormal for Jack. [ECF 81-3, 48:20–22].

27.     Johnson orders Jack to the front of his vehicle "to sort things out." [Ex. 8, at 1].

28.     The following conversation occurs next:

Johnson:        "Step to the front of the vehicle."

Jack:           "Okay, sir. Are you my protection?"

Johnson:        "Stay right there, don't move."

                *Johnson puts on gloves, Jack moves from agitation*

Johnson:        "Stay right there!"

                *Jack moves from agitation*

Jack:           "Officer, (mumbles)."

Johnson:        "Stay right there, I'm not playing with you! Get to the front of the car."

Jack:           "Why are you doing this to me?"

                *Jack complies by kneeling in front of Johnson's patrol car*

Jack:           "Help, please!"

                *Johnson continues putting on gloves*

Jack:           "Sir, tell me, who's Lunneen?"

Johnson:        "You are."

Jack:           "Thank you. Thank you, sir."

                *pause*

Jack:           "Are you guys tryna kill me?"

Johnson:        "No."

[ECF No. 57-15, 70–71 (1:21:00–1:41:27); *See also* ECF No. 78, at 8; *Cnty. Answer*, ECF No. 14, ¶ 46].

**1:43 a.m.     Wyss connects with Johnson and Jack**

29.     As Wyss arrives at the corner of Cass and Madison, he immediately recognizes Jack as the man on the bike. [ECF No. 81-2, 35:12–17, 40:13–16; Ex. 1 at 1].

30.     By this point, it is obvious to both officers that Jack's pants are loosely fitted and falling down. [ECF No. 81-2, 45:7–9].

 

31.     Both Officers know Jack is unarmed. [ECF No. 81-2, 45:10–21, 76:9–11; ECF No. 81-3, 58:1–2, 64:2–8].

32.     Johnson radios: "If you could, maybe have medic run this way. . . Excited delirium of some sort." [ECF No. 57-15, 71: 2:00:02–2:07:14].

33.     Wyss hears Johnson claim Jack was suffering from "excited delirium." [ECF No. 57-15, 71: 1:52:17–2:07:14]

34.     Jack asks for—and receives—permission to stand up. [Ex. 3 at 15:44–48; ECF No. 78, at 8; ECF No. 81, at 12; ECF No. 57-15, at 71:2:16:12–2:19; ECF No. 57-15, 38; ECF No. 81-2, 42:21–23, 43:18–19].

35.     Jack is having difficulty breathing and holds onto the patrol car for balance. [Ex. 3 at 15:50].

36.     The following conversation then takes place:

| | |
|---|---|
| Jack: | "Well guys, what's going on . . . is I've been working hard, guys. And I'm an addict. *coughs twice* Right now, it's climaxing. (mumbles). I'm sorry. Guys. HELP! YES! CALL MY PEOPLE HERE TOO! (mumbles). And, uh, I didn't say a word to nobody. Not a soul. About anything (inaudible). I swear to God on my life. I don't—you guys know. ***I know what's happening and you're gonna kill me. Why?!*** Guys." |
| Wyss: | "Nobody's gonna kill you tonight, all right?" |
| Johnson: | (to Wyss) "You have PC?" |
| Jack: | "Huh?" |
| Wyss: | "Yeah, I got MDOP." |
| | *Officers start to close-in on Jack* |
| Jack: | "Okay, I'm sorry." |
| Wyss: | "Turn around for me." |
| Jack: | "All right." |
| Wyss: | "Turn around, turn around." |
| Jack: | "HELP!" |
| Wyss: | "Put your hands, yep, nope, right here." |
| | *Jack starts to walk backwards, facing the officers* |
| Wyss: | "Nope, nope, nope, c'mon, hey, hey, hey." |
| | *Johnson draws and points taser at Jack's chest* |
| Jack: | "HELP! FINE!" |
| Wyss: | "Nope, you need to stay right here." |
| Jack: | "Guys, don't do this!" |

[Ex. 3 at 15:53–16:33; *See* ECF No. 78, 9; ECF No. 81, 12; Ex. 9 at 1; Ex. 8 at 1; ECF No. 57-15, 38–39 (citing video markers)].

**1:45 a.m.       Wyss and Johnson close in to arrest Jack, who is fully compliant, deeply paranoid, and obviously in need of medical attention**

37.       The officers close in on Jack and decide to execute an arrest despite acknowledging Jack was fully compliant. [ECF No. 81-2, 42:24–25, 43:15–17, 47:12–18].

38.       The officers never tell Jack he is under arrest. [*See* Ex. 3 at 16:36–16:41; ECF No. 81, 12; ECF No. 81-2, 47:10–11, 19–22].

39.       Johnson draws his taser and points it directly at Jack's chest; both officers continue to shout commands, and Jack continues to plea for help, saying: "Okay. Why? Why? Why are you being this way? HELP! HELP!" [Ex. 3 at 16:46–17:10; ECF No. 81, 12; ECF No. 57-15, 39 (16:38)].

40.       Jack has his hands up nearly this entire time, except for when he complies with Johnson's command to put his arms behind his back. [*Compare* Ex. 3 at 16:46–17:10, *with id.* at 16:52; ECF No. 57-15, 39].

41.       A back-and-forth with constant, physical movement and shouting—by both the officers and Jack—then ensues. [Ex. 3 at 17:10].

42.       During this time, the officers continue to yell verbal commands at Jack to "get down on your knees" and "put your hands behind his back," to which Jack responds with things such as "Don't please!", "Please don't!", "I'm not the one!", and "Please no!", all while continuing to shout for help. [ECF No. 57-15, 39–41 (16:32-17:43)].

43.       During this entire time, Johnson has his taser unholstered and drawn, which projects a red laser beam onto Jack's torso. [ECF No. 57-1, 23 (citing video at 16:45)].

**1:47 a.m.       Johnson tases Jack in the chest; Wyss pepper sprays Jack twice in the face**

44.     Johnson then says: "There are cars coming, get down." [ECF No. 57-15, 41 (17:45)]. However, no car ever passes the group on the street. [ECF No. 81-2,55:9–24].

45.     Without any warning, Johnson deploys his taser ten seconds later, which hits Jack in the chest. [*See* ECF No. 81-2, 60:15–20; ECF No. 57-3, 5; *TaserLogs*, Ex. 12 at 1–3 (showing the discharges at 1:47:06, 1:47:41 and 1:47:57; Ex. 9].

46.     Jack reacts to the taser by doubling over in pain, grunting, and yelling "Ouch!"; he then rips the probes out of his chest. [ECF No. 57-7, 6 (photograph of Jack doubling over)].

47.     Wyss hears and sees the taser deploy and hit Jack in the chest. [ECF No. 81-2, 63:1–25; Ex. 1 at 2].

**Wyss and Johnson tackle Jack and use compressive body weight and pain compliance techniques to effect prone handcuffing**

48.     Immediately after Johnson deploys his taser, Wyss says, "All right, he's going down!" [ECF No. 57-15, at 41].

49.     Less than a minute later, Wyss deploys his pepper spray twice, hitting Jack on the side of the head and then in the face. [Ex. 1 at 2; ECF No. 57-15, 41, 42 (noting the taser was deployed at 17:54:27, and OC was sprayed at 18:22:27 and 18:25:27)]].

50.     The officers then close in on Jack and wrestle him to the ground. [ECF No. 57-15, at 42]. They do so with the knowledge that Jack had been exhibiting signs of so-called "excited delirium" for at least thirty minutes, had just engaged in near constant physical motion and was breathing rapidly, and had just been tased in the chest and pepper sprayed twice in the face.

51.     Initially, Jack lands on his hands and knees, so the officers grab Jack and use their "body weights to pull him down." [ECF No. 81-2, 72;8–15].

52.    The officers repeatedly yell at Jack to roll over and to give them his hands; Jack responds with "help," "ow," "stop," "sorry guys," "help me, please," "for the sake of god" "don't."; "I f****** up, I'm sorry," "Guys don't"; "C'mon." [ECF No. 57-15, at 42–43].

53.    At 1:47:34 a.m., Wyss performs a "leg sweep" to push Jack's legs out from underneath him and cause him to fall completely to the ground. [Ex. 1 at 2; ECF No. 57-15, 42 (18:53); ECF No. 81-2, 71:2–9, 71:15, 73:3–8; *But see id.* 5:4–8 ("We were in the middle of the street. And if he's gonna have a hard landing, I want to try and catch him, lest he injure himself going down.")].

54.    The officers successfully force Jack's entire body to the ground, with Jack landing on his side. [ECF No. 57-11, 4].

55.    At one point, Wyss says "Nope, don't grab me" and Jack responds "I won't." [ECF No. 57-15, 43: 19:30-31].

56.    Nevertheless, Wyss applies pressures to Jack's mandibular nerve to gain compliance. [ECF No. 81, 3; Ex. 1 at 2].

57.    By 1:48:45 a.m., Johnson is entirely on top of Jack, belly to back, while Jack is in the prone position. [ECF No. 57-15, 44: 20:04; Ex. 1 at 2 ("Johnson positioned himself above and behind Jack's torso and attempted to pull Jack's arms behind Jack's back")].



58.     The first handcuff is placed on Jack's hand at 1:49:12 a.m. [ECF No. 57-15 at 44, 20:31].

59.     With Johnston still on top of Jack, Wyss moves to the other side of Jack's body to cuff his other hand. [Ex. 1 at 2].

60.     Jack's last audible words were "I'm sorry, sir, I'm sorry," "Sir," and "I apologize." [ECF No. 57-15, 43–44 (20:00, -:06, -:15)].

61.     Jack's pleas turn into groans and mumbles which become more and more faint as the encounter goes on. [*Id.* at 43–44].

62.     Then—for the first time since the interaction began—Jack goes silent. [*Id.* at 44 (1:49:18 a.m.)].

63.     Johnson places Jack's left arm behind his back while Wyss handcuffs the second arm, after which both of Jack's arms are handcuffed and placed behind his back. [Ex. 1 at 2].

64.     Johnson declares Jack detained at 1:49:51 a.m. [ECF No. 57-15, 44].

65.     Jack lays handcuffed on the cold ground, face down, and with his pants down far enough to expose his genitals and buttocks. [ECF No. 15, ¶ 78].

66.     Jack had stopped moving at least twenty seconds before Johnson's declaration. [ECF No. 57-15, 44].

**1:49 a.m.     Wyss and Johnson leave Jack unconscious and handcuffed in the prone position**

67.     Almost immediately thereafter, Johnson acknowledges Jack is having trouble breathing. [*Id.* 44 (21:20)].

68.     Wyss stays kneeling down next to Jack and keeps at least one hand on Jack's cuffed hands and/or back the entire time, to ensure he did not escape. [ECF No. 15, ¶ 86].



69.     Two minutes after Jack's last audible noise, the following conversation occurs:

Wyss:          "You hurt?"

Johnson:       "No, I'm good."

Wyss:          "All right."

Johnson:       "And I prolly got blood all over me."

Wyss:          "Yeah, this uniform's gettin' washed."

[ECF No. 57-15, 45 (citing 22:42–22:49)].

. . . (30 seconds pass)

Wyss:          "Is that Mike?" (referring to the paramedic)

*2 minutes and 47 seconds after Jack's last audible sound*

| | |
|---|---|
| Johnson: | "I don't know." "Is he breathing?" (referring to Jack) |
| | *Wyss checks pulse, then shakes Jack* |
| Wyss: | "He looks kinda grey." |
| Johnson: | "We gotta get some Narcan, I don't know what the heck he took." |

[ECF No. 57-15, 45 (citing 23:24–23:43)].

**1:52 a.m. The paramedic arrives at the scene and immediately notices Jack is not breathing**

70. The paramedic pulls into the bank parking lot and exits his vehicle; then, the following conversation occurs:

| | |
|---|---|
| Paramedic: | "Tell me the mess here." |
| Johnson: | "He lost his mind, we were fighting him, fighting with him, and now he's on the ground." |
| Paramedic: | "Is he breathing?" |
| Johnson: | "Well, he was just a minute ago, but he was—" |
| | *paramedic checks Jack's pulse* |
| | *Three-and-a-half minutes after Jack's last audible sound* |
| Paramedic: | "He isn't even breathing." |
| Johnson: | "Where'd my taser go? Any idea?" |
| Wyss: | "I kicked it right over . . . in my shadow right there. I just kicked it away from him so he didn't get any good ideas." |
| Johnson: | "This thing didn't even work." (referring to the taser) |
| Wyss: | "Well you got one." |
| Paramedic: | "Can we get him on his back guys." |
| Johnson: | "Yeah." |
| Paramedic: | "We should probably un-cuff him too, 'cause he's not going anywhere." |
| Johnson: | "Alright, lemme get—" |
| Wyss: | "Can you give me a light?" |
| | *Wyss unhandcuffs Jack* |
| Paramedic: | "Do we know what he did?" |
| Wyss: | "He broke out somebody's window, messed up their AC unit." |
| Paramedic: | "Do we know if he took a bunch of drugs or anything?" |

| | |
|---|---|
| Wyss: | "And when we tried to get hands on—" |
| Johnson: | "He didn't say, he thought we were trying to kill him and—" |
| Wyss: | "I mean he was paranoid as shit." |
| | *Four-and-a-half minutes after Jack's last audible sound* |
| Paramedic: | "Let's roll him on his back." |
| Johnson: | "Yeah, I just need to get—" |
| | *attempting to remove handcuffs* |

[*Id.* 46 (citing 24:04–25:21)].

71.     Jack is finally rolled to his back approximately five minutes after his last audible sound. [*Id.* at 46 (citing 25:32)].

72.     Before asking the paramedic if he needs any help, Johnson again expresses frustration that the taser "didn't even work." [*Id.* at 46 (citing 24:40, 25:49) ("What do you need, Mike?"].

73.     The paramedic asks for help grabbing the LUCAS machine out of his vehicle. [*Id.* 46 (citing 25:51–47: 25:53)].

74.     Wyss asks the paramedic whether he has any extra "medical gloves" and then searches for them. [*Id.* at 47 (citing 26:02)].

75.     Johnson retrieves the LUCAS machine from the paramedic's vehicle. [*Id.* at 29 (citing 01:54:48 a.m.); *Compare id.*, *with* ECF No. 78, 7 ("Johnson assisted him in attempting to resuscitate" Jack)].

**1:56 a.m.     Chest compressions are finally applied to Jack via a LUCAS machine seven minutes after becoming unresponsive and unconscious**

76.     Finally, the paramedic places the LUCAS machine onto Jack's chest. [ECF No. 57-15, 47 (26:53:12)].

77.     Wyss comments that Jack "must have pissed off the gods of police this week, s***." [*Id.* at 48 (30:24:28)].

78.    More than four minutes passed from the time the paramedic arrived until the LUCAS machine was functioning; this means the LUCAS machine was not functioning for more than *seven minutes* after Jack had stopped moving, during which time Jack received absolutely no CPR or other life-saving intervention. [ECF No. 57-7, 9].

79.    Both Wyss and Johnson had automated external defibrillators (AEDs) in their vehicles; Wyss also had a breathing bag. [ECF No. 15, ¶ 84; ECF No. 81-3, 26:10–22, 31:10–13].

80.    Wyss had substantial training in CPR, basic life support, and first aid, including mental health first aid. [ECF No. 81-2, 48:17–23, 79:1–3; *Wyss Training Records*, Ex. 13, *passim*; ECF No. 15, ¶ 83].

81.    Per his CPR training, Wyss knew he needed to place Jack on his back immediately and begin chest compressions. [ECF No. 81-2, 123:14–19].

82.    Johnson also had substantial training in CPR, first aid, and basic life saving techniques, including in response to persons with mental illness. [ECF No. 81-3, 26:10–22; *Johnson Training Records*, Ex. 14].

83.    Nevertheless, neither Wyss nor Johnson even attempted to perform CPR or other basic life saving measures—including the use of their AEDs or Wyss's breathing bag that were in their patrol vehicles just 50 yards away. [ECF No. 15, ¶ 88].

**2:12 a.m.    Jack is taken to the hospital by ambulance; the officers call their supervisors and union attorneys**

84.    Jack is eventually loaded into an ambulance and taken to a nearby hospital.

85.    Before returning to their respective patrol vehicles, Johnson and Wyss exchange report information with one another. [ECF No. 15, ¶ 90].

86. Once in his vehicle, Wyss calls Chief Toliver. [ECF No. 15, ¶ 106; ECF No. 57-15, 51 (36:04)].

87. Wyss says: "I just got into a fight with a junkie and he might have died." [*Id.* (36:09); ECF No. 15, ¶ 107].

88. When asked what happened, Wyss says: "We found him and he decided he wanted to start fighting. And, uh, when we finally got him on the ground, he just like stopped completely and went grey." [ECF No. 15, ¶ 108; ECF No. 57-15 at 51, 36:26–36:30].

89. Wyss concludes: "It blew up in my face." [ECF No.15, ¶ 27; ECF No. 57-15 at 52, 37:24].

90. Once Wyss turns off his body camera, he contacts his union representative and asks for legal representation out of concern that criminal charges were possible. [ECF No. 81-2, 92:16–25; 93:8–14, 94:11–21, 96:13–24, 97:14–21].

**2:30 a.m. Jack is pronounced dead at Lakeland hospital**

91. Resuscitation measures are unsuccessful, and Jack is pronounced dead at 2:30 a.m. [*Med. Exam. Rep.*, Ex. 15 at 1].

**Jack's autopsy reveals severe bruising and 74 separate contusions and abrasions from the encounter**

92. The autopsy detailed at least seventy-four *separate* abrasions and contusions on Jack's "face, head, neck, abdomen, back, and extremities, including taser perforations," which is indicative of a severe struggle. [ECF No. 57-3, 5; ECF No. 81-6, 2, 4; *Id.* at 8–10; *Autopsy Photographs*, Ex. 16 (detailing the abrasions, contusions, hemorrhages, and other injuries suffered)].

93. Many of these injuries were to Jack's face, nose, and mouth, which demonstrate that his face was pressed "against the ground" and interfered with his ability to breath. [ECF No. 57-3, 5; Ex. 16].

94. The autopsy also revealed "large areas of hemorrhage in the soft tissues and deep muscles of [Jack's] mid and lower back," demonstrating the extreme level of prone back pressure applied. [ECF No. 57-3, 5, 7–8].

95. Jack also had conjunctival petechia in both eyes, which is most often associated with asphyxia or manual strangulation.[5] [ECF No. 57-7, 9, 16].

96. A toxicology report was positive for methamphetamine at 333 mg/L. [*Id.* at 10]. This amount is less than that found in recreational meth users. [*Id.* at 18].

**The pathologist concludes cause of death is excited delirium but rules the manner of death indeterminate because the diagnosis is highly controversial**

97. Dr. Douglas, the pathologist who conducted the autopsy, concluded the cause of death was excited delirium associated with methamphetamine use and cardiomegaly. [ECF No. 81-6, at 4]. Because Dr. Douglas recognized the "significant debate in the medical community regarding manner of death certification in excited delirium deaths associated with law enforcement intervention," Dr. Douglas ruled the manner of death was indeterminate. [*Id.* at 4–6]. In doing so, she reasoned there were "reasonable arguments for invoking a manner of death of accident *or homicide*." [*Id.* at 5 (emphasis added); *Douglas Dep.*, Ex. 17 at 90:6–8, 91:4–16, 91:22–24; *But see* ECF No. 57-7, 2, 10 (concluding manner of death was homicide); ECF No. 57-3 at 8].

---

[5] "Petechiae are small pinpoint hemorrhages which indicate mechanical obstruction of venous return to the head, and associated restriction of respiration. Petechiae can be seen anywhere in the body, but when they are found in the white (sclera) and conjunctiva of the eyes, they are most often associated with asphyxia, and manual strangulation, in particular." [*Freeman*, ECF No. 57-7, at 16; *See also Wohlgelernter Rep.*, ECF No. 57-11, at 6].

98.     It is undisputed that excited delirium is a highly controversial diagnosis. [ECF No. 57-3, 6; Ex. 17 at 62:4–5 (admitting the debate in the medical community concerning a history of forcible restraint); Ex. 17 at 65:11–12, 68:5–8, 69:3–4, 69:13–14, 72:6–7, 93:1–20 (admitting others would conclude differently); ECF No. 57-7, 19–22; ECF No. 81-6, at 4–6].

99.     The diagnosis is not recognized by the American Medical Association, [ECF No. 57-3, 6],[6] the American Psychiatric Association, [*Id.*], cardiologists, [ECF No. 57-11, 7], or the Diagnostic and Statistical Manual of Mental Disorders (DSM-5). [ECF No. 57-7, 19].

100.    For decades, excited delirium has been promoted "as a novel rationale for ignoring the potentially fatal effects of restraint-related asphyxia" when in-custody deaths occur. [ECF No. 57-7, 2 (stating the diagnosis is used almost exclusively for in-custody deaths and provides an exculpatory explanation for a death that may otherwise be attributed to excessive force)].

**Post-death investigations**

101.    Both Wyss's and Johnson's respective departments placed them on administrative leave with pay, pending investigations into the incident. [*Wyss Leave Letter*, Ex. 18 at 1; *Johnson Leave Letter,* Ex. 19; ECF No. 15, ¶ 110].

102.    The Michigan State Police investigated Jack's death. [ECF No. 15, ¶ 111].

103.    Through his attorney, and as part of this investigation, Wyss provided a written statement to the Michigan State Police. [ECF No. 81-2, 117:5–6].[7]

104.    Johnson also consulted legal counsel and received legal advice prior to and when writing his report. [ECF No. 81-3, 123:3–4, 123:15–124:7].

---

[6] "The AMA's position is that there is not medical evidence to support the existence of such a condition and has denounced its use as a false means of justifying excessive use of force by law enforcement." [*Baden*, at 6].

[7] Johnson's and Wyss's written statements were identical but given to the MSP and their respective departments. [*See Wyss Dep.*, 117:9–12].

105.     On October 26, 2018, Chief Toliver of the BSOTPD informed Wyss that he did not violate the department's "Use of Force, Use of Weapons and Restraints, Post Force Reporting Process (Chapter 3 and Chapter 4)." [Ex. 18 at 2]. Consequently, Toliver revoked Wyss's administrative leave notice and permitted him to return to work on October 29, 2018. [*Id.* at 2; *But see Twp. Rep.*, Ex. 20 at 2 (stating Wyss's report was reviewed on October 30, 2018)].

106.     Johnson also returned to work shortly thereafter. [ECF No. 14].

107.     On March 4, 2019, the Berrien County Prosecutor's Office declined to pursue criminal charges against Wyss and Johnson, finding the officers did not act criminally but conceded that their actions contributed to Jack's death. [*Prosecutor's Mem.*, Ex. 21 at 1; ECF No. 15, ¶ 112].

## III.     DISPUTED AND MATERIAL ACTS

The following facts are disputed and, on summary judgment, must be resolved in the light most favorable to Plaintiff and disregard Defendants' conflicting evidence the jury isn't required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

**The cause of Jack's death**

108.     The parties dispute whether the officers' actions caused or contributed to Jack's death. [*See* ECF No. 78, 21]. The County Defendants contend there "is simply no basis to conclude that any act or acts by Sgt. Johnson caused or contributed to" Jack's death. [ECF No. 78, 21]. According to the County, "the record shows [Jack] was in a state of drug-induced 'excited delirium.'" [*Id.*].

109.     Plaintiff's retained experts, including Dr. Baden, Dr. Freeman, and Dr. Wohlgelernter, explicitly reject and substantively refute Dr. Douglas's findings, conclusions, and analysis. [ECF Nos. 57-3, 57-7, 57-11].

a. According to Dr. Baden, Jack died from "traumatic asphyxia during restraint by prone back pressure, pepper spray, and taser use." [8] [ECF No. 57-3, 7–8]. Dr. Baden explains that "[c]ompression of the neck, chest, and abdomen during physical restraint is an asphyxia mechanism resulting from restricted inspiration." [ECF No. 57-7, 14]. Pressure on the prone back "forces the abdominal organs upwards against the diaphragms" which "prevents the diaphragms from moving downward and expanding the lungs which is necessary to inhale air and oxygen." [ECF No. 57-3, 7]. "This is why victims of excessive force often cry out 'I can't breathe.' They truly can't inhale." [*Id.*].

b. Dr. Wohlgelernter agrees, finding Jack died from "restraint/compressive asphyxia with mechanical obstruction of respiration, secondary to compressive force applied to his torso by the police officers with resultant respiratory compromise and subsequent development of hypoxia/hypoxemia causing asystole and PEA cardiac arrest." [ECF No. 57-11, 6]. [9] Dr. Wohlgelernter "rejects the contention that a major contributing factor to the sudden cardiac arrest" was methamphetamine intoxication. [*Id.*]. Dr. Wohlgelernter explains: "The undeniable fact that the cardiac rhythms at the time the EMS confirmed cardiac arrest was asystole and PEA is incompatible with the theory that methamphetamine was the culprit." [*Id.*]. "Methamphetamine, even at lethal levels of intoxication, does NOT cause asystole or PEA." [*Id.* at 7]. Additionally, he

---

[8] "[A]sphyxia is defined as a lack of oxygen (*i.e.* hypoxia) caused by an interruption in breathing, and is a well-known trigger of cardiac dysrhythmia and arrest." [ECF No. 57-7, at 14]. In the context of restraint, positional asphyxia "refers to increased difficulty with breathing that is associated with the use of restraint" used on a prone position. [*Freeman*, ECF No. 57-7, at 14].

[9] Asystole—also known as flatline—"is a state of cardiac standstill with no cardiac output and no ventricular depolarization." [ECF No. 57-11, 6]. In this case, "the only plausible explanation for the asystole is suffocation/restraint asphyxia related" the prone restraint. [*Id.*]. Pulseless electrical activity (PEA) "refers to cardiac arrest in which the electrocardiogram shows a heart rhythm that should produce a pulse, but does not." [*Id.*]. Similarly, "the only plausible and possible cause of PEA cardiac arrest in the case of Jack Lunneen was hypoxia/hypoxemia secondary to restraint/compressive asphyxia. No other cause of PEA is plausible or relevant in explaining Jack's cardiac arrest." [*Id.*].

"rejects the contention that the cardiomegaly noted by Dr. Douglas was a major contributing factor to Mr. Lunneen's cardiac arrest because there is no evidence of acute or prior myocardial infarction, and the cardiomegaly "was not of sufficient severity to cause sudden cardiac arrest." [*Id.* at 5, 7 (stating there are no clinical records documenting arrhythmias creating symptoms or requiring treatment)].

   c.  Dr. Freeman concurs. [ECF No. 57-7, 18, 24]. According to Dr. Freeman, the risk that Jack would have died from cardiac arrest absent restraint by the officers was 1 in 46 million. [*Id.* at 22, 24].

   d.  The risk of death from methamphetamine is "1 death per 353,000 doses of methamphetamine" which makes the risk of death from a single dose of methamphetamine "exceedingly small." [*Id.* at 18, 24]. Moreover, Dr. Freeman states there is no evidence to support the implication "that the very small amount of methamphetamine in" Jack's post-mortem blood "was even a *plausible* cause of his death in the absence of the violent restraint." [*Id.* at 18].

   e.  Thus, when the evidence is viewed in the light most favorable to Plaintiff, there is sufficient evidence in the record upon which a reasonable jury could conclude that the officers' actions caused Jack's death. [*See* Ex. 21 at 1; Ex. 17, 87:24–25 ("yes, I think the law enforcement intervention contributed" to Jack's death); *Id.* 80:19–20, 97:25–98:1 (admitting law enforcement intervention contributed to his death)]. *See also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004) (finding an argument similar to the County's inapposite because, even if suspect "had not died, but had only been injured, his clearly established rights were no less violated").

**Jack's alleged/suspected crime**

110.    The Defendants contend Jack was suspected of malicious destruction of property (a misdemeanor) or attempted breaking and entering (a felony). [ECF No. 81, 11]; *Compare* MICH. COMP. LAWS § 750.377a(c) (MDOP), *with* MICH. COMP. LAWS § 750.110 (breaking and entering).[10] Plaintiff disputes the attempted breaking and entering allegation.

a.    The overwhelming weight of the evidence demonstrates the 911 call was for suspected malicious destruction of property. [Ex. 18 at 2 (referencing "MDOP/In Custody Death"); Ex. 20 (MDOP); ECF No. 81-2, 28:22–25, 29:1–4l; ECF No. 81-6, 2, 4–5 (MDOP); Ex. 1 at 1; ECF No. 57-15, 52 (Wyss telling Chief, MDOP)].

b.    The only evidence in support of the breaking and entering allegation is Johnson's written report and deposition testimony. [Ex. 8 at 1; ECF No. 81-3, 65:1–2]. There is no evidence demonstrating either Wyss or Johnson had information to believe Jack had *entered* Dry's home. In fact, Dry called 911 *after* Jack had already left the premises surrounding her house and she could no longer see him.

c.    Additionally, it is undisputed that, before the officers closed in on Jack to execute an arrest, Johnson asked Wyss whether he had probable cause, and Wyss said: "Yeah, I got MDOP." [ECF No. 57-15; ECF No. 81-3, 124:8-13 (confirming he understood MDOP to mean malicious destruction of property, a misdemeanor); *See id.* at 111:11–16)]. Thus, in viewing the evidence in the light most favorable to Plaintiff, Jack was suspected of committing a property-based misdemeanor.

**Whether Jack was actively resisting arrest or feared for his life**

111.    The parties dispute whether Jack was resisting arrest.

---

[10] *But see People v. Culp*, 310 N.W.3d 421, 108 Mich. App. 452 ("To commit the crime of malicious destruction of property, the defendant must have intent to injure or destroy the property; if he voluntarily becomes so intoxicated that he in fact does not have requisite intent, he cannot be convicted of the crime").

a.     Collectively, both sets of defendants contend that Jack "resisted," "evade[ed] the officers," [ECF No. 78, at 5, 10, 13], "pulled away," and "actively resisted." [ECF No. 81, 10, 19].

b.     However, it's undisputed that Jack was fully and completely compliant until he feared the officers were going to kill him.  It was only after Jack feared for his life that he began to walk away from the officers who—at that time—began closing in on him quickly from both sides.

c.     It is undisputed that, from the time the officers closed in to execute an arrest until they tackled Jack to the ground, Jack toggled "between walking backwards and walking towards the officers." [Ex. 9 at 6; *Cnty.* 9 at 6; ECF No. 78, 9 (claiming Jack "tried to flee from the officers by *walking away* and as he did, he continued to yell for help) (emphasis added)]. This yo-yo-like movement is contrary to traditional notions of fleeing or evasion. [*See* ECF No. 81-2, 52:13-18 (acknowledging that, over the course of the *entire* interaction, Jack *never* "turn[ed] his back and start[ed] running from" Wyss or Johnson)].

d.     Throughout the encounter, the officers demanded Jack to:

- turn around 3 times, [ECF No. 57-15, 39];

- stop moving 4 times, [*Id.* at 39, 41];

- get down on his knees 18 times, [*Id.* at 39–42];

- put his hands behind his back 10 times, [*Id.*]; and

- roll over onto his stomach 7 times, [*Id.*].

e.     According to the County Defendants, "Johnson issued 19 distinct commands to [Jack] to turn around, put his hands on his back, and/or to get down on his knees. Each of the 19 commands for compliance were disregarded." [ECF No. 78, 9].

f.  Jack responded to every single one of the officers' commands; specifically, Jack:

- asked if the officers were going to kill him 3 times, [ECF No. 15, ¶ 97];
- begged the officers not to shoot him 3 times, [ECF No. 57-15, 39–40];
- apologized to the officers 7 times, [*Id.* at 38–43];
- pleaded with the officers 13 times, [*Id.* at 10 ("please")];
- questioned why the officers were hurting him 4 times, [*Id.* at 39, 41–43 ("Why?")];
- addressed the officers by "sir" 3 times, [*Id.* at 38, 43];
- uttered phrases like "don't do it," and "no, no, don't" 22 times; [*Id.* at 39–42].
- assured the officers he would comply at least 3 times; [*Id.* at 38, 40, 43, 72]; and
- yelled for help at least 48 times. [*Id.* at 10]. This equates to a cry for help every 6 seconds. [*See* ECF No. 15, ¶¶ 94-95].

g.  Wyss testified it was possible Jack simply did not hear the commands. [*See* ECF No. 81-2, 52:1–5].

h.  In his written report, Johnson claimed that, at times, Jack "would charge toward [him] then turn around and walk toward Cass Street." [Ex. 8 at 2]. It's only after Jack yells for help twelve times and Johnson approaches Jack with a drawn taser for more than thirty seconds *after* Jack reveals he's concerned for his life that Jack briefly runs past Johnson. [Ex. 3 at 16:46–



17:10]. As he does so, Jack runs towards Wyss and the two patrol vehicles and begs the officers three times not to shoot him. [Ex. 3, 17:17–19; ECF No. 57-15, 39–40].

i. Lastly, the parties dispute whether Jack was "swatting at" or "swinging for" either officer. When viewed in the light most favorable to Plaintiff, the evidence shows Jack was "flailing" his arms about in an uncoordinated fashion, [ECF No. 81-2, 51:24–52:6], attempting to swat at red beam from Johnson's laser, pulling the taser probes from his chest, and swatting away the mist from Wyss's OC spray, *not* "swatting at" or "swinging for" the officers.

**Whether Wyss had a "boot gun"**

112. The Township Defendants contend Wyss had a gun concealed in his boot when he encountered Jack during the incident. [ECF No. 81, 13]. According to the Township Defendants, Jack grabbed Wyss's leg during the on-the-ground encounter in the bank parking lot, which allegedly justified Wyss's pressure to Jack's mandibular nerve. [*Id.*]. The County Defendants do not take a position on this factual issue. [*See generally* ECF No. 78]. Plaintiff heavily disputes this contention because:

a. The "gun in my boot" story is revealed *nowhere* in *any* of the post-incident reports, including Wyss's, despite the fact that he was so immediately concerned by the potential consequences of his actions that he contacted his union representative and requested for legal representation. At the very least, the foregoing demonstrates Wyss's objective incentive and subjective desire to include *every single* fact in his report that would *remotely* justify the level of force used. Importantly, however, Wyss fails to mention the purported boot gun in his report. [*See* Ex. 1 at 1–3 (alleging only that Jack grabbed his leg); ECF No. 81-2,120:4–17].

b. After Wyss's deposition, Plaintiff sent requests for production asking Wyss to produce all documents demonstrating that (1) he was allowed to have the boot gun while on

duty; (2) he was in fact concealing the gun in his boot on October 22, 2018; and (3) support his contention that he was concerned Jack was going to grab or access the boot gun during their encounter. [*RFPs*, Ex. 22 at 2 (RFP Nos. 3, 4, 5); *Cert. of Serv.*, ECF No. 44]. Plaintiff also sent Wyss interrogatories asking him to identify and describe (1) the make, model, year, and serial number of the gun he allegedly had in his boot; (2) the make, model, type, and kind of holster he used for the gun; and (3) the brand, size, and type of boot he was wearing during the encounter. [*ROGs*, Ex. 23 at 2; ECF No. 44]. Wyss has never responded to this set of written discovery. [*See generally* Docket (lacking any certificate of service to the contrary); ECF No. 81-2, 74:19–25 (admitting no supportive documents exists)].

       c.    The *only* evidence offered in support of Wyss's position is his self-serving deposition testimony years after Jack's death. [*See* ECF No. 81-2, 73:20–76:15; *See* ECF No. 81, at 13 (citing only his deposition)]. This is precisely the type of statement courts are cautioned to avoid adopting on summary judgment. *Scott v. Heinrich*, 39 F.3d 912, 915 (9th Cir. 1994) (stating courts "may not simply accept what may be a self-serving account by the police officer") (cited with approval in *Jefferson v. Lewis*, 594 F.3d 454 (6th Cir. 2010)).

       d.    Therefore, when the evidence is viewed in the light most favorable to Plaintiff, Wyss was not carrying a concealed gun in his boot. Alternatively, this issue will require the jury to make a credibility determination, which is outside the court's role on summary judgement.

**Whether the taser was effective**

113.    Both sets of Defendants assert the taser was ineffective *because* Jack pulled the probes out. [ECF No. 78, 9–10]. The objective, forensic evidence demonstrates the taser was effective. [Ex. 12; ECF No. 57-15, 59 (demonstrating taser pulsing via audio and video spectrums);

*Id.* at 41: 17:55 ("Ouch!"); *See* Ex. 16 (showing the physical mark on Jack's chest); ECF No. 57-7 (photograph of Jack doubling over in pain); *See also* ECF No. 57-15, 74 (acknowledging, while looking at the discharged cartridges, that at least one probe latched on to Jack's chest)]. Thus, when viewing the evidence in the light most favorable to Plaintiff, the taser was, in fact, effective. [Ex. 16 (photos of taser marks)].

**Whether Jack was left in the prone position**

114.    Both officers assert Jack was not left in the prone position, but was instead placed in a three-quarter position by Wyss. [ECF No. 81, 21; ECF No. 78, 16].

a.    During his deposition, Wyss claimed—for the very first time—that he did not leave Jack in the prone position; instead, Wyss claimed he grabbed, pulled, and rotated Jack into a "three-quarter position." [ECF No. 81-2, 115:24–116:6]. Wyss admits this action is not shown on the video but contends, to the extent it is, it is shown "at a very deceptive angle." [ECF No. 81-2, 116:1–16; *Id.* 87:17–25 (stating the video "doesn't accurately capture the angle"); *Id.* 88:1–10]]. Importantly, however, Wyss testified he will not dispute, and in fact agrees with, the video's depiction of events. [*Id.* 42:15, 70:22].

b.    Wyss's deposition testimony undermines this contention. [*Id.* 84:1–22]. According to Wyss, his "intent" in allegedly rolling Jack into this three-quarter position was to comply with his training, which he acknowledged required him to keep Jack's "face and chest off the ground." [*Id.* 120:15–22]. The video demonstrates Jack's face and chest remained on the ground:



c.  The officers' reliance on Mr. Noble's report is misplaced. Specifically, Noble reports that, post-handcuffing, Jack "is still laying prone on the ground—more on his left shoulder and it appears he is in that position due to his large stomach. Officer Wyss is kneeling over him holding the handcuffs." [ECF No. 57-1, ¶ 27]. Noble's statement contradicts Wyss's testimony that he rolled Jack into that position, *not* to exculpate the failure to do so, as the County contends. [*Id.* ¶ 57(a)–(b)]. Put another way, Noble states that, to the extent Jack is not lying completely prone but is rather tilted slightly, it is because of Jack's stomach, *not* because Wyss intended to roll Jack to avoid creating or worsening already-existing asphyxial conditions. [*Id.* ¶ 57; Ex. 16]. This statement contradicts, rather than exculpates, Wyss.

d.  Similar to the boot gun, Wyss's contention that he rolled Jack into a "three quarters position" is contrary to his written report. Plaintiff sent Wyss interrogatories and requests for production asking for documentation evidencing this maneuver and whether it was compatible with his training or departmental policies and procedures. [Ex. 23; Ex. 22]. Wyss has similarly failed to respond to these sets of discovery.

e.  The Defendants' position is also contrary to the Township Defendants' admission that Jack "laid on the cold ground, *face down*, handcuffed, with his pants down far enough to expose his genitals and buttocks" after he was handcuffed. [ECF No. 15, ¶ 78 (emphasis added)].

f.   On summary judgment, the court "may not simply accept what may be a self-serving account by the police officer." *Heinrich*, 39 F.3d at 912. Instead, the Court "must carefully examine all the evidence in the record," to determine whether the officer's "story is internally consistent and consistent with the other known facts." *Id.*

g.   When the evidence is viewed in the light most favorable to Plaintiff, the officers "failed to follow their training and place [Jack] in a recovery position for more than four minutes and 30 seconds after he had been secured and that failure was inconsistent with generally accepted police practices." [ECF No. 57-1, ¶ 57(a)].[11]

**Whether Wyss applied a sternum rub**

115.   Wyss claims that, after Jack was handcuffed and restrained, he attempted to apply a sternum rub. [Ex. 1 at 2].  This is not captured on the video. [ECF No. 81-2, 87:7–25 (admitting)]. Wyss admits there is *no* documentation—policy, procedure, or otherwise—that supports the "three-quarter" position allegedly used. [*Id.* at 123:9–13].

116.   According to Wyss, Jack "moaned but did not otherwise respond" to the sternum rub. [Ex. 1 at 2]. This is contradicted by Thorton's Report, which indicates Jack's last audible sound occurred 25 seconds before handcuffs were secured. [ECF No. 57-15, 44 (20:37-21:02)].

117.   Moreover, Wyss's admission that he maintained at least one hand on Jack's back or handcuffs after he was subdued is inconsistent with this contention. It would seem rather difficult for Wyss to grab, roll, and rotate an unconscious, 228-pound man in this fashion with only one hand, which allegedly (and simultaneously) occurred with Wyss applying a "sternum rub" to Jack. Most importantly, however, when the evidence is viewed in the light most favorable to Plaintiff, the video shows that—to the extent Jack is lying slightly angled—that position is caused

---

[11] Even if the Court accepts Wyss's three-quarter position claim, the positioning is still contrary to generally accepted police practices, BSOTPD's policies and procedures, Wyss's training, and Sixth Circuit precedent.

by Jack's protruding stomach and not any action of Wyss or Johnson to place Jack into recovery mode. [ECF No. 57-1, ¶ 57(b)].

**The type of force used but not captured on video**

118.    Courts have long recognized that the summary judgment analysis becomes particularly difficult in deadly force cases such as this, where the officers are the only surviving witnesses. *Heinrich*, 39 F.3d at 915. This is because it's "easy to overvalue the narrative testimony of an officer and to undervalue potentially contradictory physical evidence." *Stanton v. Elliott*, 25 F.4th 127 (4th Cir. 2022). Thus, courts "must ensure that the officer[s do] not tak[e] advantage of the fact that the witness most likely to contradict [their] story—the person [who is] dead[]—is unable to testify." *Heinrich*, 39 F.3d at 915. To do so, the court "must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer[s] and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer[s'] story is internally consistent and consistent with the other known facts." *Id.* "It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id*. Put another way, this Court must be cautious and "may not simply accept what may be a self-serving account by the police officer[s]." *Id*.

119.    In this case, the officers admit to using several types of force including tasing, pepper spraying, tripping, tackling, grabbing, prone handcuffing, and restraint post-handcuffing. The officers' motions appear to rely on the assertion that *no other force* was used simply because it's not evidenced by their own post-incident reports or the body camera footage. But the enhanced videos clearly demonstrate additional force was used by the officers—force that they failed to report or admit.

120. For example, it is undisputed that Wyss employed a mandibular grab. [ECF No. 81, 3; Ex. 1 at 2]. However, the following still frame—taken from the perspective of Johnson's video camera—shows *Johnson's* hand on Jack's face and neck, *not* Wyss's.

 



121. In addition to this notable discrepancy, there are significant portions of the video footages (both in quantity and quality) that obstruct the view, either because of Johnson's coat or Jack's body being compressed under the weight of the officers' chests which is where they dawned their cameras. At one point, the physical struggle causes Johnson's camera to fall off. These facts, when considered in conjunction with the extreme injuries noted at autopsy and interpreted in the light most favorable to Plaintiff, support at least a reasonable inference that the officers used

additional, physical force while on the ground and attempting to secure handcuffs. This inference is further supported by the "facts" Wyss "failed to report," such as the three-quarter positioning and "boot gun."

**Plaintiff's Expert's (Jeff Noble's) opinions**

122. Defendants consistently misconstrue Noble's opinions. First, Noble does not offer opinions on the reasonableness of the Johnson's and Wyss's failure to de-escalate the situation before resorting to use of force. [ECF No. 57-1, ¶ 40–41].

123. Second, and contrary to Defendants' assertion, Noble *is* critical of the taser. According to Noble, Johnson's knowledge that Jack was unarmed, mentally disturbed, and minimally dangerous rendered the use of the taser objectively unreasonable and excessive *unless* the taser was deployed to save Jack from an immediate threat of harm *to himself*. [*Id.* ¶ 42(f), (g)]. While Noble believes the car did *not* present such a danger, he recognizes that Johnson's pre-taser warning that a car was coming and the fact that only one car is distantly visible in the video creates a genuine dispute of fact as to whether the car posed an immediate threat of harm to Jack that must be decided by the jury. *Johnson v. Breeden*, 280 F.3d 1308, 1318 (11th Cir. 2002).

124. Third, Noble's opinion regarding the tackle and "control holds" is more nuanced than Defendants imply. Specifically, the opinion is based on the disputed premises that Jack was actively resisting arrest and intentionally non-compliant. [ECF No. 57-1, ¶ 43(a)–(c)]. In short, Noble's opinions on these issues do not view the evidence in the light most favorable to Plaintiff, which is the controlling standard summary judgment.

125. Lastly, the ultimate question is whether Johnson and Wyss violated Jack's constitutional rights based upon an objective reasonableness standard "not an officer's opinion." *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017).

## IV.    LEGAL STANDARD

Ordinarily, the summary judgment movant bears the initial burden to either affirmatively disprove an essential element of the non-movant's case or to demonstrate the non-movant lacks evidence to support the claim at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If, in these circumstances, the movant bears the initial burden, the non-movant must respond and demonstrate the existence of a genuine factual issue to be tried. FED. R. CIV. P. 56(c).

The defense of qualified immunity "alters the usual summary judgment burden of proof." *Tucker v. City of Shreveport*, 998 F.3d 165, 172–73 (5th Cir. 2021). "Although nominally an affirmative defense, the plaintiff has the burden to negate the defense once it is properly raised." *Id.* "Once a defendant invokes qualified immunity, the plaintiff bears the burden to show that qualified immunity is inappropriate." *Quigley v. Thai*, 707 F.3d 675, 681 (6th Cir. 2013). The issue of whether qualified immunity is appropriate is "generally a question of law." *Champion*, 380 F.3d at 900. "However, where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000).

When reviewing a motion for summary judgment, the court must not weigh the evidence or determine the truth of the matter. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). All reasonable inferences must be resolved in the light most favorable to the non-moving party. *Id.* at 255. "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Quigley*, 707 F.3d at 679 (citation omitted).

## V.    RELEVANT LAW

## 1.    SECTION 1983

To succeed on a § 1983 claim, a plaintiff must establish a person acted under color of law to deprive him or her of a federally protected constitutional or statutory right. 42 U.S.C. § 1983. Here, there are two constitutional rights at issue: (1) the right to be free from an officer's use of excessive force under the Fourth Amendment, *Graham v. Connor*, 490 U.S. 386, 396 (1989), and (2) a pretrial detainee's right to medical care when they suffer injury while being apprehended by the police, as guaranteed by the Due Process Clause of the Fourteenth Amendment, *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

## 2.     QUALIFIED IMMUNITY

"Qualified immunity shields government officials from civil-damages liability for violations of 'clearly established statutory or constitutional rights.'" *Burnett v. Griffith*, 33 F.4th 907, 911 (6th Cir. 2022) (internal citation omitted). The qualified immunity analysis has two prongs: (1) whether the facts, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right; and (2) whether the right is clearly established. *Quigley*, 707 F.3d at 680. The two prongs may be addressed in either order, *Pearson v. Callahan*, 555 U.S 223, 236 (2009), but a plaintiff must satisfy both to defeat summary judgment, *Martin*, 712 F.3d at 957.

In relation to the clearly established prong, plaintiffs are not required to "match each application of force with a precisely analogous," "fundamentally similar," or "materially similar" case to satisfy the clearly established prong. *Id.* at 960–71. "The mere fact that a court has not held the particular action in question unlawful is insufficient to create immunity." *Griffith v. Coburn*, 473 F.3d 650, 659 (6th Cir. 2007). "An action's unlawfulness may be plain 'from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs.'" *Martin*, 712 F.3d at 961 (internal citation omitted). "The Court can consider more than

merely the factual context of a prior case: the general reasoning that a court employs may also suffice for purposes of putting the defendant on notice that this conduct is clearly unconstitutional." *Coburn*, 473 F.3d at 659 (internal citation omitted).

## V.     ARGUMENT

## 1.     EXCESSIVE FORCE:

"The Fourth Amendment protects against 'unreasonable seizures' and guarantees citizens the right to be 'secure in their persons.'" *Martin*, 712 F.3d at 957–58. "Whether an officer's use of force in effecting an arrest violates the Fourth Amendment" depends on whether his "actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Id.* at 958 (internal quotations and alterations omitted). "The court must carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.*

Generally, this balancing requires consideration of the three *Graham* factors, which are: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. "Though important," these factors are non-exhaustive, *Martin*, 712 F.3d at 958, and the "bottom-line inquiry is whether the totality of the circumstances justifies a particular level of force," *Wright v. City of Euclid,* 962 F.3d 852 (6th Cir. 2020). In assessing the totality of the circumstances, the Sixth Circuit has found that other relevant considerations may include whether the suspect has diminished capacity, *Champion*, 380 F.3d at 904, and the duration of the encounter, *Palma v. Jones*, 27 F.4th 419, 436 (6th Cir. 2022).

The objective reasonableness of an officer's use of force is considered from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

*Graham*, 490 U.S. at 396. When "a plaintiff claims that excessive force was used multiple times, the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step of the way." *Palma*, 27 F.4th at 429. If, after viewing the facts in the light most favorable to Plaintiff, "a jury could conclude that [Johnson or Wyss] engaged in gratuitous violence by using force beyond the scope of that which was reasonably necessary or justifiable," then the officers are not entitled to qualified immunity. *Id.* at 429–30.

### A. The officers violated Jack's constitutional right when they used excessive force

   *i.      Jack was suspected of committing a property-based misdemeanor*

The first *Graham* factor considers the severity of the crime at issue. *Graham*, 490 U.S. at 396. This factor is relevant because, depending on the nature and severity of the crime, responding officers "may have some reason to fear for their safety or the safety of others." *Palma*, 27 F.4th at 432. Because Jack matched Dry's and dispatch's description of the suspect, Wyss and Johnson "may have been justified in deploying *some* force against" Jack. *See Martin*, 712 F.3d at 958 (emphasis added). "But the question is not whether *any* force was justified." *Id.* (emphasis added). Instead, the question is whether Johnson and Wyss "could reasonably use the *degree* of force employed against" Jack. *Id.* (emphasis added). To apply force so excessive that it resulted in Jack's death—when his only suspected crime was a simple property-based misdemeanor—was not only unjustified but violated Jack's constitutional Fourth Amendment right.

   *ii.      Johnson and Wyss knew Jack was in medical and psychological distress, unarmed, and not dangerous; Johnson knew Jack personally*

The second *Graham* factor considers "the officers' conduct in light of any 'immediate threat' [Jack] posed to their safety and that of others." *Id.* at 958. This factor considers whether the officers "had reason to believe that [Jack] was either on drugs or mentally unstable" and whether they knew he was unarmed. *Id.* Both Johnson and Wyss knew Jack was on drugs, mentally unstable, and unarmed.

Johnson suspected Jack had a history of drug use. [ECF No. 57-15, 48, 75 ("He's involved with meth I know that. I just don't know to what extent."); *Johnson Dep.*, 37:1–2 (stating he heard rumors Jack was involved in narcotics); *See* Ex. 5]. Before the officers close in to arrest him, Jack told Johnson and Wyss that he was an addict who was climaxing. [Ex. 3]. Less than a minute into their interaction, Johnson radioed for a medic, citing Jack's "excited delirium." [ECF No. 57-15, 71]. Wyss heard Johnson's radio call, [*Id.*] and also came to the own conclusion that Jack was suffering from "excited delirium." [*See id.* at 46 ("I mean he was paranoid as s***"), 74 ("he lost his mind")]. Neither officer saw, nor suspected, any weapons on Jack. [ECF No. 81-2, 45:10–12, 76:9–11; ECF No. 81-3, 58:1–2, 64:2–8, 92:13–17]. Both officers admitted Jack was not a danger to them. [ECF No. 81-2, 76:12–15; ECF No. 81-3, 58:3–6)].

Much like the subject in *Martin*, Jack "exhibited clear signs that that he was distraught": despite being shirtless and shoeless in 35° weather, he was sweating profusely, yelling for help, acting erratically, making incoherent statements, and demonstrating substantial fear and paranoia. *Martin*, 712 F.3d at 958. In *Martin*, the Court found the officers' response—"tackling Martin and falling on top of him—was unreasonable." *Id.* Prior to tackling Jack and falling on top of him, Johnson tased Jack in the chest and Wyss pepper sprayed him twice in the face. If the response of "tackling Martin and falling on top of him" was objectively unreasonable, *id.*, so too was Johnson's use of the taser, Wyss's double use of the pepper spray, and their conjoined effort of tackling and falling on top of Jack.

Further, because of their knowledge and Jack's clear symptoms, Johnson and Wyss were required to "take into account [Jack's] diminished capacity before using force" against him. *Palma*, 27 F.4th at 437; *Roel v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 870 F.3d 471, 482 (6th Cir. 2017); *Champion*, 380 F.3d at 904. "*Champion* required the officers to de-escalate the situation and adjust

the application of force downward. Contrary to this command, the officers ignored [Jack's] diminished mental state and used excessive force to control him." *Martin*, 712 F.3d 951. The Sixth Circuit also requires officers "to use their training and expertise in crisis management to determine whether and how to de-escalate a situation before resorting to force. Officers must use this experience to assess the level of risk in light of a person's mental illness." *Palma*, 27 F.4th at 438. Wyss and Johnson failed to use their extensive training to de-escalate the situation with full knowledge of Jack's obvious mental illness and drug use, resulting in his ultimate death.

        *iii.*    *Jack's non-compliance was a result of his condition and does not constitute resistance of any kind*

"The third and final *Graham* factor requires the court to weigh the officers' conduct against [Jack]s attempts to evade or resist arrest." *Martin*, 712 F.3d at 959. Much like the actions of each individual officer, the arrestee's alleged acts of resistance must be considered in stages. *Id.* Jack's alleged resistance can be considered in three separate stages, none of which justify the use of force ultimately used by the officers.

The first alleged act of resistance occurred when Jack began to walk away from the officers. [*See* ECF No. 81, at 1 (stating Jack responded to the officers' attempt to effect an arrest by "pulling away")]. Jack's action cannot be considered in a vacuum, however; just seconds before walking away, Jack said: "I know what's happening and you're gonna kill me. Why?!" [Ex. 3 at 15:53–16:33]. Shortly thereafter, Wyss and Johnson quickly closed-in on Jack from both sides without telling him he was under arrest. [*Id.* 16:33; ECF No. 81-2, 47:10–11 (stating they never told Jack he was under arrest)]. The video evidence supports at least a reasonable inference that Jack walked away from the officers because he thought they were going to kill him, not because he was actively attempting to resist arrest or flee the scene. *Cf. Brown v. Chapman*, 814 F.3d 447, 460 (6th Cir. 2016).

"[T]he mere fact that [Jack] tried to escape from [the officers'] control does not justify the latter's conduct as a matter of law." *Id.* (citing *Baker v. City of Hamilton*, 471 F.3d 601, 607–08 (6th Cir. 2006) (finding suspect's attempt to evade arrest by running two blocks from officer does not preclude excessive force claim or justify officer's baton strikes).

The second act of alleged resistance, which is the primary focus of the officers' motions, is Jack's failure to comply with their verbal commands. [ECF No. 78, 13; ECF No. 81, 18]. Without authority or analysis, Wyss concludes this constituted "active resistance."

"Resistance includes 'physically struggling with, threatening, or disobeying officers.' But not all disobedience justifies the use of force." *Palma*, 27 F.4th at 430 (internal citation omitted). "Noncompliance alone does not indicate active resistance; there must be something more." *Goodwin*, 781 F.3d at 326. This is especially true in cases such as this, where Jack's "unresponsiveness was consistent with his mental illness[.]" *Palma*, 27 F.4th at 437. And much like the first alleged occurrence, the evidence—when viewed in the light most favorable to Plaintiff—demonstrates Jack was fearful of the officers and concerned they were going to kill him.

It is during this second stage of alleged resistance that Johnson uses his taser and Wyss pepper sprays Jack twice in the face. Absent physical resistance, Jack's "defiance, alone, cannot justify" Johnson's decision to tase him. *Id.* at 430. It is axiomatic that "a taser is a serious use of force." *Estate of Armstrong*, 810 F.3d 829; *Bryan*, 630 F.3d at 825 (finding tasers "are a greater intrusion than other non-lethal methods of force"). While there are instances where an officer's use of a taser on a mentally ill subject may be objectively reasonable, such as when the subject "aggressively approaches[s] officers with a garden hose," *Roell*, 870 F.3d at 438, [12] or where the

---

[12] *Roell* is very different from the facts and circumstances here. In *Roell*, the suspect was "actively resisting the deputies' efforts to control him as opposed to trying to extricate himself from the deputies' application of excessive force." No. 1:14-cv-637, 2016 WL 4363112, at * 8 (S.D. Ohio Aug. 16, 2016). Roell possessed "at least one object

subject yells at the officers to leave and approaches them holding a garden rake. *Estate of Erwin*, 861 Fed. App'x at 5, that is not what happened here.

The undisputed evidence shows that both Johnson and Wyss knew Jack was unarmed, minimally dangerous, and mentally unstable. Where the evidence is viewed in the light most favorable to Plaintiff, Jack was suffering from a psychotic episode and was extremely concerned for his safety. Based on prior encounters, Jack sought out Johnson for help, but became increasingly more agitated and concerned the officers were going to kill him. When he tried to get away from this threat, the officers chased, tased, pepper sprayed, and tackled him as he begged and pleaded for help.

The third and final stage of alleged resistance occurred during the physical struggle on the ground. Once again, however, the alleged resistance is Jack's failure to comply with the repeated, verbal commands. A reasonable juror could conclude that Jack was not resisting, but was "struggling to cast the officers' weight from his back so he could breathe." *Martin*, 712 F.3d at 961.

      iv.    *Under the totality of the circumstances, the officers' uses of force were objectively unreasonable and excessive*

While the *Graham* factors are important, they are non-exhaustive, and the "bottom-line inquiry is whether the totality of the circumstances justifies a particular level of force." *Wright,* 962 F.3d at 882. Other relevant considerations include the duration of the encounter. *Palma*, 27

---

that he could have used as a weapon and there [was] some evidence that he was in fact using it as a weapon. Thus, the threat Roell posed to the deputies, while not extreme, was more than minimal." *Id.* at *9. And even though *Martin* require[d] officers to de-escalate situations with mentally disturbed suspects and adjust the level of force downward, "there was little time for the deputies to de-escalate the situation with Roell before the struggle began." *Id.* Roell was also a threat to the 911 callers because he was still in their enclosed backyard. 870 F.3d at 481. Here, both officers knew Jack had no direct encounters with Dry, was unarmed, banged on the window in an attempt to seek help, and had moved locations and posed no threat to Dry at the time they encountered him.

F.4th at 436. While courts are sympathetic to the fact that officers often must make split-second decisions, such decisions stop being "split second" after a point. *Id.* Here, the entire encounter lasted roughly 45 minutes during which time Wyss and Johnson learned of Jack's situation, engaged in conversations with him, obtained knowledge of his mental illness, drug use, and lack of a weapon, and heard his repeated and continual pleas for help. Absolutely nothing about the encounter indicates that it was "rapidly evolving" or that either officer was required to make a split-second decision, and absolutely nothing about the encounter was uncertain, where Jack was simply fearful, paranoid, and seeking help. The encounter became tense only after the officers quickly closed-in on Jack who believed they were going to kill him.

Wyss's and Dry's behavior is also informative to this factor. Specifically, Dry informed Wyss she heard Jack yelling for help seven minutes before she called 911. [ECF No. 57-15, 4]. When Wyss got to her house, the two spoke outside on her front porch for seven minutes (despite Dispatch's admonishment to Dry), which clearly indicates neither of them feared Jack would harm them. In fact, Wyss gave Dry his business card and said he would be "taking pictures" of the damage "in the next few minutes." Simply put, the officers did not respond to the sort of "tense, uncertain, and rapidly evolving" circumstances that ordinarily warrant the level of discretion afforded by the doctrine of qualified immunity. *See Palma*, 29 F.4th at 436.

Under *Martin*, Johnson's use of the taser, Wyss's use of the pepper spray, and both officers' decision to wrestle Jack to the ground for prone handcuffing was excessive and "not reasonably calculated to neutralize [Jack's] resistance." *Id.* at 960. This is true irrespective of the minor factual differences between *Martin* and the case at hand. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). For example, in *Martin*, it was undisputed that the officers—in addition to tackling the subject—issued "body strikes, neck and chin restraints, and torso locks" in response to the subject biting one of the

officers during the on-the-ground struggle. *Martin*, 712 F.3d at 963. In this case, the officers tackled Jack to the ground and used a leg sweep and other physical force to place Jack in the prone position. [ECF No. 81, 13; Ex. 1 at 2]. Johnson then used his entire body weight to lay on Jack "belly to back" while Wyss used "compliance control techniques," including—by his own admission—a mandibular grab technique on Jack's jaw. [ECF No. 81-2, 74:2–3, 76:24–77:17]. The video footage also depicts an officer placing pressure on Jack's neck.

Unlike the officers in *Martin*, neither Wyss nor Johnson admit to employing body strikes, neck and chin restraints, or torso locks. However, the objective evidence demonstrates Jack had at least "74 separate abrasions and contusions on his face, head, neck, abdomen, back and extremities, including taser perforations, indicative of a severe struggle." [ECF No. 57-3, 5; ECF No. 57-7, 9; ECF No. 81-6, 2, 4, 8–10 (detailing the individual abrasions, contusions, and other injuries); Ex. 17 at 60:1].

This evidence—when considered in the light most favorable to Plaintiff and in combination with the significant portions of video obstructed by Johnson's jacket, the closeness of body parts to both Johnson's and Wyss's cameras, and the fact that Johnson's camera eventually fell off—demonstrates the use of force used by the officers was unreasonable and excessive, even without officer admissions as in *Martin*.



Jack was eventually handcuffed after being tased, pepper sprayed, tackled, and beaten. By this time, Jack was visibly and obviously unconscious, as recognized by both Jack and Wyss. Nevertheless, Wyss continued to hold onto Jack's handcuffs with *at least* one hand at all times to ensure Jack wouldn't escape. [ECF No. 81-2, 83:18–24; ECF No. 15; ECF No. 81-2, 83:18–84:8, 89:12–15, 124:1–13, 125:9–12]. This is precisely the type of conduct the Court found objectively unreasonable and excessive in *Martin*, 712 F.3d at 960.

## B. Jack's right was clearly established in October 2018

The "clearly established" prong is intended "to ensure that officials are on notice that their alleged conduct was unconstitutional." *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015). While Plaintiff is not required to "match each application of force with a precisely analogous, fundamentally similar, or materially similar case to overcome the clearly established prong" of the qualified immunity analysis, *Martin*, 712 F.3d at 960–61, the 2013 Sixth Circuit *Martin v. City of Broadview Heights* decision is fundamentally and materially similar to the facts at hand.

### i.    *Martin v. City of Broadview Heights*

In *Martin*, a 911 caller reported a man wearing only jeans "was yelling for help outside" an apartment. 712 F.3d at 954. Dispatch notified responding officer Tieber that "a naked male entered a nearby apartment." *Id.* Tieber encountered a naked man, "later identified as Martin, running towards his patrol car, speaking quickly and nonsensically." *Id.* "Martin momentarily calmed down and asked Tieber for help, placing his hands behind his back and insisting Tieber take him to jail." *Id.* "When Tieber grabbed Martin's hands and reached for his handcuffs, Martin jogged away." *Id.* The officer "caught Martin before he got further than 20 feet, and fell on top of Martin with his abdomen to Martin's back." *Id.* "Officer Semanco then arrived on the scene and, observing Martin trying to push himself up, dropped his knee into Martin's side to keep him on the ground." *Id.* at 955. Semanco "fell on top of both Martin and Tieber and delivered one or two 'compliance body shots' to Martin's side with his knee." *Id.* "During the struggle, Martin bit Tieber's knuckle." *Id.*

"Martin was face down on the ground when Officer Zimmerman arrived." *Id.* "As Tieber and Semanco attempted to get Martin's arms behind his back, Zimmerman kneeled on Martin's calves to prevent him from kicking and assisted in handcuffing him." *Id.* "Officer Novotony showed up shortly before Martin was handcuffed." *Id.* Once detained, Zimmerman and Tieber "continued to hold Martin in a face-down position," *id.*, "Tieber with his hand and Zimmerman with his arm, 'just to make sure [Martin] wasn't going to get up and try to run away." *Id.* at n.1.[13]

---

[13] In *Martin*, the officers "vigorously dispute[d]" the fact that they continued to hold Martin face down in the prone position. *Id.* at n.1. "They maintain[ed] that the district court did not find that any of them put pressure on Martin's back after he was handcuffed." *Id.* The Sixth Court of Appeals found the officer's "admission that he and the other officer] continued to hold Martin down—[one] with his hand and [the other] with his harm, 'just to make sure [Martin] wasn't going to get up and try to run away'—flatly contradict[ed] their assertion." *Id.* The Court found the admission "relevant for another reason": "Zimmerman himself, though, admitted that he applied force to Martin's body after Martin was handcuffed. How much force was applied and for how long are disputed factual issues a jury must decide." *Id.*

When Zimmerman and Tieber "heard Martin make a gurgling sound," they rolled Martin onto his side and began attempts to resuscitate him. *Id.* at 955.

In affirming the district court's denial of qualified immunity, the Sixth Circuit Court of Appeals concluded the facts, when viewed in the light most favorable to the plaintiff, demonstrated the officers' use of force was objectively unreasonable. *Id.* at 956–57. In reaching this conclusion, the Court found the officers used "severe force that did not match the threat" posed by Martin who was unarmed and, from the very beginning, "exhibited clear signs that he was distraught: he was unclothed, acting erratically, making incoherent statements, yelling for help, and asking to be taken to jail." *Id.* at 958. Specifically, the Court found "Tieber's response to the situation—tackling Martin and falling on top of him—was unreasonable." *Id.* at 956. The Court also found the officers' post-handcuffing conduct to be unreasonable, stating: "[e]ven after Martin was handcuffed and subdued, Zimmerman and Tieber used their arms to keep Martin in a face-down position, and did not roll Martin onto his side until he made a 'gurgling' noise." *Id.* at 959. "In sum, the officers' response to the threat Martin posed to them or others was unreasonable." *Id.*

The officers argued their use of force was reasonable because Martin resisted arrest and failed to comply with their commands. *See id.* The Court found "the mere fact that Martin tried to escape from Tieber's control [did] not justify the latter's conduct as a matter of law" because Tieber's "take-down and the force that followed was not a reasonable response to Martin's attempted escape." *Id.* As for the alleged resistance on the ground, the Court found that the evidence supported at least a reasonable inference "that Martin's physical movements were an attempt to gasp for air and escape the compressive weight of the officers on top of him, not an effort to fight with the officers or get away." *Id.* In sum, "the force the officers used was not reasonably calculated to neutralize Martin's resistance." *Id.* at 960.

The Court found "the officers violated clearly established law that required them to take into account 'the diminished capacity of an unarmed detained . . . when assessing the amount of force exerted.'" *Id.* at 962. Because Martin was unarmed and "exhibited conspicuous signs that he was mentally unstable . . . *Champion* required the officers to de-escalate the situation and adjust the application of force downward. Contrary to this command, the officers ignored Martin's diminished mental state and used excessive force to control him." *Id.* With respect to Tieber's and Zimmerman's post-handcuffing conduct, the court found "the prohibition against placing weight on Martin's body *after* he was handcuffed was clearly established in the Sixth Circuit as of August 2007." *Id.* at 961 (citing *Champion*, 380 F.3d at 901). "Zimmerman and Tieber crossed the line *Champion* drew when they placed their arms on Martin's back to restrain him after he was handcuffed and prone." *Id.* at 961.[14]

Additionally, the court considered the officers' training and departmental policies and procedures to determine both prongs of the qualified immunity analysis. *Id.* at 960. When Martin was arrested, the officers' department had policies governing use-of-force and positional asphyxia which instructed "them to recognize the risks of restraining an individual exhibit bizarre and agitated behavior." *Id.* at 956, 962. "The officers' awareness of a policy that warn[ed] of the boundaries of appropriate force with respect to the danger of positional asphyxia reinforce[d] the conclusion that their conduct was unreasonable." *Id.* Additionally, the Court found the officers' training and department's policies governing such conduct was "further evidence that the officers were put on notice that their conduct exceeded the bounds of permissible force": "Though they knew the hazards of the tactics they deployed against a high-risk individual, the officers failed to

---

[14] "The better view is that *Champion* proscribes the use of 'substantial or significant pressure' that creates asphyxiating conditions in order to restrain a subject who does not pose a material danger to the officers or others. That Champion himself was handcuffed when this occurred is incidental to the rule." *Martin*, 712 F.3d at 961.

heed the policy's warnings." *Id.* at 962. Thus, the officers were not entitled to qualified immunity. *Id.* at 963.

<blockquote>

**ii.** *The Officers' training and departmental policies put them on notice that they were violative of Jack's constitutional rights*

</blockquote>

Just as in *Martin*, the officers' training and respective departmental policies are "further evidence that the officers were put on notice that their conduct exceeded the bounds of permissible force." *Id.* at 962. Indeed, each department had policies and procedures that "regulated the conduct of officers when they encountered" Jack, "instructing them to recognize risks of restraining an individual exhibit bizarre and agitated behavior." *Id.*

As early as March 29, 2007, BSOTPD's departmental policies and procedures required officers, including Wyss, to ensure special care is given to suspects who are obese, intoxicated, emotionally disturbed, or "involved in a prolonged and violent encounter prior to being taken into custody." [*BSOTPD*, Ex. 24 at § 7-A-7; ECF No. 57-1, ¶ 54, ns. 118, 119]. Because of this policy, Wyss knew to look for "bizarre behavior symptoms," including extreme strength, paranoia, purposeless running or movement, undressing in public, hiding, shouting, hearing voices, and combativeness followed by sudden tranquility, profuse sweating, high blood pressure, hyperthermia, incoherent talking, and bluish/gray skin. [Ex. 24 at § 7-A-10, -11, § 7-A-7; *BCSO*, Ex. 25 at 0433, *et seq.*].

For at least thirty years, the law enforcement community has known these factors indicate an increased risk of positional asphyxia while in the prone position. [ECF No. 57-1, ¶¶ 44–48].[15]

---

[15] In 1993, the International Association of Chiefs of Police—"the world's oldest and largest professional policing organization"—issued a directive stating: "when it is necessary to use the weight of several officers in order to subdue an individual for handcuffing, the arrestee should be freedom from that weight as soon as possible in order to allow him to breathe freely. In order to facilitate the individual's breathing, he should also be rolled onto his side or into a sitting position as soon a possible." [ECF No. 57-1, ¶¶ 48, 49]. *BSOTPD* policies are based off of IACP. In 2017, the IACP's Model Policy provided: "When restrained, officers should position the subject in a manner that will

Johnson and Wyss witnessed and acknowledged Jack exhibit *many* of these high-risk symptoms. [ECF No. 57-7, at 15–17; *See discussion*, *infra*].

Johnson's and Wyss's recognition of Jack as a suspect who had an increased risk of dying from positional asphyxia started well before their joint encounter at the intersection of Cass and Madison Street. Specifically, Wyss's knowledge began around 1:15 a.m. when Jack approached him on his bicycle appearing agitated, incoherent, and obese. Johnson was informed of this behavior shortly thereafter. By 1:27 a.m., both Johnson and Wyss were informed that a suspect had been running around, yelling for help, digging through recycling bins, and had pushed in a window air conditioning unit of a woman's home. [*See* Ex. 17 at 35:16–18 (attraction to glass)]. By 1:40 a.m., both Johnson and Wyss knew Jack was continuing to run and yell incoherently. [Ex. 3 at 13:07–13:27; Ex. 1 at 1; Ex. 8 at 1; ECF No. 57-15, at 37].

By 1:43 a.m., both Johnson and Wyss knew Jack was exhibiting signs of "excited delirium" *and* that Jack had been engaged in prolonged physical exertion—including running, yelling, digging, and pushing—for *at least* thirty minutes, if not more. Despite this knowledge and their knowledge and training that ***prolonged exertion of physical stress can heighten possibility of sudden death,*** the officers decided to physically engage a fully compliant and deeply paranoid Jack Lunneen and, despite Jack's cries for help every six seconds, Johnson decided to use his taser,

---

assist breathing, such as placement on his or her side, and avoid pressure to the chest, neck or head. Officers should not attempt to control continued resistance or exertion by pinning the subject to the ground or against a solid object, using their body weight. . . . Officers shall ensure the airway is unrestricted and be prepared to administer CPR or an automated extern defibrillator (AED) if the subject becomes unconscious. Following a struggle, the subject should be showing normal signs of physical exertion such as heavy breathing. However, if the subject becomes calm and breathing is not labored during or after the application of restraints, it might be an indication that he or she is in jeopardy and requires immediate medical attention to avoid cardiac arrest." [*Noble*, at ¶ 51 (citing IACP Model Policy 2017, which requires officers to roll subjects on their side and "should not attempt to control continued resistance or exertion by pinning the subject to the ground" using body weight); *Id.* ¶ 52 (DOJ bulletin in 1995 identified certain factors most often associated with in-custody deaths, including excited delirium, violent struggles, unresponsiveness during or immediately after physical struggle)].

Wyss decided to pepper spray him twice in the face, and they both decided to tackle him and engage in prone handcuffing while using "compliance techniques" that caused at least 74 separate abrasions and contusions on his face, head, neck, abdomen, back and extremities, including taser perforations, indicative of a severe struggle. "Though they knew the hazards of the tactics they deployed against a high-risk individual, the officers failed to heed the policy's warnings. This is further evidence that the officers were on notice that their conduct exceeded the bounds of permissible force." *Martin*, 712 F.3d at 962 "The Constitution does not countenance this level of force." *Martin*, 712 F.3d at 963.

### iii. <u>Sixth Circuit precedent also put the Officers on notice</u>

As of August 2007, "*Champion* required the officers to de-escalate the situation and adjust the application of force downward." *Id.* at 962. "Contrary to this command, the officers ignored [Jack's] diminished mental state and used excessive force to control him." *Id.* As of April 2013, *Martin* required "officers to de-escalate the situation with a mentally disturbed suspect before resorting immediately to severe force to subdue him." *Roell*, 2016 WL 4363112, at *9, *aff'd* 870 F.3d 471. Contrary to this mandated requirement, the officers immediately resorted to severe force, including the use of a taser, two bouts of pepper spray, and a prone restraint with compressive back pressure, even though Jack was unarmed, minimally dangerous, mentally disturbed, and fully compliant. As early as August 2007, it was clearly established that officers who apply "pressure to the back of a prone suspect who no longer resists arrest and poses no flight risk is an objectively unreasonable use of force." *Martin*, 712 F.3d at 961. Wyss "crossed the line *Champion* drew" when he placed his hands on Jack's back "to restraint him after he was handcuffed and prone." *See*

*id.*[16] Similarly, officers were aware—as of 2007—that "the use of substantial or significant pressure that creates asphyxiating conditions in order to restrain a subject who does not pose a material danger to the officers or others" is objectively unreasonable and violative of such person's clearly established rights. *Id.* at 961. By "subduing an unarmed, minimally dangerous, and mentally unstable individual with compressive body weight" Johnson and Wyss violated Jack's "clearly established right to be free from excessive force." *Id.* at 963.

By all accounts, the force used by Johnson and Wyss in this case is greater than that which was used by the officers in *Martin*. It is axiomatic that a taser entails a higher level of force than simply tackling someone to the ground. *Wells v. City of Dearborn Heights*, 538 Fed. App'x 631, 639 (6th Cir. 2013); *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 726 (7th Cir. 2014) ("[O]ne need not have personally endured a taser jolt to know the pain that must accompany it") (citing other circuits in agreement). Wyss's use of the pepper spray, while a less lethal type of force than the taser, was unreasonable and excessive in that it occurred just *seconds* after the taser was deployed and that he sprayed Jack a second time within seconds of the first shot. [ECF No. 81-2, 65:20–24 ("When the taser did not work, we immediately went to the OC spray)].

In short, any of Wyss's and Johnson's individual actions, by themselves, violated a clearly established right, and the combination of actions bolsters the conclusion that "no reasonable officer

---

[16] Wyss contends "there was absolutely no force applied to [Jack] by" Wyss after handcuffs were in place. [ECF No. 81, at 20]. Wyss's admissions that he kept a hand on Jack's handcuffs to ensure he wouldn't get away "flatly contradicts" this assertion. *See Martin*, 712 F.3d at 961. Wyss also argues the Sixth Circuit in *Champion* "explicitly refused to extend the excessive force doctrine to a situation where the absence of force is being alleged." [ECF No. 81, at 20–21]. This argument is both incorrect and inapposite. Rather than "explicitly refusing to extend the excessive force doctrine," the *Champion* Court exercised judicial restraint and declined to *consider* "whether leaving a bound suspect on his or her stomach *without more* constitutes excessive force that violates a suspect's clearly established Fourth Amendment rights." *Champion*, 380 F.3d at 902 (emphasis added). In *Martin*, however, the court found that keeping a hand and arm on a handcuffed, prone, and unconscious subject violated the clearly established law of the Sixth Circuit as of August 2007. *Martin*, 712 F.3d at 961. Therefore, Wyss violated Jack's clearly established and constitutional rights when he placed weight on Jack's body *after* he was handcuffed. *See id.*; *Palma*, 27 F.4th at 443 (the Sixth Circuit has repeatedly held "that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law") (quoting *Baker*, 471 F.3d at 607).

could believe that excessive force was not being used." *Champion*, 380 F.3d at 904. In this case, neither Wyss nor Johnson is entitled to qualified immunity for the excessive force used to subdue an unarmed, minimally dangerous, and mentally unstable Jack Lunneen. *Martin*, 712 F.3d at 963.[17]

## 2.    DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

The Fourteenth Amendment prohibits the government from depriving any person of life, liberty, or property without due process of law. U.S. CONST. amend. XIV, § 1. The Supreme Court has long recognized this imposes upon governmental officials a constitutional obligation "to provide medical care to those whom it detains." *Griffith v. Franklin Cnty.*, 975 F.3d 554, 566 (6th Cir. 2020). This right belongs to pretrial detainees and convicted prisoners alike, *see Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018), but the proper standard depends upon the injured person's classification. *Brawner v. Scott Cnty.*, 14 F.4th 596 (6th Cir. 2021).

### A. Because Jack was a pretrial detainee, the modified subjective prong to the deliberate indifference standard is appropriate

The Sixth Circuit's "law governing deliberate indifference claims" is "evolving." *Trozzi v. Lake Cnty.*, 29 F.4th 745, 751 (6th Cir. 2022). Prior to 2021, the Sixth Circuit (and many others) applied the same analytical framework to unconstitutional denial of medical care claims brought by or on behalf of pretrial detainees and convicted prisoners regardless of the injured person's constitutional status. *Id.* at 752. That framework—which was derived from *Farmer v. Brennan*, 511 U.S. 825 (1994)—contained both objective and subjective components. *See Jones v. Cincinatti*, 736 F.3d 688, 696 (6th Cir. 2012). It required plaintiffs to establish (1) the existence of an objectively serious medical need, and (2) "a sufficiently culpable state of mind: deliberate

---

[17] *See Campbell v. Bastin*, 998 F.Supp.2d 572 (E.D. Kent. 2014) (the officers "avoided the conduct that made the actions of their counterparts in *Champion* and *Martin* unreasonable" because "they did not use pepper spray or taser to secure Campbell's compliance" and "positioned themselves in such a way that they were not applying direct pressure to Campbell's back or blocking his airways", finding the Police Defendants seemed to have actively avoided the type of conduct directly condemned in *Champion* and *Martin*").

indifference." *Griffith*, 975 F.3d 554. The subjective component demanded a showing that the officer was aware of facts from which she could infer a substantial risk and the officer drew the inference but nevertheless disregarded it. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

In 2015, the Supreme Court decided whether "a pretrial detainee must show that the officers were *subjectively* aware that their *use of force* was unreasonable, or only that the officers' use of that force was *objectively* unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 391–92 (2015) (emphasis added). After reiterating the well-established differences between claims brought by convicted prisoners under the Eighth Amendment and those brought by pretrial detainees under the Fourteenth, the Court held the appropriate standard was objective only. *Id.* at 396.

Subsequently, in *Brawner v. Scott County*, the Sixth Circuit "took on the unenviable task of trying to understand whether (and if so, how) *Kingsley* changed things." *Trozzi*, 29 F.4th at 752. *Brawner* determined *Kingsley* "required modification of the subjective prong of the deliberate-indifference test for pretrial detainees." *Brawner*, 18 F.4th at 596.

Post-*Brawner*, the deliberate indifference test for Fourteenth Amendment denial of medical care claims requires plaintiffs to establish that (1) the detainee had an objectively serious medical need; (2) a reasonable officer on the scene—knowing what the particular officer knew at the time of the incident—would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the officer knew "his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk." *Trozzi*, 289 F.4th at 757–58 (reconciling *Farmer*, *Kingsley*, *Brawner*, and *Greene*). Each officer's conduct must be considered separately. *Greene*, 22 F.4th at 607.

**B. There can be no reasonable dispute that Jack was exhibiting symptoms of and ultimately suffered from serious medical needs**

First, Jack must have suffered from an objectively serious medical need. *Trozzi*, 289 F.4th at 757. "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Greene*, 22 F.4th at 607.

From 1:15 a.m. to 2:55 a.m., Jack was exhibiting tell-tale signs of objectively serious medical needs. Even before the officers attempted to arrest Jack, he was incoherent, agitated, and deeply paranoid; hearing voices, shouting, and undressing in public despite near-freezing temperatures, all the while sweating profusely. He was also obese, out of breath, and claimed to be suffering from drug addiction. He had been running around the neighborhood yelling for help.

Once the officers attempted to arrest him, he continued to demonstrate incoherency, agitation, and extreme paranoia, as well as signs of extreme strength and purposeless movements, including more running and prolonged physical exertion. While on the ground, Jack became unresponsive and unconscious. He was having difficulty breathing, and then he stopped breathing and moving entirely and turned grey. When people like Jack are subjected to prone pressure, death can occur "in less than one minute" "especially if CPR is not instituted immediately." [ECF No. 57-3, 7].

Jack ultimately went into PEA cardiac arrest and was pronounced dead shortly thereafter. [ECF No. 57-11, 6]. There can be no reasonable dispute that Jack was suffering from and exhibiting signs of objectively serious medical needs. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (finding symptoms of "excited delirium" presented a serious medical need). *See Estate of Owensby*, at 603 (death is evidence of objectively serious medical need); *See* Ex. 17, 36:16–20 (reacting to officers' acknowledging "excited delirium" and saying "I was like oh, good, they're aware of it and maybe would intervene appropriately. I was like good, that they recognized

this was a psychiatric emergency.")]. Indeed, any "lay person under these circumstances would immediately recognize that [Jack] risked serious harm unless given immediate medical attention." *See Scozzari v. Miedzianowski*, 454 Fed. App'x at 455.

**C. Wyss and Johnson recklessly disregarded Jack's serious medical needs**

The second and third prongs of this modified analysis require consideration of each individual officer's knowledge at the time of the incident. *Trozzi*, 29 F.4th at 754. In this context, an officer's training on certain conditions may be sufficient to establish personal knowledge. *Greene*, 22 F.4th at 609–12.

> **i.** *Wyss knew Jack was a "probable sudden death subject" and the reasons for that classification*

As early as March 29, 2007, BSOTPD's departmental policies and procedures required officers, including Wyss, to ensure special care is given to suspects who are obese, intoxicated,[18] emotionally disturbed, or "involved in a prolonged and violent encounter prior to being taken into custody." [Ex. 24 at § 7-A-7; ECF No. 57-1, ¶ 54, ns. 118, 119]. Because of this policy, Wyss knew to look for "bizarre behavior symptoms," including extreme strength, paranoia, purposeless running or movement, undressing in public, hiding, shouting, hearing voices, and combativeness followed by sudden tranquility, profuse sweating, high blood pressure, hyperthermia, incoherent talking, and bluish/gray skin. [Ex. 24 at § 7-A-10, -11, §§ 22-A-2, 22-B-2 (defining "person in custody with special needs" as someone who has "demonstrated through action that they are

---

[18] "The restraining conditions that [Jack] was subjected to during his arrest have been demonstrated to result in impaired breathing capacity and lung function." [*Freeman Rep.*, at 15]. "Obese individuals with a protruding belly like Mr. Lunneen are at a heightened risk of positional asphyxia when in a prone position, due to pressure against the diaphragm by the belly, thus restricting gas exchange in the lungs." [*Id.*]. Methamphetamine intoxication creates higher oxygen demand and, because of the "drug-induced hyperactivity, agitation, and circulation stimulation with higher blood pressure and heart rate." [*Dr. W. Rep.*, at 7]. Other high risk factors that created additional "draws on [Jack's] oxygen reserves" including agitation, exertion, methamphetamine intoxication, cold weather, and inflicted pain. [*Freeman Rep.*, at 17]. "The user of a TASER causes excruciating pain (which is the intent of the use of the device), which in turn serves to increase the need for oxygen in a tased individual." [*Id.*].

mentally disturbed" or "has a medical problem or demonstrates bizarre behavior."); ECF No. 81-2, at 110:2–14 (acknowledging signs such as incoherent talking and gray skin tone are "indicative of severe medical problems)].

The BSOTPD refers to suspects who exhibit these types of symptoms as "probable sudden death subjects." [Ex. 24 at § 7-A-14]. When encountering "probable sudden death subjects," Wyss knew to treat it as "emergency medical situation." [*Id.* § 7-A-11; ECF No. 81-2, 115:2–7 (recognizing these symptoms can mean "a mental health or physical health crisis is imminent")]. Wyss was warned *not* to "physically engage the person until additional assistance is on the scene [because] ***prolonged exertion of physical stress can heighten possibility of sudden death***." [Ex. 24 at § 7-A-11, 7-A-12, 7-A-7; ECF No. 81-2, 114:14–21 (acknowledging policy)]. Because of this heightened possibility, Wyss knew he should allow "probable sudden death subjects" the opportunity to calm down. [Ex. 24 at § 29-A-1]. Even if "probable sudden death suspects" are suspected of violating the law, Wyss knew he needed to communicate clearly, calmly, and in short sentences, and to give direction and information on what he was going to do. [Ex. 24 at § 29-A-1, § 7-A-2 (valid arrest requires officers to "inform the person who is being arrested of his intent to arrest the person and for what cause")]. Wyss knew to "speak in a reassuring tone and try to remain patient" because of possible "delusions and hallucinations that [probable sudden death subjects] believe are real." [Ex. 24 at § 29A-3].

Wyss also knew he should avoid placing compressive weight or pressure on the chest of a "probable sudden death subject," like Jack, while attempting to secure handcuffs. Once handcuffs were placed on Jack, a "probable sudden death subject," Wyss knew he was required to "AVOID PLACING THE PERSON IN A PRONE POSTION." [Ex. 24 at § 7-A-12; ECF No. 81-2, 115:2–23 (acknowledging you cannot leave prone suspects exhibiting bizarre symptoms)].

Once engaged with a "probable sudden death subject," like Jack, Wyss knew to watch for breathing difficulties, profuse sweating, and sudden changes from combativeness to tranquility. [Ex. 24 at § 7-A-12]. Wyss knew that, "*most importantly*," he was required to "ensure proper medical care is provided to anyone injured during the incident." [Ex. 24 at § 7-A-12]. Wyss knew he was "responsible to protect [Jack] and to provide for necessary basic human needs while [] in [his] custody." [Ex. 24 at § 29-A-2; *See id.* § 7-A-14 (requiring post-incident reports for "probable sudden death subject" encounters to include "any first aid rendered")]. The BSOTPD required Wyss to review these policies annually. [ECF No. 81, at 30].[19]

In addition to the foregoing, the BSOTPD required Wyss to demonstrate competency in several "core training areas," including first aid and CPR, identifying and handling suspects with substance abuse or mental illnesses, and use of force (including decision making, restraints, and post-force monitoring). [Ex. 24 at § 19-2, -4]. Based on his CPR training, Wyss knew he needed to place suspects like Jack "on their back to start compressions" following prolonged, physical exertion and prone handcuffing. [ECF No. 81-2, 123:14–19].

ii.      *Wyss disregarded the risk of positional asphyxia and sudden death*

From their first encounter, Wyss knew Jack was exhibiting *many* of the "bizarre behavioral symptoms" that render someone a "probable sudden death suspect," including incoherency, agitation, and obesity. Between their initial interaction and the officers' attempt to arrest Jack, Wyss learned Jack was exhibiting even more "bizarre behavioral symptoms," including undressing

---

[19] As early as 2012, BSOTPD's policies and procedures became "generally adopted from the Model Rules published by the International Association of Chiefs of Police" (IACP). In 2017, one of the IACP's model policy directed officers who encounter suspects suffering from excited delirium to avoid compressive weight while in the prone position; if, however, such force is used, it directed officers to "be prepared to administer CPR or an automated external defibrillator (AED) if the subject becomes unconscious." [*Noble*, ¶ 51]. The policy also note that, "following a struggle, the subject should be showing normal signs of physical exertion such as heavy breathing. However, if the subject becomes calm and breathing is not labored during or after the application of restraints, it might be an indication that he or she is in jeopardy and requires immediate medical attention to avoid cardiac arrest." [*Id.*].

in public, profuse sweating, and paranoia, and that Jack was possibly suffering from a drug addiction. Ex. 1 at 1 (describing Jack as unaware of his surroundings, walking back and forth, agitated, and speaking to people who were not present)]. By the very nature of Dry's 911 call, Wyss also knew Jack had engaged in prolonged, physical exertion, including biking, running, digging through recycling bins, yelling, and pushing in window AC units. Despite this knowledge, and contrary to his trainings and departmental policies, Wyss quickly closed-in on Jack to effect an arrest while failing to inform Jack he was under arrest. The sudden enclosure by Wyss and Johnson amplified and justified Jack's fear that the Officers were going to kill him. This fear caused Jack to continue seeking and yelling for help, which exacerbated and prolonged Jack's exertion of physical stress. Wyss then jointly tackled Jack to the ground and used compressive and full body weight to enable Johnson to execute prone handcuffing. [ECF No. 81-2, 71:2–9 (stating the goal of tackling Jack to the ground was to execute prone handcuffing)].

Once handcuffs were secured, Johnson verbally stated Jack was having trouble breathing. [*Thorton*, at 44 (citing video stamp)]. Rather than watch for any signs of distress in Jack, such as difficulty breathing or the sudden change from combativeness to tranquility, Wyss made sure to check on Johnson, comment on his own uniform needing to be washed, kick Johnson's taser away so Jack wouldn't "get any good ideas" and hold Jack in the prone position so he wouldn't escape. Wyss claims he simply *couldn't* roll Jack onto his back and begin chest compressions because of the prone handcuffing and Wyss's "positive control of the handcuffs." [ECF No. 81-2, 124:6–10]. To do so would have either required Wyss to put his hand underneath Jack and the ground or to let go of the handcuffs and risk Jack getting up and running away, neither of which was a risk Wyss was willing to take. [*Id.*, 124:11–16]. Thus, when asked to weigh the mere "possibility" that Jack may be feigning his unconsciousness, difficulties breathing, and gray skin tone with Jack's

heightened risk of sudden death, Wyss chose to take all necessary steps to ensure the former did not occur.

By the time the paramedic arrived at the parking lot, Jack's condition was *so patently obvious* that the paramedic immediately asked whether Jack was breathing; the paramedic was forced to check Jack's pulse on his own because neither Wyss nor Johnson readily knew the answer. [*See* ECF No. 57-15, 46 (citing video stamps); Ex. 3 at 24:31–37 (paramedic stating "Geez, Oh Pete!")]. Even then, Wyss and Johnson stood there and did *nothing*:



The paramedic had to ask Johnson and Wyss to unhandcuff Jack and roll him over by stating the obvious: "he's not going anywhere." [ECF No. 57-15, 46]. Before assisting the paramedic in any way, Wyss asked whether the paramedic had any medical gloves, even though he was already wearing gloves. [*Id.* at 47; *See* Ex. 3 at 26:47–27:26 (changing black gloves for blue medical gloves found in paramedic vehicle)].

At the very least, Wyss's conduct was *egregious*, let alone deliberately indifferent. [ECF No. 81-2, 80:2–5 (admitting there was *nothing* preventing him from retrieving the AED device or breathing bag from his vehicle); *See also* ECF No. 57-1, ¶ 60 (criticizing Wyss's failure to comply with policies, procedures, training, and generally accepted police practices); ECF No. 57-15, 51 (Wyss stating "I just got into a fight with a junkie and he might have died."); ECF No. 15, ¶ 107 (admitting Wyss said this)].

### *iii.* *Sergeant Johnson knew Jack was at risk of a sudden, in-custody death*

Like Wyss, Johnson knew of the risks forecasting probable sudden in-custody deaths from positional asphyxia and prone positioning, especially when the risk arises in the context of "excited delirium" suspects. [*See* Ex. 25 at 0434; ECF No. 81, 30 (stating BSOTPD "receive[s] use of force training through" BCSO; *See also supra* (discussion of Wyss's trainings); ECF No. 57-1 (citing and discussing policies)]. Johnson completely and utterly failed to comply with these policies in total and complete disregard of the serious risks of which he was well aware. [*E.g.*, ECF No. 81-3, 69:7–11; *E.g.*, ECF No. 57-1, ¶ 60 (criticizing Johnson's failure to comply with policies, procedures, training, and generally accepted police practices)].

Johnson also received annual training in CPR, first aid, mental health and responding to persons with mental illnesses, sudden in-custody deaths, use of force, civil rights protections, physical control tactics, and tasers. [Ex. 14 at 1–15]. As early as 2015, Johnson had been trained on "understanding and responding to excited delirium calls," "responding to people with mental illnesses," "sudden in-custody Deaths," and "interacting with the mentally ill as a first responder." [*Id.*]

Johnson received annual training on CPR, first aid, mental health and responding to persons with mental illnesses, sudden in-custody deaths, BCSO's use of force training, civil rights protections, physical control tactics, and tasers. [Ex. 14 at 1–15]. As early as 2015, Johnson had training specifically on "understanding and responding to excited delirium calls," "Responding to People with Mental Illnesses," "Sudden In-Custody Deaths," and "Interacting with the Mentally Ill as a First Responder." [Ex. 14 at 9, 12, 13; *See also id.* at 14–15 (demonstrating the trainings continued after October 2018)].[20]

Johnson argues he was not deliberately indifferent to Jack's condition because he called for an ambulance at the very beginning of his encounter with Jack. [ECF No. 78, 18]. This demonstrates Johnson's personal knowledge of Jack's conditions and the seriousness of it, not the lack of deliberate indifference. As discussed above, everything Johnson did after his initial call for an ambulance is further evidence of his deliberate indifference.

Johnson argues his post-handcuffing conduct is the opposite of indifference, namely, radioing for an ambulance once he acknowledged Jack wasn't breathing; attempting to flag down the paramedic when he went to the patrol cars rather than the parking lot by waving his arms and shining his flashlight in that direction; and retrieving the LUCAS machine for the paramedic. [*Id.* 18–19].

There are, however, just as many facts that, when viewed in the light most favorable to Plaintiff, would enable a reasonable jury to conclude Johnson was deliberately indifferent, his foregoing actions notwithstanding. For example, Johnson recognized Jack was "having trouble breathing," and—rather than do anything to ensure his condition didn't worsen—Johnson merely yelled "Hey! Wake up!" [ECF No. 57-15, 73].

Johnson's attempts to redirect the paramedic were lackluster *at best*. Four minutes and 35 seconds pass from the time Johnson acknowledges Jack is having trouble breathing to when the paramedic pulls into the bank parking lot. [*Id.* at 73–74]. In that time, Johnson no doubt radioed for a medic and insisted they come "priority one." [*Id.*]. That fact, however, demonstrates Johnson's personal knowledge of Jack's serious medical needs, which makes his subsequent actions—and lack thereof—deliberately indifferent. For instance, Johnson made no attempts to render CPR or other life-saving measures; he yelled at Jack to wake up. [*Id.*]. When Johnson realizes the paramedic reported to the patrol vehicles—which are just across the street and no more

than 50 years away—Johnson does nothing more than yell, shine his flashlight, and ask whether the paramedic is "f---ing deaf." During that time, Johnson and Wyss check-in with one another. [*Id.*]. Johnson never considers having him or Wyss render CPR or roll Jack over into the recovery position; the only recommendation he makes is to "get some NARCAN in him."

Johnson argues "it would make little sense for [him] to begin attempting to resuscitate [Jack] when the individuals better trained and prepared to provide him care were practically within eyesight." [ECF No. 78, 19]. This argument overlooks the fact that *Johnson was trained and certified* in CPR, first aid, and basic life saving measures, including the use of the AED that he had in his vehicle. [ECF No. 81-3, 26:10–25; 31:10–13]. It is also disputed by Johnson's deposition testimony, where he explained that he has used AEDs somewhere between 75 and 125 times in his law enforcement career, and has provided chest compressions more than 50 times. [ECF No. 81-3, 28:10–30:23; *Lifesaving Award*, Ex. 27 at 1 (honoring and recognizing Johnson's "lifesaving efforts" in quickly responding "to administer CPR to victim in distress" finding it "instrumental in saving the life of [victim]" ]. "Death can occur in less than one minute from prone pressure especially if CPR is not instituted immediately." [ECF No. 57-3, I'll 7].

While Johnson did summon an ambulance and request they become "priority one," it is undisputed that Johnson knew Jack was at an increased risk of positional asphyxia and was encountering him in his last minutes. Johnson knew Jack was in critical condition "and yet did nothing to make sure that [he did] not take[] a turn for the worse." *Greene*, 22 F.4th at 611. This failure is deliberately indifferent. They knew, and a reasonable officer on the scene—knowing what Johnson knew at the time—would have known it, too. [ECF No. 67-1, ¶ 60].

**D. The officers are not entitled to qualified immunity on Plaintiff's deliberate indifference claim because the rights at issue were clearly established**

Because there is sufficient evidence to conclude the officers were deliberately indifferent to Jack's medical needs, "the only remaining question is whether the right was clearly established." *Greene*, 22 F.4th at 614.

Since 1972, the Sixth Circuit has stated that, "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005). This right was reiterated in 2013, when the Sixth Circuit stated, "it is clearly established that a prisoner has a right not to have his known, serious medical needs disregarded by a medical provider or [an] officer." *Greene*, 22 F.4th at 615; *Kindl v. City of Berkley*, 798 F.3d 391, 301 (6th Cir. 2015); *Owensby*, 414 F.3d at 604 (finding right to adequate medical care clearly established regardless of whether pretrial detainee resists arrest).

Jack's last audible sound was made at 1:49:18 a.m. [ECF No. 57-15, 26]. Within 39 seconds, Johnson recognized Jack was having trouble breathing. [*Id.*]. It took Johnson 2 minutes and 46 seconds to ask Wyss whether Jack was breathing. [*Id.*]. Within 2 minutes and 56 seconds, Wyss reported Jack was turning grey. [*Id.*]. Paramedics arrived within 3 minutes and 32 seconds of Jack becoming unresponsive, but Jack remained in the prone position for 4 minutes and 52 seconds after he became unresponsive, and he was rolled onto his back only at the paramedic's request. [*Id.*]. Jack would suffer for 7 minutes and 19 seconds after becoming unresponsive before he received chest compressions via the LUCAS machine. [*Id.*]. Before CPR or any other life-saving resuscitation measures were attempted, Wyss asked for medical gloves. [*Id.*]. Johnson's only response was to yell "Hey! Wake up!" and to summon an ambulance. [*Id.*]. "[A]t a certain point, bare minimum observation ceases to be constitutionally adequate." *Greene*, 22 F.4th at 609

(concluding defendants "recklessly failed to act with reasonable care in failing to render medical assistance while detainee suffered from delirium tremens").

On October 22, 2018, no reasonable officer could conclude Johnson's or Wyss's behavior was constitutionally permissible. *See Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (per curiam); *Greene*, 22 F.4th at 615 ("Greene experienced a clearly established life-threatening medical condition" and officers "did not provide *any* medical assistance during that time. Greene's right not to have known, serious medical needs disregarded by County Defendants was clearly established in this scenario"). Therefore, neither Wyss nor Johnson is entitled to qualified immunity.

### E. The authorities cited by Johnson and Wyss are inapposite

Both officers contend they are entitled to qualified immunity because their constitutional obligations were fulfilled once Johnson summoned for medical care. This argument is premised on the incorrect notion that the Due Process Clause does not require them to personally administer first aid or other emergency treatment to a detainee in their custody. [ECF No. 78, at 17–18]. Both officers rely on *Rich v. City of Mayfield Heights* for this proposition. Their understanding of *Rich* is not only incorrect but, most importantly, *Rich* is inapposite to this case.

In *Rich*, a prison guard found a pretrial detainee hanging in his cell. 955 F.2d 1092, 1093 (6th Cir. 1992). Rather than get the prisoner down, the guard ran to summon help. *Id.* The guard and paramedics returned and provided medical care to the prisoner less than one minute later. *Id.* at 1094. At issue in *Rich* was "the right of a pretrial detainee to be cut down by police officers when discovered hanging in a jail cell," which required the Court to consider "whether there was a recognized constitutional right at the time of this incident that would have required the police officers to cut down [the detainee] themselves rather than call for medical assistance." *Id.* at 1097.

In overruling the district court's denial of qualified immunity, the Sixth Circuit applied the clearly established, particularized "right to have medical assistance summoned immediately upon police officers become aware that [the detainee] was in need of immediate medical care." *Id.* Because the police officers "reacted immediately by calling for the paramedics" *and* because the paramedics "arrived within minutes," the officers did not deny or delay the detainee's access to medical care. *Id.* at 1098.

*Rich* was not, very clearly, a case involving positional asphyxia or a failure to render CPR or other life-saving resuscitation measures, such as an AED or breathing bag. *See id.* And contrary to Johnson's assertion, the holding in *Rich* was *not* that the "Due Process Clause does not require officers to personally administer first aid or other emergent treatment." [*Compare id.* ECF No. 78, at 18]. The officers' position is more accurately premised on *Maddox v. City of Los Angeles*, 792 F.2d 1408 (9th Cir. 1986), a case briefly and partially discussed by *Rich*. 995 F.2d at 1097.

In *Maddox*, following a physical altercation, two officers detained a man who was "standing naked in the middle of a busy street" whom they believed to have taken PCP. 792 F.2d at 1411. Once handcuffs were secured, the officers placed the detainee in the back of their patrol vehicle and started driving him to the hospital for medical care. *Id.* En route, the detainee became belligerent, requiring the officers to pull over on a freeway to reposition and resecure him. *Id.* At this point, another physical altercation ensued but ultimately concluded in the detainee once again being subdued and secured in the back of the car. *Id.* The detainee was "still for the remainder of the ride to the hospital," but he had a detectable pulse until they arrived at the hospital, at which point a pulse was difficult to detect. *Id.* Although the officers were trained in CPR, they rushed the detainee to the jail ward of the hospital where medical staff began CPR. *Id.* The detainee died

hours later. *Id.* On appeal following a jury trial, *id.* at 1412, the Ninth Circuit considered whether the district court properly instructed the jury. *Id.* at 1414–15. The jury was instructed as follows:

> With respect to medical care, the concept of due process of law requires the officers to take reasonable steps to secure medical care which they recognize as necessary for the decedent. The constitutional rights of the decedent are violated if the officers are deliberately indifferent to the necessity of medical care for the decedent. However, any failure by the officers themselves to render cardial pulmonary resuscitation is not a violation of the decedent's constitutional rights.

*Id.* at 1415.

The plaintiff claimed the district court erred in giving the last sentence of the instruction relating to the failure to render CPR. *Id.* In finding no error, the Court reasoned: "When read in conjunction with the court's instruction that, 'the concept of due process of law requires the officers to take reasonable steps to secure medical care which they recognize as necessary for the decedent,' the instruction at issue set forth the constitutional obligation of the officers in this case." *Id.* Despite the Court's clear invocation of judicial restraint where it declined to "decide the precise standard [that] applies in determining whether a [state actor] fulfills its due process obligations to pretrial detainees who require medical attention[,]" *id.* at 1415, Johnson relies on the following dicta: "we found no authority suggesting that the due process clause establishes *an affirmative duty* on the part of police officers to render CPR *in any and all circumstances.*" *Id.* (emphasis added) (citing "*But cf. Bass v. Wallenstien*, 769 F.2d 1173 (7th Cir. 1985) (prison doctor's delay in reacting to cardiac arrest was a basis for § 1983 claim)").

Notably, the incident in *Maddox* occurred in 1982 and was decided by the Ninth Circuit in 1986; the incident in *Rich* occurred in 1987 and was decided by the Sixth Circuit in 1992. *Maddox*, 792 F.2d at 1408, 1411; *Rich*, 955 F.2d at 1092, 1093. Since then, district courts within the Sixth Circuit have interpreted *Rich* and *Maddox* in light of binding precedent. Specifically, in 2012, the Middle District of Tennessee stated: "In light of subsequent Sixth Circuit cases, the Court is of the

opinion that it would be a mistake to reach *Rich* as holding that, in any and all circumstances, an

officer need never do more than summon medical help in order to avoid being found deliberately

indifferent to a serious medical need." *Eibel v. Melton*, 904 F. Supp. 2d 785, 807 (M.D. Tenn.

2012). The Court reasoned:

> Consider, for example, *Estate of Owensby v. City of Cincinnati,* 414 F.3d 596 (6th
> Cir. 2005). There, Cincinnati police officers choked, hit, and maced a suspect who
> had eluded arrest in the past, and threw him into the back of a squad car. Arriving
> at the scene, another officer peered into the back of the cruiser where he saw that
> the suspect 'was bleeding and appeared unable to breathe," prompting the officer
> to say, "this looks f[-]ed up. Can he breathe? It don't look like he can from the way
> he's laying.' *Id.* at 600. Nevertheless, all of the officers 'failed to investigate [the
> suspect's] condition any further and did not attempt to provide him with medical
> care.' *Id.* at 603.
>
> In affirming the denial of qualified immunity, the Sixth Circuit 'agree[d] with the
> district court's conclusion that the evidence—again, when viewed in the light most
> favorable to the estate—indicate[d] that each officer did, in fact, know of and
> disregard the substantial risk of harm to [the suspect's] health and safety.' . . .

*Id.* at 807 (quoting *Owensby*, 414 F.3d at 600–03). Critical to the Court's holding in *Owensby* was

that "each officer viewed [the suspect] in significant physical distress, yet made *no attempt to*

*summon or provide any medical care* until several minutes later, when [an officer] checked on [the

suspect] and discovered that he was not breathing." *Id.* at 603 (emphasis added). "This very

passage has been quoted for the proposition that "*Owensby* involved not only the failure to

summon medical care, but also the failure to provide medical care." *Eibel*, 904 F.2d at 807.

The Sixth Circuit has characterized *Owensby*'s holding as finding sufficient evidence to

survive summary judgment that the police violated the suspect's Fourteenth Amendment right to

medical care while in custody where the police critically injured a suspect and "then failed to give

him medical attention while he lay in extremis." *Hunt v. Sycamore Cmmty. Sch. Dist. Bd. of Educ.*,

542 F.3d. 529 (6th Cir. 2008).

Similarly, the officers in *Eibel* shot a suspect multiple times. 904 F. Supp. 2d at 807. The suspect was actively bleeding and, "despite the fact that he was still handcuffed, nobody bothered even to place pressure on the wound, although most, if not all of the officers had received at least rudimentary first aid training." *Id.* at 807. Under these circumstances, the district court found the officers were aware of a serious medical situation "but did nothing[.]" *Id.* Thus, "a reasonable jury could conclude [they] were deliberately indifferent to [the suspect's] serious medical need in violation of the Fourteenth Amendment," notwithstanding the fact "that help was promptly summoned." *Id.* at 807–08. The Court also rejected the officers' claim to qualified immunity, stating "reasonable officers would have known, based on this Circuit's precedent, that the obligation to provide adequate medical care to an injured detainee is not discharged merely by promptly calling for assistance." *Id.* at 808. Wyss and Johnson should have known this, too.

Lastly, Johnson argues summary judgment is proper under *Thomas v. City of Columbus*. [ECF No. 78, 18]. In *Thomas*, an officer responded to an ongoing burglary with multiple assailants in an apartment where the victim was reportedly hiding in a bedroom. 854 F.3d at 363. The apartment was in a high crime area and the officer suspected a gun may have been involved. *Id.* Once on the scene, this officer saw two men running from the apartment, one of whom had a gun. *Id.* The officer fired two shots at the man with the gun; the second person fled. *Id.* The officer never administered aid to the person he shot, "later saying that he considered it unsafe to do so with an active crime scene." *Id.* Tragically, the person shot was the victim who managed to disarm one of the burglars before fleeing his apartment; he died from the two gunshot wounds. *Id.* The Sixth Circuit found the officer did not act with deliberate indifference when he failed to provide medical aid because he immediately summoned help and then focused on his own safety by taking cover and waiting for backup to arrive. *Id.* at 367. Like the officer in *Thomas*, Johnson and Wyss

promptly summoned help and failed to render any medical assistance to Jack in the interim. But unlike the officer in *Thomas*, neither Johnson nor Wyss had to take cover and wait for backup to arrive to an ongoing, active crime scene in a high crime area. Thus, *Thomas* is patently inapposite to the disposition of this case.

Where an arrestee's condition is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention," it is sufficient for a plaintiff to show "the need was not addressed within a reasonable time frame." *Blackmore*, 390 F.3d at 900. Johnson and Wyss were aware of a serious medical situation "but did nothing." *Eibel*, 904 F. Supp. 2d at 807. Notwithstanding the summons for an ambulance, a reasonable jury could find both Johnson and Wyss were deliberately indifferent to Jack's medical needs, both pre- and post-handcuffing, in violation of Jack's Fourteenth Amendment rights. Therefore, neither Johnson nor Wyss are entitled to qualified immunity.[21]

### 3. UNCONSTITUTIONAL CONDITIONS OF DETAINMENT

Wyss argues Plaintiff's fourth claim for unconstitutional conditions of confinement should be dismissed for failure to state a claim because it is duplicative of Plaintiff's claims for excessive force and deliberate indifference. [ECF No. 81, at 25–26]. This "argument is slightly uncommon." *Cessna v. Ethicon, Inc.*, No. 7:20-cv-37, 2020 WL 2121392, at *7 (M.D. Ga. Apr. 2, 2020). First, it is vastly different than a claim of qualified immunity. Consequently, the altered summary judgment framework is inapplicable to this argument. *Quigley*, 707 F.3d at 681 (providing the modified summary judgment burden in qualified immunity cases).

---

[21] Johnson and Wyss seem to imply that the prone restraint cannot be both use of force and a deliberate indifference to a serious medical need claim. [ECF No. 81, at 12–13; ECF No. 78, at 17]. This is incorrect. Courts have found that prone restraint is excessive force. *See Hopper v. Montgomery Cnty. Sheriff*, 310 F.Supp.3d 911, 929–30 (S.D. Ohio 2017) (finding that in May 2012, "it was 'clearly established' that forcibly restraining an individual in a prone position for a prolonged period of time is unconstitutional"); *Aguirre v. City of San Antonio*, 995 F.3d 395, 417 (5th Cir. 2021).

Second, duplicative-claim arguments typically "arise in the context of separate *actions* presenting the same claim rather than a *single* action presenting duplicative claims." *Id.* (citing cases). When the duplicative argument arises within a single action, the issue is essentially whether the plaintiff impermissibly "seeks a double recovery for a single injury in a single action[.]" *Id.; Gen Tel. Co. v. EEOC*, 446 U.S. 318, 333 (1980) ("it goes without saying that the courts can and should preclude double recovery"); Martin A. Schwartz, SEC. 1983 LITIG. CLAIMS & DEFENSES § 16.09, *Rule Against Double Recovery* (4th ed. 2022) (noting that § 1983 complaints "frequently assert multiple constitutional claims" and courts should ensure the verdict form prevents any double recovery).

Even still, issues of duplicity are most commonly and more appropriately addressed at the pleadings stage. *Cessna*, 2020 WL 2121392, at *8. "The logic behind this makes sense: questions of whether a claim involves the same allegations, issues, and relief can often be answered by examining the pleadings alone and not evidence later developed." *Id.* "Additionally, issues of whether a claim is duplicative more closely resemble matters 'in abatement' rather than on the merits." *Id.* "[The Township] Defendants cite no binding federal case that authorizes entry of summary judgment because a claim is duplicative of another in the same action." *Id.* at *7.

When faced with a similar procedural quagmire, at least one federal court determined the threshold inquiry is to determine whether the claims are, in fact, duplicative. *Id.* at *8 If they are, the question "becomes what to do with the[] duplicative claims" on summary judgment. *Id.* at *10.

A claim may be considered duplicative if "the parties, issues, and available relief do not significantly differ." *Id.* at *7. Each of the claims at issue here—Plaintiff's first, fourth, and sixth causes of action for excessive force, conditions of detainment, and deliberate indifference to a serious medical need, respectively—are asserted against Defendant Wyss. [*Pl.'s Compl.*, ECF No.

1, ¶¶ 113–23, 142–48, 157–64]. To same extent, the allegations supporting each claim also overlap. [*Compare id.* ¶¶ 117–18, *with id.* ¶¶ 143–44, *and id.* ¶¶ 158–59; *Compare id.* ¶ 147–48, *with id.* ¶ 162, 164]. The allegations also differ. For example, Plaintiff alleges under claim four that "the conditions of detainment put Decedent at substantial risk of suffering serious harm," [*Id.* ¶ 146]. Under claim six, Plaintiff alleges "the denial of medical care put Decedent a risk of suffering serious harm." [*Id.* ¶ 161].

Importantly, however, Wyss does not argue entitlement to summary judgment on Plaintiff's claim for unconstitutional conditions of confinement *because there is no genuine dispute of material fact*. [ECF No. 81, 25–26]. Instead, here merely argues the claim is duplicative *as pled.*" *See Cessna*, at *10. Thus, Wyss fails to meet his burden on summary judgment. *See Cessna*, 2020 WL 2121392, at *10.

Wyss's motion is more appropriately considered one for dismissal rather than summary judgment. [ECF No. 81, 25–27 (framing the argument as "dismissal for failure to state a claim" rather than "judgment as a matter of law")]; *Cessna*, 2020 WL 2121392, at *10. "However, such a motion must be brought at the pleadings stage—now, such a motion is untimely." *Id.* at *7 (citing FED. R. CIV. P. 12(h)) (waiving and preserving certain defenses).[22] Wyss neither contends nor explains why he "did not or could not have made these arguments at the pleadings stage of this case." *See Cessna*, 2020 WL 2121392, at *10. Thus, to the extent Wyss's argument should be construed as a motion for partial dismissal," the court should deny the motion as untimely. *Id.* Wyss's remedy is that, should Plaintiff pursue a double recovery for a single injury at trial, Wyss "may address that issue at or after trial." *Id.*; *See* Schwartz, § 16.09, *supra*.

---

[22] "The question of whether a claim is duplicative in the same lawsuit does not appear to be one for a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) because the issue of whether a claim is duplicative does not go to the merits of the claim." *Cessna, Inc.*, 2020 WL 2121392, at *10 n.5.

4.    *MONELL* CLAIMS

   Plaintiff's seventh and eighth claims allege *Monell* liability for unconstitutional policy or

custom against the Township and Chief Tolier and the County and Sheriff Paul Bailey,

respectively. [ECF No. 1, ¶¶ 165–90].

   Municipality liability attaches when "through its deliberate conduct, the municipality was

the 'moving force' behind the injury alleged." *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)

(quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). A municipality "may be liable

under Monell for a policy of permitting constitutional violations regardless of whether the policy

is written." *Jackson v. City of Cleveland,* 925 F.3d 793, 830 (6th Cir. 2019); *see Monell*, 436 U.S.

at 691. In addition, a "plaintiff can establish municipal liability by showing that the municipality

ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish

allegations of unconstitutional conduct." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 882 (6th

Cir. 2020) (quoting *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1247–48 (6th Cir. 1990)).

   It was the Sheriff's Department's custom, policy and practice to refer in-custody deaths to

an outside agency (such as the Michigan State Police) for *criminal* investigation; however, those

outside agencies did *not* investigate whether involved officer violated department policies or

procedures. [Ex. 26 at 56:9–57:8, 73:13–18]. And yet, this was the *only* investigation into whether

the involved officer violated department policies or procedures. [*Id.* at 97:19–21]. In other words,

the Sheriff's Department had a custom, policy and practice *against* investigating in-custody deaths

for policy or procedure violations.

   Under circumstances involving possible inappropriate use of force warranting criminal

investigation by an outside agency, the Sheriff's Department does *not* investigate whether the

officer violated department policies or procedures. [*Id.* at 77:9–15]. In fact, the department *never*

internally investigated deadly use of force, force resulting in great bodily harm, or in-custody

deaths prior to Jack Lunneen's death. [*Id.* at 78:16–81:14]. Nor did the department conduct any meaningful investigation into Lunneen's death.

The Sheriff's Department did not complete a use of force report in this case, did not complete an in-custody death report, and did not even interview Johnson about Lunneen's death. [*Heit Dep.* at 116:3–24, 117:14–20, 118:5–10, 127:14–20, 129:2–6]. Instead, the Sheriff's Department summarily concluded—without conducting an internal investigation and without making any findings of fact—that Johnson did nothing wrong and did not violate any department policies. [*Id.* at 119:7–11, 136:1–5]. A municipality "ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct." *Wright*, 962 F.3d at 882. A reasonable jury could determine that the Sheriff's failure to ever internally investigate in-custody deaths, even when force is used, was the moving force behind violations of Jack Lunneen's constitutional rights.

A reasonable jury could also find that Chief Toliver ratified Officer Wyss' unconstitutional conduct. The ratification theory of municipal liability does not require proof of a pattern or custom. *Wilson v. Louisville-Jefferson Cty. Metro Gov't & Brett Hankison*, No. 3:19-CV-00739-CRS, 2020 WL 981717, at *2, (W.D. Ky. Feb. 26, 2020). Instead, ratification of a single violative act is enough for municipal liability to attach. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). A final policy maker may ratify the unconstitutional acts of its employees in two ways. First, through "affirmative approval of a particular decision made by a subordinate." *Feliciano v. City of Cleveland*, 988 F.2d 649 (6th Cir. 1993). The second is by "failing to meaningfully investigate and punish allegations of unconstitutional conduct." *Wright*, 962 F.3d at 882. Chief Toliver and the township board ratified Officer Wyss' unconstitutional acts in both ways.

First, Chief Toliver affirmatively approved of Wyss' conduct, concluding that he did not violate any department policy, including the department policy prohibiting prone restraints. [*Toliver Dep.* 69:3–20, 71:1–16]. Second, Chief Toliver failed to meaningfully investigate Wyss' conduct. Like the Sheriff, Chief Toliver did not conduct an internal investigation, did not prepare findings of fact, did not complete a use of force report, did not interview Wyss, and did not even review Wyss's written statement. [*Id.* 68:4–23, 56:10–11, 57:9–19]. Regardless of whether Chief Toliver was a final policy maker, his determination that Wyss did nothing wrong was reviewed and ratified by the township board. [*Id.* 14:3–15:3]. *See Shape v. Barnes Cnty.*, 396 F. Supp. 2d 1067, 1076–77 (D.N.D. 2005) (finding that, regardless of whether the sheriff was a policymaker, the County could be held liable because "the Board of Commissioners directly ratified the Sheriff's decision"). Accordingly, a reasonable jury could determine that—by failing to investigate or punish Wyss and by affirmatively approving of his conduct—the Village of Berrien Springs ratified Wyss' unconstitutional conduct.

## 5.     STATE LAW CLAIMS

### A.  Plaintiff's claim for gross negligence is properly predicated on Wyss's and Johnson's unintentional actions

In Michigan, governmental employees are liable if they engage in grossly negligent conduct while acting in the course and scope of their employment. MICH. COMP. LAWS § 691.1407(2). Gross negligence is statutorily defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether injury results." MICH. COMPL. LAWS. § 691.1407(7)(a). To meet his burden to prove his entitlement to immunity, the defendant "must show that [his] conduct was not grossly negligent and was not the proximate cause of Plaintiff's injuries." *Wendrow v. Mich. Dep't of Human Servs.*, 534 F. App'x 516, 532 (6th Cir. 2013). "Where, as here, the party with the burden of proof is seeking summary judgment, that party has the obligation of presenting

evidence showing that no reasonable trier of fact could find other than for the moving party." *Murphy*, 2014 WL 4187806, at *1.

Wyss fails to provide any evidence or argument to carry his burden on that issue. *See id.* Instead, Wyss merely argues Plaintiff's gross negligence claim must be *dismissed* because it's premised on Wyss's intentional acts, which fails to state a claim upon relief can be granted. [ECF No. 81, at 33]. This argument "fares no better when it is considered as an attack on the adequacy of plaintiff's pleading." *See Murphy*, 2014 WL 4187806, at *1.

Wyss relies on the seminal Michigan case *VanVorous v. Burmeister*, 687 N.W.2d 132 (Mich. App. 2004) for the proposition that claims "involving elements of intentional torts" cannot be pursued under a gross negligence theory. [ECF No. 81, 32–33]. In *VanVorous*, the plaintiff's husband was shot and killed by police following an extended car chase. *VanVorous*, 687 N.W.2d at 139. The plaintiff brought claims for excessive force under § 1983, as well as state claims for assault and battery, intentional infliction of emotional distress, and gross negligence. *Id.* On summary judgment, the court found the officers were entitled to qualified immunity and dismissed the plaintiff's state law claims without prejudice. *Id.* The plaintiff subsequently pursued her state law claims in state court; in doing so, she premised her gross negligence claim on the officers' failure to refrain from using excessive force. *Id.* The court found her gross negligence claim was "***fully*** premised on her claim of excessive force," which led the court to the "inevitable conclusion that" plaintiff was collaterally estopped from pursuing it. *Id.* at 143 (emphasis added).

Thus, according to *VonVorous*, "a gross negligence claim cannot lie in certain circumstances where the police conduct at issue forms the basis for an intentional tort." *Collins v. Ferguson*, No. 17-cv-108982017, 2017 WL 4387287, at *7 (E.D. Mich. Oct. 3, 2017). Wyss contends the *only* state law claim available to Plaintiff is assault and battery. [ECF No. 81, 32].

Contrary to Wyss's assertion, *VonVorous* does *not* hold that claims for excessive force and gross negligence are per se incompatible. *See Bell v. Porter*, 739 F.Supp.2d 1005, 1015 (W.D. Mich. 2010). For example, in *Bell v. Porter*, an officer responded to an altercation on a city bus involving the bus driver and the plaintiff, who was a double amputee with two prosthetic legs. 739 F. Supp. 2d at 1009. During the immediate investigation, the officer "put his hands out and pushed her chest, causing her to fall backwards." *Id.* The plaintiff filed suit in federal court alleging excessive force under § 1983, violations of Michigan's Persons with Disabilities Civil Rights Act, gross negligence, and assault and battery. *Id.* at 1009–10. Relying on *VanVorous*, the officer argued the gross negligence claim should be dismissed "because it [was] subsumed into her assault and battery claim." *Id.* at 1014. While acknowledging the plaintiff's excessive force claim was "based on the same incident as her assault and battery claim," the Court found the plaintiff had "adequately alleged an alternative basis for the claim that [did] not rely on an intentional, offensive touching." *Id.* at 1015. The court held her gross negligence claim was not barred by *VanVorous*, and the defendant was not entitled to summary judgment. *Id.*

This case is similar to *Bell*. In addition to alleging Wyss owed Jack a duty to avoid the use of excessive force, Plaintiff alleged Wyss owed Jack a duty to act prudently and with reasonable care, to take reasonable available measures to abate or reduce the risk of serious harm, to use alternative means to apprehend Jack (including the use of de-escalation tactics), and to not to act deliberately indifferent to Jack's safety and well-being. [ECF No. 1, ¶¶ 118, 121, 122, 163, 147, 162, 191, 192]. While many of the officers' actions would constitute intentional torts—including the taser, the pepper spray, the tackle, the leg sweep, and the mandibular grabs—many do not, including the officers' decision to: close in on Jack and escalate the situation ; the officers' decision to leave Jack lying face-down and naked on the cold ground; and the officers' decision not to

provide basic life-saving resuscitation measures. While Plaintiff contends the Officers' failure to place Jack into recovery mode constitutes excessive force, this failure to act is not the type of "offensive, intentional touching" at issue in cases like *VanVorous*. *See Collins*, 2017 WL 4387287, at *7 (discussing the rationale behind *VanVorous* and stating intentional conduct is more appropriately analyzed under the "analogous assault and battery claim" rather than the "reasonable care" underlying a negligence claim).

Moreover, the individual allegations asserting Wyss acted deliberately indifferent and Plaintiff's independent claim for deliberate indifference and denial of medical care is sufficient to bypass the *VanVorous* bar. "The Sixth Circuit has observed that gross negligence under Michigan law is equivalent to deliberate indifference under Eighth Amendment analysis." *Murphy*, 2014 WL 4187806, at *1;[23] *Vinson v. Mich. Dep't of Corrections*, No. 14-11130, 2015 WL 9897844, at *15–16 (E.D. Mich. Oct. 30, 2015) , *adopted in relevant part*, 2016 WL 242528 (E.D. Mich. Jan. 21, 2016); *Kindl*, 798 F.3d at, 404) (affirming denial of summary judgment on the defense of governmental immunity to gross negligence claim which also asserted deliberate indifference / denial of medical care); *Murphy*, 2014 WL 4187806, at *1 ("Conduct that is deliberately indifferent is not necessarily intentional.").

Based on the foregoing, Plaintiff has "adequately plead an alternative basis for the claim that does not rely on an intentional, offensive touching," and Wyss's Motion must be denied in this respect. *Bell*, 739 F.Supp.2d at 1015.

### B. Plaintiff's tenth cause of action for violations of Michigan's statutes

---

[23] The Sixth Circuit's Post-*Brawner* modified deliberate indifference standard does not alter the reasoning in *Murphy* on this issue.

The Township argues the claim should be dismissed for failing to state a claim upon which relief may be granted because Plaintiff improperly seeks money damages against a municipality. [ECF No. 81, 33–34]. Plaintiff agrees. *Jones v. Powell*, 462 Mich. 329, 612 N.W.2d 423 (2000).

### C. Johnson's failure to address Plaintiff's state law claims renders his motion one for partial summary judgment

The County Defendants request the Court "dismiss all counts of Plaintiff's Complaint" in their favor but fail to address the validity of Plaintiff's state law claims. [ECF No. 78, at 21]. Because Johnson failed to even raise the issue, he is not entitled to summary judgment. FED. R. CIV. P. 56(c); *Hansen v. State Farm Mut. Auto. Ins. Co.*, No. 2:10-cv-01434-MMD-RJJ, 2012 WL 6204822, at *11 (D. Nev. Dec. 12, 2012).

### D. The Court should retain jurisdiction over the state law claims

If the Court dismisses the federal claims, it should retain jurisdiction over Plaintiff's state law claims. District courts have broad discretion to determine whether to retain supplemental jurisdiction over state claims. *Carlsbad Techn., Inc. v. HIF Bio, Inc.*, 556 U.S. 635 (2009). On balance, the factors weigh in favor of retaining jurisdiction over Plaintiff's state law claims. This case has been pending for nearly 2 years, the parties have engaged in significant discovery, underwent a facilitated mediation, and now, fact discovery is closed. Since only two of Plaintiff's ten claims are grounded in state law, the Court will spend considerable time and resources—in addition to that already spent—in deciding summary judgment. *See Harper AutoAlliance Int'l, Inc.*, 392 F.3d 195, 210–11 (6th Cir. 2004). Thus, factors of judicial economy and fairness heavily way in favor of retention. *See Barcume v. City of Flint*, 132 F. Supp. 2d 549, 557 (E.D. Mich. 2001) (stating the "justice delayed is justice denied" adage is fundamental to our legal system).

## 6. THE DOCTRINE OF QUALIFIED IMMUNITY IS UNFAIR, UNWORKABLE, AND UNJUSTIFED

Plaintiff recognizes that the Court is required to follow precedent. Nevertheless, and to preserve argument, Plaintiff joins the chorus of many other voices expressing concerns over the

"clearly established" requirement. Tragically, nearly 1,100 Americans are killed every year at the hands of law enforcement. *Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 789 (10th Cir. 2021) (Lucero, J., dissenting). As one judge recently described one of the many problems with it,

> First, many courts grant immunity without first determining whether the challenged behavior violates the Constitution. They avoid scrutinizing the alleged offense by skipping to the simpler second prong: no factually analogous precedent. Forgoing a knotty constitutional inquiry makes for easier sledding, no doubt. But the inexorable result is "constitutional stagnation"—fewer courts establishing law at all, much less clearly doing so. Section 1983 meets Catch-22. Plaintiffs must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because no one's answered them before. Courts then rely on that judicial silence to conclude there's no equivalent case on the books. No precedent = no clearly established law = no liability. An Escherian Stairwell. Heads government wins, tails plaintiff loses.

*Zadeh v. Robinson*, 928 F.3d 457, 479–80 (5th Cir. 2019), cert. denied, 141 S. Ct. 110, 207 L. Ed. 2d 1051 (2020) (Willett, J., concurring in part) (footnotes omitted). The fiction underlying the "clearly established" prong – an assumption that officers check Westlaw before their shifts to find out what they can – and cannot – constitutionally do – should not be perpetuated. *See Caldwell v. Univ. of New Mexico Bd. of Regents,* No. CIV 20-0003 JB/JFR, 2020 WL 7861330, at *29 n.14 (D.N.M. Dec. 31, 2020) ("It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: 'Are the facts here anything like the facts in *York v. City of Las Cruces*?'"). While Plaintiff has satisfied his burden of showing that Johnson and Wyss violated Jack's constitutional rights, and that a reasonable officer in their position would have known that he or she was doing so, Plaintiff seeks to preserve his challenge to the qualified immunity doctrine.

## VI. CONCLUSION

Based on the foregoing, Plaintiff respectfully requests this Court deny Defendants' Motions for Summary Judgment.

Respectfully submitted this 15th day of July, 2022,

/s/ Noah W. Drew

Mel C. Orchard, III
Noah W. Drew
Emily S. Madden
15 South Jackson Street/ P.O. Box 548
Jackson, Wyoming 83001
(307) 733-7290 / (307) 733-5248 Fax
orchard@spencelawyers.com
drew@spencelawyers.com
madden@spencelawyers.com

Sean W. Drew
DREW LAW OFFICE
302 Sycamore St. / P.O. Box 880
Niles, Michigan 49120
(269) 683-5121
drewlawoffice@gmail.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of July, 2022, I served this document electronically via email on the following persons:

James T. McGovern
James M. Straub
STRAUB, SEAMAN & ALLEN, P.C.
1014 Main Street / P.O. Box 318
St. Joseph, MI 49085
(269) 982-1600
jmcgovern@lawssa.com
jstraub@lawssa.com

*Attorneys for County Defendants*

G. Gus Morris
Christopher J. Raiti
MCGRAW MORRIS P.C.
Troy, MI 48084
gmorris@mcgrawmorris.com
craiti@mcgrawmorris.com

*Attorneys for Township Defendants*

       /s/ Noah W. Drew
Mel C. Orchard, III
Noah W. Drew
Emily S. Madden
15 South Jackson Street/ P.O. Box 548
Jackson, Wyoming 83001
(307) 733-7290 / (307) 733-5248 Fax
orchard@spencelawyers.com
drew@spencelawyers.com
madden@spencelawyers.com

Sean W. Drew
DREW LAW OFFICE
302 Sycamore St. / P.O. Box 880
Niles, Michigan 49120
(269) 683-5121
drewlawoffice@gmail.com

*Attorneys for Plaintiff*