UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS E. LUNNEEN,

      Plaintiff,

                                Case No. 1:20-cv-1007

v.

                                Hon. Hala Y. Jarbou

VILLAGE OF BERRIEN SPRINGS, et al.,

      Defendants.

_____/

## OPINION

Plaintiff Thomas Lunneen ("Plaintiff"), on behalf of Jack Lunneen ("Lunneen"), brings this civil rights action asserting claims under 42 U.S.C. § 1983. Plaintiff alleges that Defendants Roger Johnson and James Wyss violated Lunneen's Fourth Amendment right to be free from excessive force and Fourteenth Amendment right to receive medical care when he was injured while being apprehended by the police. Plaintiff further alleges that these actions resulted in unconstitutional conditions of detainment. Plaintiff also brings municipal liability claims against Defendants Paul Toliver, L. Paul Bailey, Village of Berrien Springs-Oronoko Township, and Berrien County. Finally, Plaintiff alleges state law violations against Defendants Johnson, Wyss, Village of Berrien Springs-Oronoko Township, and Berrien County. Before the Court is Defendants Johnson, Bailey, and Berrien County's motion for summary judgment (ECF No. 77) as well as Defendants Wyss, Toliver, and Village of Berrien Springs-Oronoko Township's motion for summary judgment (ECF No. 81). For the reasons stated below, the Court will grant in part and deny in part both motions for summary judgment.

# I. BACKGROUND

On October 22, 2018, at approximately 1:15 a.m., James Wyss, an officer with the Village of Berrien Springs-Oronoko Township Police Department ("BSOTPD"), was parked at an intersection on night duty.  (Wyss Rep., ECF No. 100-1, PageID.1331.)  Lunneen rode his bicycle up to Wyss's patrol car and asked to speak with him.  (*Id.*)  Lunneen "appeared agitated and had difficulty standing still or looking at [Wyss] for more than a second or two."  (*Id.*)

Lunneen asked for Roger Johnson, a sergeant with the Berrien County Sheriff's Department ("BCSD").  (*Id.*; Johnson Dep. 8, ECF No. 81-3.)  Lunneen and Johnson are "acquaintance[s]" who have run into one another and conversed in the past around the Village of Berrien Springs.  (Johnson Dep. 33.)  Johnson suspects that Lunneen wanted to provide him with information relating to narcotics.  (*Id.* at 34.)  Lunneen then rode off on his bicycle.  (Wyss Rep., PageID.1331.)  Wyss initially followed Lunneen but quickly lost sight of him.  (*Id.*)  Wyss then saw Johnson driving by, waived him down, and provided a description of Lunneen.[1]  (*Id.*)

At 1:24 a.m., Eileen Dry, a resident of the Village of Berrien Springs, called 911 about a white, middle-aged, shirtless man running around her home.  (Detail Call for Serv. Rep., ECF No. 100-6, PageID.1347; 911 Call 00:33-00:38, ECF No. 100-7.)  Dry explained that this man had broken her living room window and pushed her air conditioner in.  (911 Call 00:09-00:21.)  Wyss responded to a call from dispatch directing him to Dry's address for a Malicious Destruction of Property ("MDOP") complaint.  (Wyss Rep., PageID.1331.)

Once Wyss arrived, Dry again provided a description of the man.  (Wyss Body Camera Footage 7:46-7:50, ECF No. 81-4.)  Dry first heard the man yelling for help near her home.  (*Id.*

---

[1] BSOTPD and BCSD share concurrent jurisdiction in the overlapping portions of the Village of Berrien Springs-Oronoko Township and Berrien County.  (Johnson Dep. 32-33.)

at 7:53-8:10.)   The man then dug through her recycling bin, punched the sides of her air conditioner, and pushed it into her living room, shattering the glass.  (*Id.* at 8:11-8:32.)  Dry stated she was shaken up by the encounter.  (*Id.* at 10:14-10:16.)  Wyss told Dry, "If this is the same guy I'm thinking of, he had come up to my car sort of spouting off a bunch of nonsense and then rode away on a bicycle."  (*Id.* at 10:27-10:34.)  While speaking with Dry, Wyss saw Lunneen run across the yard of a neighboring house, turn the corner, and head towards the downtown area.  (Wyss Rep., PageID.1331.)  Wyss followed Lunneen on foot and radioed Johnson, informing him of Lunneen's location and direction of travel.  (*Id.*)  Wyss quickly lost sight of Lunneen.  (*Id.*)

Shortly thereafter, Johnson spotted Lunneen while surveilling the area.  (Johnson Rep., ECF No. 100-8, PageID.1352.)  Lunneen approached Johnson's patrol car near the passenger side door and wanted to get in.  (*Id.*)  Johnson stepped out of his patrol car and ordered Lunneen to the front.  (*Id.*)  Although it was only thirty degrees at the time, Lunneen was shirtless, sweating profusely, and had blood on him.  (*Id.*)  Johnson radioed for a paramedic, citing possible excited delirium.  (*Id.*)

Wyss then arrived on the scene.  (Wyss Body Camera Footage 15:00.)  When Wyss asked Lunneen what was going on, he replied:

> Well guys, what's going on is I've been working hard guys and I'm an addict.  *coughing* Right now, it's climaxing.  (inaudible) I'm sorry.  Guys.  HELP! YES! CALL MY PEOPLE HERE TOO! (inaudible)  And uh, I didn't say a word to nobody.  Not a soul.  About anything (inaudible).  I swear to God on my life.  I don't—you guys know.  I know what's happening and you're gonna kill me.  Why?

(*Id.* at 15:36-16:18; Pl.'s Expert Rep. Transcribing Body Camera Footage, ECF No. 57-15, PageID.568.)  Johnson then asked Wyss if he had probable cause to arrest Lunneen, and Wyss responded, "Yeah, I got MDOP."  (*Id.* at 16:21-16:24.)

Johnson and Wyss approached Lunneen to arrest him.  At first, Lunneen appeared compliant by turning around to face Johnson's squad car with his arms slightly behind his back. (*Id.* at 16:26-16:30.)  But then he began backing away from them.  (*Id.* at 16:31-16:55.)  Johnson and Wyss repeatedly instructed Lunneen to put his hands behind his back, to get down on his knees, to stay back, and to stay out of the road.  (Wyss Body Camera Footage 16:32-17:50.)  In response, Lunneen repeatedly exclaimed, "Help!", "Please don't!", and "I'm not the one!" while continuing to move towards the road with his arms swinging around.  (*Id.*; Pl.'s Expert Rep. Transcribing Body Camera Footage, PageID.569-70.)  During this verbal exchange, Johnson had his taser pointed at Lunneen.  (Wyss Body Camera Footage 16:32-17:50.)  After approximately one minute and thirty seconds of verbal instructions, Johnson tased Lunneen, who keeled over, ripped the probes out of his chest, and began running back and forth in the street.  (*Id.* at 17:57-18:02.)  Johnson and Wyss followed Lunneen, again warning him to stop and to stay back.  (*Id.* at 18:03-18:30.)  Wyss then deployed his pepper spray twice, once hitting Lunneen on the side of the head and the second time hitting Lunneen in the face.  (*Id.* at 18:47-18:49.)

Johnson and Wyss proceeded to bring Lunneen to the ground to execute the arrest.  Johnson and Wyss unsuccessfully attempted to use their body weight to pull Lunneen to the ground by his arms.  (Wyss Dep. 71-72.)  Wyss then performed a "leg sweep" to "get [Lunneen's] feet out from underneath him so [they] could lower him to the ground and then execute prone handcuffing." (*Id.*)  Lunneen landed on the ground and grabbed Wyss's leg.  (*Id.* at 74.)  Wyss warned Lunneen to let go of him before applying pressure to Lunneen's mandibular nerve to force him to let go. (*Id.*; Wyss Body Camera Footage 20:05-20:10.)  Wyss testified, and Plaintiff disputes, that Wyss had a gun concealed in his boot at this time, which justified the application of mandibular pressure. (Wyss Dep. 120.)

After moving Lunneen into the prone position, Johnson and Wyss handcuffed him. (Wyss Body Camera Footage 21:02.) Johnson immediately stepped away from Lunneen while Wyss stayed kneeling, holding the handcuffs to prevent an escape. (*Id.* at 21:05.) Plaintiff contends Lunneen remained in a prone or nearly prone position, while Wyss testified that he rolled Lunneen into a "three quarters position." (Johnson Body Camera Footage 8:36; Wyss Dep. 115-16, 121.)

Johnson then noticed Lunneen was having trouble breathing. (Johnson Body Camera Footage 8:03-8:10.) Both Johnson and Wyss are trained in first aid, CPR, and automated external defibrillation. (Wyss Training Records, ECF No. 100-13; Johnson Training Records, ECF No. 100-14.) They are also both trained in administering first aid to those suffering from mental illness. (*Id.*) Wyss says he applied a sternum rub, and Lunneen moaned in response. (Wyss Rep., PageID.1332; Wyss Dep. 87-88.) Plaintiff disputes this assertion, noting that the sternum rub was not captured on the body camera footage, and Lunneen's last audible sound was heard before the handcuffs were secure, not after. (Pl.'s Expert Rep. Transcribing Body Camera Footage, PageID.574.) Johnson radioed dispatch and elevated the request to a priority one, noting that Lunneen was having trouble breathing. (*See* Wyss Body Camera Footage 21:02-21:18; Pl.'s Expert Rep. Transcribing Body Camera Footage, PageID.574.) Johnson and Wyss did not otherwise administer medical care before the paramedic arrived.

The paramedic first drove to where Johnson and Wyss's patrol cars were parked down the road, not where Lunneen was handcuffed. (Johnson Body Camera Footage 9:00.) Johnson radioed dispatch to inform the paramedic of their location and went into the road to flag the paramedic down by waiving his hands, flashing his light, and screaming "Over here!" (*Id.* at 9:00-9:25.) Wyss can also be heard yelling, "Bank parking lot!" (Pl.'s Expert Rep. Transcribing Body Camera Footage, Page ID.575.) Once the paramedic arrived on the scene, he asked Johnson and Wyss to

help Lunneen onto his back and uncuff him.  (Johnson Body Camera Footage 11:28-11:34.) Johnson retrieved the Lund University Cardiopulmonary Assist System ("LUCAS device") from the paramedic's vehicle to begin automated chest compressions while Wyss put on medical gloves. (*Id.* at 12:35-13:01.)  The paramedic then positioned and turned on the LUCAS device.  (*Id.* at 13:34-15:01.)  An ambulance arrived shortly thereafter, and Lunneen was transported to Lakeland Medical Center Emergency Room in St. Joseph, Michigan.

Lunneen was pronounced dead at 2:30 a.m.  (Medical Examiner's Rep. 1, ECF No. 100-15.) The autopsy conducted by Dr. Elizabeth A. Douglas found "multiple abrasions and contusions of the head, trunk, and extremities" as well as 333 ng/mL of methamphetamine in Lunneen's system.  (Postmortem Examination Rep. 3-4, ECF No. 81-6.)  Dr. Douglas ruled the cause of death was excited delirium associated with methamphetamine use.  (*Id.* 3.)  However, Dr. Douglas ruled the manner of death to be indeterminate:

> There is significant debate in the medical community regarding manner of death certification in excited delirium deaths associated with law enforcement intervention. There are reasonable arguments for invoking a manner of death of accident or homicide. In my opinion, for public health and vital statistics purposes, the manner of death is best certified as indeterminate.

(*Id.*)  Lunneen's medical experts dispute Dr. Douglas's cause of death finding and instead opine that Lunneen died of asphyxiation.  (*See* Pl.'s Medical Expert Reps., ECF Nos. 57-3, 57-7, 57-11.)

## II. STANDARD

### A. Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."

*Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).  "Courts consider the evidence in light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."  *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013).

### B. Qualified Immunity

"Qualified immunity is an affirmative defense that protects government officials from liability 'when a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights.'"  *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (quoting *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007)).  Officers are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent."  *Id.*  This legal principle must "clearly prohibit the officer's conduct in the particular circumstances before him."  *Id.* at 590.  Accordingly, "[t]he relevant, dispositive inquiry" under the clearly established prong is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  "'This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"[C]ourts have discretion to decide which of the two prongs of the qualified-immunity analysis to tackle first."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  The plaintiff bears the burden of showing that the officer is not entitled to qualified immunity.  *See LeFever v. Ferguson*, 645 F. App'x 438, 442 (6th Cir. 2016).

## III. ANALYSIS

### A. Excessive Force

#### 1. Constitutional Violation

"The use of excessive force during an arrest is unreasonable and violates the Fourth Amendment." *LaPlante v. City of Battle Creek*, 30 F.4th 572, 579 (6th Cir. 2022) (citing *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015)).  Courts consider the factors laid out in *Graham v. Connor*, 490 U.S. 386 (1989) to "'determin[e] the reasonableness of force used' by a police officer: '(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and [(3)] whether the suspect actively resisted arrest or attempted to evade arrest by flight.'" *Id.* (quoting *Livermore ex. rel. Rohm v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007)).

"These factors are not an exhaustive list because the ultimate question is whether the totality of the circumstances justifies [the] particular sort of seizure that took place." *Id.* (internal citations omitted).  "An officer's use of force 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' given the fact that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Id.* (quoting *Graham*, 490 U.S. at 396-97).  However, "'just because we look at the circumstances through the eyes of a reasonable officer does not mean . . . that we must accept the officers' subjective view of the facts when making this assessment.'" *Id.* (quoting *Jacobs v. Alam*, 915 F.3d 1028, 1041 (6th Cir. 2019)).  "'Rather, the action must be viewed in light of the surrounding circumstances.'" *Id.* (quoting *Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2022)).

"'When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately.'" *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th

Cir. 2020) (quoting *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017)).  "And when, as here, a plaintiff claims that excessive force was used multiple times, 'the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity each step along the way.'"  *Id.* (quoting *Smith*, 874 F.3d at 944).  Plaintiff alleges that Johnson used excessive force by discharging his taser, Wyss used excessive force by spraying his pepper spray, and both Johnson and Wyss used excessive force during the physical takedown and handcuffing of Lunneen.  The Court will address the constitutionality of these actions separately.

### (a) Sergeant Johnson's Use of his Taser

Johnson's use of his taser was reasonable.  Applying the first *Graham* factor, Johnson and Wyss were "justified in deploying some force against" Lunneen because they had probable cause to detain him.  *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013).  Eileen Dry called 911 to report that a man had been running through her yard, broke her window, and pushed her air conditioner into the interior of her home.  Wyss responded to the call and radioed Johnson to provide the description given by Dry.  Johnson identified Lunneen as matching Dry's description—a white, middle-aged, shirtless male.  Johnson alleges that, at the time, he believed Lunneen was suspected of breaking and entering, a felony charge.  (Johnson Dep. 65.)  However, Johnson asked Wyss if he had probable cause before beginning the arrest, and Wyss replied, "Yeah, I got MDOP."  (Wyss Body Camera Footage 16:21-16:24.)  Viewing the facts in the light most favorable to Plaintiff, Johnson and Wyss had probable cause to arrest Lunneen on a misdemeanor MDOP charge not a felony breaking and entering charge.  The severity of the crime weighs in Plaintiff's favor.  However, because Johnson and Wyss had probable cause, they were justified in using *some* force to arrest Lunneen.  This first *Graham* factor cuts both ways.

With respect to the second *Graham* factor, Lunneen posed an immediate threat to himself and potentially to others.  When considering this factor, the Court must "'take into account' that

[Johnson and Wyss] 'had reason to believe that [Lunneen] was either on drugs or mentally unstable and they knew that he was unarmed.'"[2]  *Martin*, 712 F.3d at 958 (quoting *Landis v. Baker*, 297 F. App'x 453, 465 (6th Cir. 2008)).  Even if Lunneen did not pose a threat to Johnson and Wyss, he still posed a potential threat to others and especially to himself.  Lunneen posed a threat to himself when, prior to Johnson's discharge of his taser, he ran into the street where the headlights of a car can be seen approaching and then fading.[3]  (Wyss Body Camera Footage 18:04.)  Also, Lunneen was shirtless, shoeless, and sweating profusely in thirty-degree winter weather.  And he appeared to be under the influence of narcotics, which led Johnson to immediately radio for a medic citing possible excited delirium.

The third *Graham* factor does not weigh in Lunneen's favor because Lunneen was actively resisting arrest.  "Active resistance includes 'physically struggling with, threatening, or disobeying orders.'"  *Rudlaff*, 791 F.3d at 641 (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012)).  "And it includes refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance."  *Id.* (citing *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94, 96-97 (6th Cir. 2012)).  Here, Johnson and Wyss instructed Lunneen to put his hands behind his back, to get down on his knees, to stay back, and to stay out of the road.  In response, Lunneen initially backed away from them slowly and then took off running in a circle with his arms swinging.  (Wyss Body Camera Footage 16:31-17:30.)

---

[2] Both Johnson and Wyss Johnson admit Lunneen did not appear to have a weapon on his person.  (Johnson Dep. 58; Wyss Dep. 45.)

[3] Johnson admitted that only one car could be seen approaching them in the street.  (Johnson Dep. 62-63.)  However, Wyss testified:

> There was one car coming from the north – there's a red light intersection a block south of where at that time of night intoxicated drivers and inattentive drivers will often run that red light.  I've written many tickets and made a lot of OWI arrests, and I was also aware of one accident where a car coming through that intersection had run over pedestrians in there.  So, at any point in time, a vehicle could've come around the corner.  Our concern was to get [Lunneen] out of the street and then continue assessing the situation.

(Wyss Dep. 54.)

To be sure, placing one's hands in the air can indicate both resistance and surrender. *See LaPlante*, 30 F.4th at 580-81; *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006). In *LaPlante*, the Sixth Circuit found a genuine dispute of material fact as to whether the plaintiff's action of raising his hands in the air amounted to active resistance. *LaPlante*, 30 F.4th at 580-81. However, in *LaPlante*, the officers only provided thirty seconds of verbal commands before employing a takedown maneuver, and plaintiff raised his hands *once*, right before the handcuffs went on. *Id.* at 579-80. Here, Johnson and Wyss provided approximately one minute and thirty seconds of verbal commands while Lunneen continuously moved around with his arms flailing. And, immediately before Johnson discharged his taser, Lunneen can be seen running directly towards Johnson with his arms swinging. (Wyss Body Camera Footage 17:53-56.)

"[W]hen a person resists arrest—say, by swinging his arms in the officer's direction, balling up, and refusing to comply with verbal commands—the officers can use the amount of force necessary to ensure submission." *Rudlaff*, 791 F.3d at 643. "[I]t is *not* excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest." *Id.* at 641. Considering the totality of these circumstances, Johnson's deployment of his taser was reasonable and did not violate Lunneen's Fourth Amendment rights.

### (b) Officer Wyss's Use of his Pepper Spray

Wyss's use of his pepper spray was also reasonable. As stated above, Johnson and Wyss had probable cause to arrest Lunneen on a misdemeanor MDOP charge. And both Johnson and Wyss were aware of the threat Lunneen posed to himself and potentially others.

Moreover, Lunneen was continuing to resist arrest when Wyss deployed the pepper spray. Plaintiff argues that the forensic evidence and marks on Lunneen's chest show that the taser was effective. (*See* Pl.'s Expert Dr. Freeman Rep., ECF No. 57-7, PageID.447 ("Both Sergeant Johnson and Officer Wyss claimed in their incident reports that the TASER shock had no effect

on Mr. Lunneen when it was applied, but the claims are belied by the video footage from Officer Wyss's body camera, which clearly show Mr. Lunneen doubling over and grunting as if from pain, before he turns and runs from the police."); *see also* Post Mortem Images, ECF No. 100-16.) However, as stated in Plaintiff's own expert report, "TASERs are designed to incapacitate an individual using painful electric shocks." (Pl.'s Expert Dr. Freeman Rep., PageID.447.)  In *Sheffey v. City of Covington*, 564 F. App'x 783 (6th Cir. 2014), the Sixth Circuit found an officer's second deployment of a taser reasonable in light of the plaintiff's "continued resistance and failure to exhibit signs of neuromuscular paralysis." *Id.* at 791.  Similarly, Lunneen bent over briefly after the initial deployment of the probes, but he did not otherwise exhibit signs of neuromuscular paralysis. (*See* Wyss Body Camera Footage 17:56.)  Rather, Lunneen continued to resist arrest by swinging his arms, running in circles around the street, and refusing commands to stay back. (*Id.* at 17:57-18:42.)  Under these circumstances, Wyss's use of pepper spray was reasonable and did not violate Lunneen's Fourth Amendment rights. *Cf. Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009) ("An officer has used excessive force when he pepper sprays a suspect who . . . is not resisting arrest.").

### (c) The Physical Takedown of Lunneen

Again, as previously explained, Johnson and Wyss had probable cause to arrest Lunneen and reasonably believed Lunneen posed a threat to himself and potentially others.  In light of the totality of the circumstances outlined below, the physical takedown of Lunneen was reasonable.

First, Johnson and Wyss attempted to pull Lunneen to the ground by his arms.  After Wyss deployed the pepper spray, Lunneen can be seen continuing to move away from Johnson and Wyss with his arms raised. (Wyss Body Camera Footage 18:50.)  After Johnson and Wyss attempted to grab his arms to execute the arrest, Lunneen swung his arms and moved in a circle to prevent Johnson and Wyss from grabbing hold of them.  Johnson and Wyss's attempt to pull Lunneen to

the ground by his arms was objectively reasonable considering Lunneen's continued resistance. *Cf. McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013) (finding the use of a takedown maneuver objectively unreasonable when the plaintiff "made no aggressive gestures or statements, attempted to cooperate, offered no resistance, and stated that he would 'go easy'").

After this unsuccessful attempt to pull Lunneen to the ground, Wyss employed a leg sweep. Lunneen weighed 228 pounds and was resisting Johnson and Wyss's attempts to pull him to the ground.  (Postmortem Examination Rep. 7; Wyss Body Camera 18:50-18:56.)  Because Wyss "had a reasonable basis to believe that further force was necessary to control" Lunneen, the use of a leg sweep was reasonable to bring Lunneen to the ground.  *Griffin v. Hardick*, 604 F.3d 949, 955 (6th Cir. 2010); *cf. Solomon v. Auburn Hills Police Dep't.*, 389 F.3d 167, 173 (6th Cir. 2004) (finding officer's attempt to leg sweep arrestee unreasonable when arrestee was not a flight risk, was following orders, and weighed only 120 pounds).

### (d) Subduing Lunneen on the Ground

The Sixth Circuit has held that "putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position *after* being subdued and/or incapacitated constitutes excessive force."  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004).  The Sixth Circuit in *Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013) declined to interpret *Champion* narrowly, and instead explained:

> *Champion* proscribes the use of "substantial or significant pressure" that creates asphyxiating conditions in order to restrain a subject who does not pose a material danger to the officers or others.  That Champion himself was handcuffed when this occurred is incidental to the rule.

*Martin*, 712 F.3d at 961.  Plaintiff's experts Dr. Freeman, Dr. Wohlgelernter, and Dr. Baden all disagree with the findings in Dr. Douglas's autopsy and instead believe Lunneen died of asphyxiation or cardiopulmonary arrest triggered by asphyxiation.  (*See* Pl.'s Expert Dr. Freeman

13

Rep., PageID.455; Pl.'s Expert Dr. Wohlgelernter Rep., ECF No. 57-11, PageID.513; Pl.'s Expert

Dr. Baden, ECF No. 57-3, PageID.391-92.)

A genuine dispute of material fact exists as to whether Johnson or Wyss applied substantial

or significant pressure that created asphyxiating conditions while subduing Lunneen on the ground.

Once Lunneen was on the ground, Johnson and Wyss needed to roll Lunneen into a prone position

to handcuff him.  During this time, Wyss says he applied mandibular pressure to force Lunneen to

let go of his leg.  According to Wyss, Lunneen had grabbed his left leg where his boot gun was

strapped.  (Wyss Dep. 73-74.)  Wyss says he applied mandibular pressure to distract Lunneen and

dislodge his leg.  (*Id.* 74-75.)  Plaintiff challenges Wyss's assertion that he had a boot gun by

pointing out Wyss's failure to include this fact in his post-incident report.  (Pl.'s Joint Resp. in

Opp'n to Defs.' Mot. for Summ. J. 27, ECF No. 98.)  This court "'may not simply accept what

may be a self-serving account by the police officer.'"  *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th

Cir. 2010) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).  Rather, "'it must look at

the circumstantial evidence that, if believed, would tend to discredit the police officer's

story . . . .'"  (*Id.*)  Here, the body camera footage does not capture Wyss's application of

mandibular pressure because of the physical struggle and closeness of body parts to the camera.

Whether Wyss had a boot gun or not, the degree of mandibular pressure and length of time it was

applied is not clear.  Moreover, the body camera footage depicts an officer's hand[4] on Lunneen's

neck before Wyss says, "Let go of me."  (Johnson Body Camera Footage 5:53-6:19.)  Plaintiff's

expert Dr. Freeman suggests that pressure on Lunneen's neck may have contributed to the alleged

asphyxiation.  Dr. Freeman explains:

---

[4] Plaintiff alleges this is Johnson's hand.  (Pl.'s Joint Resp. in Opp'n to Defs.' Mot. for Summ. J. 33.)

> [T]he degree of compression at Mr. Lunneen's neck is reasonably associated with the petechiae observed at autopsy, and as such may have contributed [to] the restraint-related asphyxia forces applied to Mr. Lunneen's body.

(Pl.'s Expert Dr. Freeman Rep., PageID.447.)  When viewing the facts in the light most favorable to Plaintiff, there is a genuine dispute as to whether Wyss or Johnson applied substantial or significant pressure to Lunneen's head or neck while attempting to roll him over to secure the handcuffs.

Plaintiff also claims that Johnson used his body weight to apply pressure to Lunneen's back or torso while in a prone position.  Wyss testified that Lunneen was prone on the ground when they were securing the handcuffs.  (Wyss Dep. 83.)  The body camera footage depicts Johnson straddling Lunneen around the hips before placing the handcuffs.  (Wyss Body Camera Footage 20:34.)  Johnson has at least one knee on the ground while in this straddling position.  (*Id.* at 20:58.)  The body camera otherwise obscures Johnson's actions and the degree of pressure, if any, that Johnson placed on Lunneen's back or torso while in this position.  Dr. Freeman explains that pressure to the back or torso when in a prone position may have also contributed to the alleged asphyxiation:

> Obese individuals with a protruding belly like Mr. Lunneen are at heightened risk of positional asphyxia when in a prone position, due to pressure against the diaphragm by the belly, thus restricting gas exchange in the lungs.  The restraint conditions that Mr. Lunneen was subject to during his arrest have been demonstrated to result in impaired breathing capacity and lung function.

(Pl.'s Expert Dr. Freeman Rep., PageID.445.)  When viewing the evidence in the light most favorable to Plaintiff, a genuine dispute of material fact exists as to whether Johnson applied substantial or significant pressure that created asphyxiating conditions while Lunneen was being handcuffed in a prone position.

Importantly, a jury could infer that Lunneen was no longer actively resisting arrest.  Once on the ground, Johnson and Wyss instructed Lunneen to roll over and give them his hands:

> Wyss:  C'mon, roll over
> Lunneen:  I'm trying
> Johnson:  Roll over
> Lunneen:  Sorry guys
> Lunneen:   Help me please
> . . .
> Lunneen: I fucked up, I'm sorry
> Wyss: C'mon give us your hands
> Lunneen:  Hands off please

(Pl.'s Expert Rep. Transcribing Body Camera Footage, PageID.573.)  Lunneen appears verbally compliant with Johnson and Wyss's instructions.  To be clear, Lunneen might have offered *some* resistance by grabbing Wyss's leg.  But this resistance must be viewed in light of the fact that Lunneen was on the ground with two officers standing or kneeling above him and was verbally compliant.  A question remains as to whether the force used by Johnson and Wyss was "reasonably calculated to neutralize [Lunneen's] resistance" at this point in time.  *Martin*, 712 F.3d at 960.

Finally, beyond the "situational facts" already considered, the Court must "evaluate the officers' use of certain tactics 'in light of testimony regarding the training that [the officers] received.'"  *Id.* (quoting *Griffith v. Coburn*, 473 F.3d 650, 657 (6th Cir. 2007)).  BSOTPD's policy on arrest management requires officers arresting suspects who exhibit "bizarre" behavioral and physical symptoms including paranoia/fear, profuse sweating, and incoherent talking to "avoid chest compression."[5]  (BSOTPD's Policies, ECF No. 100-24, PageID.1554.)  The policy also acknowledges that "[p]rolonged exertion of physical stress can heighten the possibility of sudden death" in such suspects.  (*Id.*, PageID.1553.)  Wyss acknowledged that he knew this policy.  (Wyss

---

[5] Notably, BSOTPD's policy instructs officers to request EMS, attempt to verbally calm the person, and only use force when necessary to gain compliance.  (BSOTPD's Policies, PageID.1553.)  This further supports the reasonableness of Wyss's actions up to the point when Lunneen was on the ground.

Dep. 107-15.)  BCSD likewise has a policy for treating the mentally ill and those under the influence of drugs.  (BCSD's Policies, ECF No. 100-25, PageID.1596.)  Johnson testified he was trained on dealing with suspects under the influence of drugs or exhibiting excited delirium and on the dangers of asphyxia when suspects are placed on their stomach with their hands behind their back.  (Johnson Dep. 18-19, 86, 118.)  Johnson and Wyss's awareness of policies and trainings that "warn[] of the boundaries of appropriate force with respect to the danger of positional asphyxia reinforces the conclusion that their conduct was unreasonable."  *Martin*, 712 F.3d at 960.  In sum, when viewing the evidence in the light most favorable to Plaintiff, a genuine dispute of material fact exists as to whether Johnson and Wyss applied an unreasonable amount of pressure while Lunneen was on the ground before handcuffs were applied.

### (e) Post-Handcuffing Pressure

After placing the handcuffs on Lunneen, Johnson immediately stepped away while Wyss held the handcuffs with one hand.  (Wyss Body Camera 21:01-21:12.)  As established in *Champion* and echoed more recently by the Sixth Circuit, "'creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable force.'"  *Kulpa ex rel. Kulpa v. Cantea*, 708 F. App'x 846, 851 (6th Cir. 2017) (quoting *Champion*, 380 F.3d at 903).

A genuine dispute of material fact exists as to whether Wyss applied substantial or significant pressure while holding Lunneen's handcuffs.  Wyss was holding onto Lunneen's handcuffs at first while standing but later while kneeling with one knee on the ground.  (Johnson Body Camera Footage 8:10-8:54, 9:29-9:33.)  In *Martin*, one officer held the plaintiff down with his hand while another officer held the plaintiff down with his arm after he had been handcuffed.  712 F.3d at 956 n. 1.  The Sixth Circuit found that "how much force was applied and for how long are disputed factual issues a jury must decide."  *Id.*  Similarly, the body camera evidence does not

rule out that Wyss applied substantial or significant pressure while kneeling and holding onto Lunneen's handcuffs.

A genuine dispute of material fact also exists as to whether any application of pressure created asphyxiating conditions.  Plaintiff's expert Dr. Freeman explains:

> [p]ositional asphyxia, in the context of restraint, typically refers to increased difficulty with breathing that is associated with the use of restraint (*i.e.* handcuffs, hobble restraint) that is used on a prone person, but can occur in any position in which a person is forced into a position that limits their ability to breathe.

(Pl.'s Expert Dr. Freeman Rep., PageID.444-45.)  Plaintiff's expert police consultant Jeffrey Noble opines that Lunneen was "laying prone on the ground—more on his left shoulder—and it appears he is in that position due to his large stomach."  (Pl.'s Expert Jeffrey Noble Rep., ECF No. 57-1, PageID.367.)  Wyss testified that he rolled Lunneen into a "three quarters" position.  (Wyss Dep. 84.)  Whether Lunneen remained prone, partially prone, or not prone at all is a question the jury must decide.

### (f) Leaving Lunneen Handcuffed on the Ground

The parties dispute whether leaving a suspect on the ground without any physical pressure is a use of force.  Plaintiffs cite no precedent establishing that such conduct is excessive force. Therefore, Johnson and Wyss are entitled to qualified immunity.

In sum, Johnson's use of his taser, Wyss's use of pepper spray, Johnson and Wyss's physical takedown of Lunneen, and Johnson and Wyss's decision to leave Lunneen on the ground do not amount to excessive force.  However, a genuine dispute of material fact exists as to whether Johnson and Wyss's actions while subduing Lunneen on the ground and Wyss's alleged application of pressure after Lunneen was handcuffed amount to excessive force.

18

### 2. Clearly Established

Lunneen's right to be free from substantial or significant pressure that creates asphyxiating conditions while being restrained on the ground is clearly established.  *Martin*, 712 F.3d at 961. In *Martin*, an individual exhibiting signs of excited delirium while on LSD or acid was running around naked near an apartment complex while speaking nonsensically.  *Id.* at 954.  The Sixth Circuit found that "[a] reasonable officer should have known that subduing an unarmed, minimally dangerous, and mentally unstable individual with compressive body weight, head and body strikes, neck or chin restraints, and torso locks would violate that person's clearly established right to be free from excessive force."  *Id.* at 963; *cf. Wiley v. City of Columbus*, 36 F.4th 661, 669-70 (6th Cir. 2022) (distinguishing *Martin* by emphasizing that officers did not apply compression to the plaintiff's chest).  In *Griffith v. Coburn*, 473 F.3d 650 (6th Cir. 2007), the Sixth Circuit also found that restraining the neck of an unarmed and mentally ill individual during an arrest was unreasonable.  *Id.* at 657.  These cases establish Lunneen's right to be free from significant or substantial pressure being placed on his neck or torso while being subdued on the ground, where that pressure creates asphyxiating conditions.

Lunneen's right to be free of substantial or significant pressure that creates asphyxiating conditions *after* being handcuffed is also clearly established.  The Sixth Circuit in *Champion* found "that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force."  380 F.3d at 903.  BSOTPD's own policies also placed Wyss on notice of this principle from *Champion*. When dealing with suspects exhibiting "bizarre behaviors [and] symptoms," BSOTPD policies require officers to avoid placing such individuals in a prone position and to avoid chest compression.  (BSOTPD's Policies, PageID.1554.)  The Sixth Circuit in *Martin* found that the officers "crossed the line *Champion* drew when they placed their arms on Martin's back to restrain

him after he was handcuffed and prone."  712 F.3d 951, 961.  A genuine dispute of material fact exists as to whether Wyss also crossed the line *Champion* drew.

Because a genuine dispute of material fact exists as to whether Johnson and Wyss's actions while subduing Lunneen on the ground and Wyss's potential application of pressure after Lunneen was handcuffed amount to excessive force in violation of clearly established law, Johnson and Wyss are not entitled to qualified immunity for these uses of force.  However, Johnson and Wyss are entitled to qualified immunity for the other uses of force discussed above.

### B. Denial of Medical Care

"The Fourteenth Amendment requires adequate medical care for persons 'injured while being apprehended by the police.'"  *Hicks v. Scott*, 958 F.3d 421, 438 (6th Cir. 2020) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).  "An injured suspect, however, is only entitled to relief if a government official acts with 'deliberate indifference to [his] serious medical needs.'"  *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  Johnson and Wyss are entitled to qualified immunity on Lunneen's claim of denial of medical care because Defendants did not violate a clearly established right.  Two Sixth Circuit cases are instructive on this issue.

In *Wilkerson v. City of Akron*, 906 F.3d 477 (6th Cir. 2018), the plaintiff argued that the district court erred in granting summary judgment for the officers on a claim of deliberate indifference to a medical need when the officers shot the plaintiff and then did not personally administer medical treatment.  *Id.* at 483.  The Sixth Circuit disagreed and found that "[w]hen police injure a person while apprehending him, they generally satisfy the Fourteenth Amendment by summoning medical care and not intentionally or recklessly delaying his access to it."  *Id.* (citing *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1097-98 (6th Cir. 1992).  The officers in *Wilkerson* called for a medic immediately after the plaintiff was secured and called again minutes later encouraging the medic to "step it up."  *Id.*  Here, Johnson radioed dispatch requesting a medic

due to Lunneen's excited delirium even before Johnson and Wyss attempted to arrest him.  Within thirty seconds of arresting Lunneen, Johnson again radioed dispatch and elevated the request to a priority one, noting that Lunneen was having trouble breathing.  (*See* Wyss Body Camera Footage 21:02-21:18; Pl.'s Expert Rep. Transcribing Body Camera Footage, PageID.574.)  Although Wyss did not personally summon the medic himself, "it would have been reasonable for him to rely on the calls by [Johnson.]"  *Hicks*, 958 F.3d at 439.

The medics in *Wilkerson* also "experienced some delay in parking and struggled with [plaintiff's] handcuffs, but there is no evidence that [the officers] had anything to do with the delay, let alone intentionally so."  *Wilkerson*, 906 F.3d at 483.  Here, the medic initially arrived at the wrong location.  The medic went to the location of the parked patrol cars instead of across the street to where Lunneen had run.  Johnson attempted to correct the mistake by walking into the street, waiving his hands, shining his flashlight, and yelling, "Over here!"  (Wyss Body Camera Footage Wyss 22:22-23:32; Pl.'s Expert Rep. Transcribing Body Camera Footage, PageID.575.)  Wyss can also be heard yelling, "Bank parking lot."  (Pl.'s Expert Rep. Transcribing Body Camera Footage, Page ID.575.)  In short, Johnson and Wyss called for a medic and did not intentionally or recklessly interrupt the arrival of emergency medical care.

In *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834 (6th Cir. 2018), the officers "did not personally perform CPR or provide other medical attention to [plaintiff after shooting him] because they believed that trained medical assistance had been summoned and that their individual intervention would not have helped."  *Id.* at 846.  Similarly, after securing Lunneen and elevating the request for a medic to a priority one, dispatch informed Johnson and Wyss that the medic was "just passing the fairgrounds now."  (Pl.'s Expert Rep. Transcribing Body Camera Footage, PageID.575.)  The fairgrounds were less than a half a mile from their location.  (Wyss Dep. 86.)

21

Johnson testified he believed it would take longer to run to his patrol car, retrieve the medical

equipment, and run back to the scene than it would take for the medic to arrive.  (Johnson Dep.

133.)  The Sixth Circuit in *Stevens-Rucker* found that the officers' actions did not violate the

plaintiff's right to Due Process under the Fourteenth Amendment because:

> An officer is charged with providing a detainee with prompt medical attention.  However,
> this attention does not require the officer to intervene personally.  Imposing an absolute
> requirement for an officer to do so ignores the reality that such medical emergency
> situations often call for quick decisions to be made under rapidly evolving conditions.  As
> long as the officer acts promptly in summoning aid, he or she has not deliberately
> disregarded the serious medical need of the detainee even if he or she has not exhausted
> every medical option.

*Stevens-Rucker*, 739 F. App'x at 846.  Because Johnson and Wyss promptly summoned a medic

and because there is no affirmative duty imposed on officers to personally administer medical care,

Johnson and Wyss did not violate a clearly established right.

The cases cited by Plaintiff that suggest such an affirmative duty are distinguishable.  In

*Greene v. Crawford County*, 22 F.4th 593 (6th Cir. 2022), the plaintiff was suffering from delirium

tremens, a life-threatening complication of alcohol withdrawal.  *Id.* at 598-99.  The Sixth Circuit

denied jail officials qualified immunity when they "did not provide *any* medical assistance" to the

plaintiff for two days other than seeking a medical assessment from a mental health professional.

*Id.* at 615.  In *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005), the officers

beat the plaintiff with a baton, placed him in a head wrap, handcuffed him, sprayed his face with

mace, and continued to beat him before putting him in the back of a squad car.  *See id.* at 599-601.

The officers "viewed [plaintiff] in significant physical distress, yet made no attempt to summon or

provide any medical care until several minutes later, when [one officer] checked on [plaintiff] and

discovered that he was not breathing."  *Id.* at 603.  Unlike the officers in *Greene* and *Owensby*,

Johnson and Wyss promptly summoned medical assistance.  Johnson and Wyss did not violate a

22

clearly established right.  They are entitled to qualified immunity on the denial of medical care claim.

### C. Unconstitutional Conditions of Detainment

Plaintiff brings a claim of unconstitutional conditions of detainment against both Johnson and Wyss.  This claim is duplicative of the excessive force and denial of medical care claims against Johnson and Wyss because it is premised on the same facts and legal theory.  In neither his complaint nor his brief does Plaintiff identify an "unconstitutional condition" that is different from the circumstances at issue in his other constitutional claims, *i.e.*, Defendants' use of force and their deliberate indifference to Lunneen's medical needs.[6]  Plaintiff is seeking recovery for the same constitutional injury under a different name.  Unlike Wyss, Johnson did not address this claim in his brief.  However, because the same logic applies to both Johnson and Wyss, the Court grants summary judgment to both Defendants on this claim.

### D. *Monell Claim*

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that municipalities could be liable under § 1983 for constitutional violations, but they "cannot be liable for the constitutional torts of [their] employees."  *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007).  In other words, "[a] municipality may not be held liable under § 1983 on a *respondeat superior* theory . . . '*solely* because it employs a tortfeasor.'"  *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691 (emphasis in original)).

---

[6] To the extent Plaintiff is referring to the condition of Lunneen lying mostly naked on the cold ground, his claim would fail for a similar reason as the claim of deliberate indifference to Lunneen's medical needs.  Defendants promptly called for medical assistance.  They were not indifferent to his condition.

Plaintiff brings a *Monell* claim against Toliver and Bailey—in both their individual and official capacities—as well as the Village of Berrien Springs-Oronoko Township and Berrien County.  Toliver and Bailey cannot be sued in their individual capacities under *Monell* because *Monell* imposes liability on municipalities, not individuals.  And a *Monell* claim against Toliver and Bailey in their official capacities is construed as a claim against the Village of Berrien Springs-Oronoko Township and Berrien County, respectively.  *Northcott v. Plunkett*, 42 F. App'x 795, 796 (6th Cir. 2002) ("Suing a public official in his official capacity for acts performed within the scope of his authority is equivalent to suing the governmental entity." (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985))).  Accordingly, the Village of Berrien-Springs Oronoko Township and Berrien County are the proper Defendants for this *Monell* claim.

To succeed on a *Monell* claim against a municipality Plaintiff must demonstrate that the alleged federal violation occurred because of a municipal policy or custom.  *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell*, 436 U.S. at 694).  And he must establish that the policy or custom was the "'moving force' behind the deprivation of the plaintiff's rights."  *Powers*, 501 F.3d at 607 (quoting *Monell*, 436 U.S. at 691).  There are four ways a plaintiff can show an illegal policy or custom: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."  *Id.*  Plaintiff's claim relies on the second and fourth ways: ratification by an official with final decision-making authority and the existence of a custom of tolerating unconstitutional conduct through a failure to investigate.[7]

---

[7] Plaintiff also plead a failure to train theory of *Monell* liability.  (Compl. ¶ 174-75.)  However, Plaintiff fails to raise a genuine dispute of material fact on a failure to train theory because he did not mention this theory in his brief.

### 1. Failure to Investigate

Plaintiff alleges that BSOTPD and BCSD "had a custom, policy and practice *against* investigating in-custody deaths for policy or procedure violations." (Pl.'s Joint Resp. in Opp'n to Defs.' Mot. for Summ. J. 73.)   The record evidence plainly indicates otherwise.   BSOTPD and BCSD placed Johnson and Wyss on administrative leave immediately after the incident.   (Wyss Leave Documents, ECF No. 100-18, PageID.1523; Johnson Leave Documents, ECF No. 100-19, PageID.1525.)   The matter was then referred to the Michigan State Police to conduct an independent fact-finding investigation.   (Toliver Dep. 50-51, ECF No. 81-7; Michigan State Police Incident Rep., ECF No. 100-9.)   Both BSOTPD and BCSD conducted an internal investigation while this independent investigation was in progress.   BSOTPD and BCSD reviewed the body camera footage as well as Johnson and Wyss's respective reports and found no violation of their respective internal department policies.   (Toliver Dep. 60-61; Heit Dep. 113-14, ECF No. 100-26.) After finding no initial violation, BSOTPD and BCSD removed Johnson and Wyss from administrative leave.    (Johnson Leave Documents, PageID.1525; Wyss Leave Documents, PageID.1524.)   BSOTPD and BCSD also conducted an internal review of the Michigan State Police report and the Berrien County Prosecutor's memo after their release.   (Toliver Dep. 69; Heit Dep. 111-12.)   Both again found no violations of their respective internal department policies. (*Id.*)   Plaintiff has cited no case law to suggest that reliance on the factual findings of an independent, unbiased agency to conduct an internal review is inadequate under *Monell*.

Moreover, Plaintiff "must show not only that the investigation was inadequate, but that the flaws in this particular investigation were representative of (1) a clear and persistent pattern of illegal activity, (2) which [BSOTPD and BCSD] knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that [BSOTPD and BCSD]'s custom was the cause" of Lunneen's injury and ultimate death. *Thomas v. City of Chattanooga*, 398 F.3d 426, 433

(6th Cir. 2005) (citing *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)).  Even when construing the record in the light most favorable to Plaintiff, there is no evidence of a pattern of inadequately investigating excessive force or denial of medical care claims.  *See id.* at 434; *see also Burgess v. Fischer*, 735 F.3d at 478-79.  Absent a pattern of conduct, Plaintiff's argument "falls prey to the problem of collapsing the municipal liability standard into a *respondeat superior* standard."  *Thomas*, 398 F.3d at 434.  There is also no record evidence demonstrating that BSOTPD and BCSD were deliberately indifferent or that the alleged failure to investigate was in any way causally related to Lunneen's death.  Plaintiff's attempt to establish a custom of tolerating unconstitutional conduct through a failure to investigate fails.

## 2. Ratification by an Official with Final Decision-Making Authority

Ratification does not require a pattern of past misconduct.  *Burgess*, 735 F.3d at 479; *Wallace v. Coffee Cnty.*, 852 F. App'x 871, 878 (6th Cir. 2021).  Plaintiff relies on the "single-act theory" to demonstrate that Bailey and Toliver ratified Johnson and Wyss's conduct by failing to investigate and punish them.  "However, [to succeed] on a single-act theory, a plaintiff must demonstrate that a 'deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question.'"  *Burgess*, 735 F.3d at 479 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).  "Moreover, that course of action must be shown to be the moving force behind or cause the plaintiff's harm."  *Id.*  Here, Sheriff Bailey and Chief Toliver's after-the-fact finding that Johnson and Wyss's conduct did not violate internal policies "did not itself cause or continue a harm against [Lunneen]."  *Id.*  Absent a causal connection between the violation and the ratification, Plaintiff's attempt to rely on the single-act theory fails to establish *Monell* liability.  In sum, Toliver, Bailey, Village of Berrien Springs-Oronoko Township and Berrien County are entitled to summary judgment on the *Monell* claim.

### E. State Law Claims

Finally, Plaintiff brings state law claims of gross negligence against Johnson and Wyss and alleged violations of the Michigan Constitution by Village of Berrien Springs-Oronoko Township, and Berrien County.

#### 1. Gross Negligence

Under Michigan law, government employees are not entitled to immunity from tort liability if their "conduct amounts to gross negligence that is the proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2)(c).  Gross negligence "means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."  *Id.* § 691.1407(8)(a). Johnson and Wyss seek summary judgment on Plaintiff's claim of gross negligence.

"Michigan courts have repeatedly 'rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence.'"  *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 642 (6th Cir. 2013) (quoting *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004)).  In *VanVorous*, the plaintiff alleged that officers were grossly negligent in shooting her husband.  687 N.W.2d at 136-37.  The plaintiff argued that the officers "breached the duty of care they owed to Mr. VanVorous by utilizing excessive force to subdue or control Mr. VanVorous and failing to follow proper police procedure in apprehending him."  *Id.* at 483.  The court rejected Plaintiff's argument and found that "plaintiff's claim of gross negligence is fully premised on her claim of excessive force."  *Id.*

A portion of Plaintiff's gross negligence claim is premised on Johnson and Wyss's intentional actions.   Plaintiff claims that Johnson and Wyss owed Lunneen:

> the duty to refrain from using deadly force until they had exhausted all other reasonable
> means of effecting his detainment and/or arrest.

(Compl. ¶ 192, ECF No. 1.)[8]  According to Plaintiff, Johnson and Wyss's alleged breaches of this duty constitute gross negligence.  In *Blowers v. City of Battle Creek*, No: 1:21-cv-376, 2022 WL 109937 (W.D. Mich. Jan. 12, 2022), the plaintiff also alleged an officer was grossly negligent by breaching various duties including "the duty to exhaust all reasonable alternatives before using deadly force" and "the duty to exercise restraint in difficult situations . . . when handling citizens with mental disabilities."  *Id.* at *13.  This Court found that the officer's alleged failure "to refrain from using deadly force do[es] not alter the intentional nature of his conduct."  *Id.*; *see also Latits v. Phillips*, 826 N.W.2d 190, 196 (Mich. Ct. App. 2012) ("[T]he claim that defendant failed to appreciate that [the plaintiff] did not pose a risk of harm may have some bearing on whether defendant made the proper decision to shoot, but it does not alter the fact that it was an intentional decision to shoot.  Similarly, any failure to follow procedures would potentially be relevant to the correctness of the decision to shoot, but not whether that decision was intentional.").  Here, Johnson and Wyss's decision not to use alternative means to arrest Lunneen bears on the reasonableness of Johnson and Wyss's uses of force, but it does not change the intentional nature of their actions.  This portion of Plaintiff's claim is barred by *VanVorous* because it relies on intentional actions, not negligence.

In his response brief, Plaintiff also points to Johnson and Wyss's actions in denying Lunneen medical care as an alternative basis to support a finding of gross negligence.  In general, "[a] non-moving party may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion."  *Tucker v. Union of Needletrades, Indus. & Textile Emp.*, 407

---

[8] Plaintiff re-asserts similar duties in his response brief:

> Plaintiff alleged Wyss owed [Lunneen] a duty to act prudently and with reasonable care, to take reasonable available measures to abate or reduce the risk of serious harm, and to use alternative means to apprehend [Lunneen] (including the use of de-escalation tactics) . . . .

(Pl.'s Joint Resp. in Opp'n to Defs.' Mot. for Summ. J. 77.)

F.3d 784, 788 (6th Cir. 2005).  To permit a non-moving party to raise new theories or claims, "generally 'subjects a defendant to unfair surprise, because the defendant had no opportunity to investigate the claim during discovery.'"  *Davis v. Echo Condo. Ass'n*, 945 F.3d 483, 496 (6th Cir. 2019) (quoting *M.D. ex rel. Deweese v. Bowling Green Indep. Sch. Dist.*, 709 F. App'x 775, 778 (6th Cir. 2017)).  However, Plaintiff did not subject Johnson or Wyss to unfair surprise.  To be clear, Plaintiff did not rely on this theory of gross negligence in his complaint.  But the factual "parameters" of Plaintiff's § 1983 claim and attendant state law claims remain the same at the summary judgment stage as they were when Plaintiff filed his complaint. *See Bard v. Brown Cnty.*, 970 F.3d 738, 750 (6th Cir. 2020); *cf. Vonderhaar v. Waymire*, 797 F. App'x 981, 990 (6th Cir. 2020) (explaining that, in response to defendant's motion for summary judgment, the plaintiff could not expand a claim "to include theories of recovery that bore no resemblance whatsoever . . . to the theory raised in her complaint").  Johnson and Wyss have had the opportunity to factually develop the claim of denial of medical care during discovery.  Accordingly, Plaintiff does not seek to "expand [his] claims to assert new theories" in response to Johnson and Wyss's motions for summary judgment. *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007).

Johnson and Wyss's alleged denial of medical care is "an alternative basis for the [gross negligence] claim that does not rely on an intentional, offensive touching."  *Bell v. Porter*, 739 F. Supp. 2d 1005, 1015 (W.D. Mich. 2010); *see also Kindl v. City of Berkley*, 798 F.3d 391 (6th Cir. 2015).  Plaintiff argues that Johnson and Wyss's decision "to leave [Lunneen] lying face-down and naked on the cold ground" and to not "provide basic life-saving resuscitation measures" constitutes gross negligence.  (Pl.'s Joint Resp. in Opp'n to Defs.' Mot. for Summ. J. 77-78.)  The merits of this claim, including proximate cause, have not been addressed by Johnson and Wyss in

their respective reply briefs.  Accordingly, the Court will not dismiss this aspect of Plaintiff's gross negligence claim.

### 2. Violations of the Michigan Constitution

Plaintiff seeks monetary damages against Berrien Springs-Oronoko Township and Berrien County for violations of the Michigan Constitution.  Plaintiff may not seek monetary damages for violations of the Michigan Constitution when other remedies are available.  *See Jones v. Powell*, 612 N.W.2d 423, 426-427 (Mich. 2000).  Here, there are other remedies available because, "[a] plaintiff may sue a municipality in federal or state court under 42 U.S.C. § 1983 to redress a violation of a federal constitutional right."  *Id.* at 427.  Further, "a plaintiff may bring an action against an individual defendant under § 1983 and common-law tort theories."  *Id.*  Unlike Berrien Springs-Oronoko Township, Berrien County did not address this claim in its brief.  However, because Plaintiff has conceded that he improperly seeks monetary damages against the municipalities for violations of the Michigan Constitution, the Court grants summary judgment as to both Berrien Spring-Oronoko Township and Berrien County on this claim.  (*See* Pl.'s Joint Resp. in Opp'n to Defs.' Mot. for Summ. J. 79.)

### IV. CONCLUSION

For the reasons stated above, the Court will grant in part and deny in part summary judgment to Johnson and Wyss on the excessive force claim.  The Court will grant summary judgment to Defendants Johnson and Wyss on the denial of medical care and unconstitutional conditions of detainment claims.  The Court will deny summary judgment to Johnson and Wyss on the state law claim of gross negligence.  The Court will also grant summary judgment to

Defendants Berrien Spring-Oronoko Township and Berrien County on the *Monell* and Michigan constitutional claims.


Dated: November 1, 2022                                    /s/ Hala Y. Jarbou
                                                                          HALA Y. JARBOU
                                                                          CHIEF UNITED STATES DISTRICT JUDGE